# Exhibit A

11:02:18

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              -   -   -

4   REALTEK SEMICONDUCTOR CORP.,      )      Civil Action
                                      )
5              Plaintiff,             )
                                      )
6         v.                          )
                                      )
7   AVAGO TECHNOLOGIES GENERAL IP     )
    (SINGAPORE) PTE, LTD.,            )
8                                     )
               Defendant.             )      No. 17-1114-GMS
9
                               -   -   -
10
    REALTEK SEMICONDUCTOR CORP.,      )      Civil Action
11                                    )
               Plaintiff,             )
12        v.                          )
                                      )
13  BROADCOM CORP.,                   )
                                      )
14             Defendant.             )      No. 17-1115-GMS

15                             -   -   -

16                      Wilmington, Delaware
                     Tuesday, December 19, 2017
17                         11:00 a.m.
                     Telephone Conference
18
                               -   -   -
19

20  BEFORE:   HONORABLE GREGORY M. SLEET, Senior Judge,
                                    U.S. District Court,
21                                  District of Delaware

22

23

24

25

```
 1    APPEARANCES:

 2           PHILIP A. ROVNER, ESQ., and
             JONATHAN A. CHOA, ESQ.
 3           Potter Anderson & Corroon LLP
                      -and-
 4           STEVEN BAIK, ESQ., and
             ANDREW T. LANGFORD, ESQ.
 5           Sidley Austin LLP
             (Palo, Alto, CA)
 6
                             Counsel for Plaintiff
 7
             JEFFREY T. CASTELLANO, ESQ.
 8           Shaw Keller LLP
                      -and-
 9           BRUCE S. SOSTEK, ESQ., and
             RICHARD L. WYNNE, JR., ESQ.
10           Thompson & Knight LLP
             (Dallas, TX)
11
                             Counsel for Defendant Realtek
12
                             -  -  -
13

14
```

11:02:30  15          THE COURT:  Good morning, counsel.  Who is on

11:02:31  16   the line for Realtek?

11:02:34  17          MR. ROVNER:  Good morning, Your Honor.  It's

11:02:35  18   Phil Rovner and Jonathan Choa from Potter Anderson.  With me

11:02:39  19   on the line is Steven Baik and Andrew Langford from Sidley &

      20   Austin.

11:02:53  21          THE COURT:  Good morning.

11:02:56  22          For Broadcom?

11:03:00  23          MR. CASTELLANO:  Good morning, Your Honor.  Jeff

11:03:02  24   Castellano with Shaw Keller, on the line for Broadcom and

11:03:07  25   Avago.  Also on the line my co-counsel, Bruce Sostek and

11:03:11  1    Rich Wynne from Thompson & Knight.

11:03:14  2             THE COURT:  Good morning.  Thank you for the

11:03:32  3    time this morning.  Counsel, I think I previewed the purpose

11:03:37  4    of the call.  It's to discuss the motion to dismiss.  Is it

11:03:49  5    Avago?  How do you pronounce that?  Why don't we get

11:04:01  6    started.  Mr. Sostek, I see your name.  Are you going to

11:04:04  7    handle this?

11:04:05  8             MR. SOSTEK:  Actually, Mr. Wynne is going to

11:04:07  9    start, Your Honor.  If you have questions for me directly, I

11:04:10  10   will be happy to answer them.

11:04:12  11            THE COURT:  I only called on you because in the

11:04:14  12   brief I saw you name first.

11:04:17  13            Mr. Wynne.

11:04:18  14            MR. WYNNE:  Yes, Your Honor.

11:04:21  15            THE COURT:  You have the floor.

11:04:23  16            MR. WYNNE:  So with respect to Avago, we believe

11:04:28  17   that the case should be dismissed for two reasons.  One,

11:04:35  18   there is no subject matter jurisdiction over Avago.

11:04:40  19   Therefore, it should be dismissed under Rule 12(b)(1).

11:04:45  20   There is no dispute, there is no diversity jurisdiction

11:04:48  21   here.  And with respect to federal question jurisdiction, in

11:04:54  22   particular, Realtek has asserted that there is jurisdiction

11:05:01  23   under the patent law.  The case law that we have cited in

11:05:06  24   our briefs going back, the Supreme Court cases, going back a

11:05:11  25   hundred years, establish that claims arising out of an

Case 2:16-cv-02515-NGS Document 164 Filed 03/28/24 Page 5 of 178 Page ID #:7442

11:05:16    1    alleged breach of a patent license agreement do not arise

11:05:20    2    under the patent laws.

11:05:26    3        In fact, Your Honor's prior rulings in the

11:05:29    4    Mattel case that we cited in our briefs show that --

11:05:32    5        THE COURT: I don't know, counsel. The other

11:05:34    6    side says that was wrongly decided. I am not sure you want

11:05:37    7    to rely on that. But go ahead.

11:05:42    8        MR. WYNNE: I appreciate that, Your Honor. But

11:05:48    9    this is one that I think is a little bit telling.

11:05:52    10        If you look at the complaint in the Avago

11:05:55    11    matter, the cover page included both Avago and Broadcom

11:06:01    12    together. And then when you get to the substance of the

11:06:05    13    complaint, it's only against Avago.

11:06:11    14        So it's clear that somebody from Realtek figured

11:06:14    15    out that there was no subject matter jurisdiction because of

11:06:18    16    the lack of diversity and decided, we are just going to file

11:06:24    17    two separate lawsuits.

11:06:26    18        The problem is, of course, that with respect to

11:06:30    19    Avago, that the filing of the separate lawsuit doesn't cure

11:06:36    20    the jurisdiction problem because you have aliens on both

11:06:41    21    sides of the V, and therefore there is no diversity.

11:06:46    22        I think the case law is pretty clear. The only

11:06:52    23    real argument that Realtek advanced in their opposition was

11:06:57    24    that under the ABB case from the Federal Circuit, that if

11:07:04    25    you have a declaratory judgment action, you look to the

11:07:08   1    hypothetical course of pleading that the DJ defendant would

11:07:14   2    file as an affirmative case.

11:07:18   3            In that particular case, the DJ plaintiff was

11:07:24   4    asserting noninfringement, and therefore the course of

11:07:29   5    pleading would be a claim for patent infringement.

11:07:32   6    Therefore, that would arise under federal law.

11:07:36   7            Here there is no allegation of noninfringement

11:07:45   8    by Realtek.  There is no allegation of invalidity by

11:07:51   9    Realtek.  There is only an allegation of license.

11:07:54   10           And the hypothetical course of pleading, then,

11:07:59   11   would be one of non-license, which, of course, would be a

11:08:04   12   state law claim itself.

11:08:06   13           We think for that reason the ABB case is

11:08:12   14   inapplicable and that there is no subject matter

11:08:15   15   jurisdiction.

11:08:17   16           Now, we have also pleaded a 12(b)(6) motion with

11:08:28   17   respect to the timing of the acquisition of Broadcom.  As

11:08:36   18   made clear in our papers in this argument, together, for

11:08:42   19   both the Avago case and the Broadcom case, ███████████████

11:08:49   20   ████████████████████████████████████████████████████████

11:08:52   21   ████████████████████████████████████████████████████

11:09:02   22   █████████████████████████████████████████████████████████

11:09:08   23   ████████████████████████████

11:09:12   24           Prior to that time, Avago's ultimate parent

11:09:19   25   company, Avago Technologies, Ltd. and Broadcom had announced

| 11:09:24 | 1 | that they were planning a transaction to be completed in |
| 11:09:33 | 2 | 2016 by which Avago Technologies, Ltd. would acquire |
| 11:09:41 | 3 | Broadcom Corporation. |
| 11:09:44 | 4 | With knowledge that this transaction was going |
| 11:09:47 | 5 | to occur in the future, Realtek ███████████ |
| 11:09:52 | 6 | ████████████████████████████████████ |
| 11:09:58 | 7 | ██████████████████ So in light of that, we believe |
| 11:10:04 | 8 | that there really is no dispute, at least I don't think |
| 11:10:09 | 9 | there is a dispute, about the date of the transaction, |
| 11:10:14 | 10 | because all of the filings by both Broadcom and Avago |
| 11:10:21 | 11 | Technologies, Ltd. with the SEC establish that that |
| 11:10:24 | 12 | transaction occurred on February 1st, 2016, ██████ |
| 11:10:32 | 13 | ████████████████████████████████████ |
| 11:10:36 | 14 | ███████████████ |
| 11:10:40 | 15 | In light of that, and ██████████ |
| 11:10:43 | 16 | ██████████████████████ we believe |
| 11:10:50 | 17 | that there is no basis for Realtek to assert that its |
| 11:10:56 | 18 | licensed to patents owned by Broadcom -- and it's been owned |
| 11:11:03 | 19 | by Broadcom since ████████████████████ |
| 11:11:07 | 20 | and before the date anybody was even talking about an |
| 11:11:12 | 21 | acquisition by Avago Technologies at Broadcom -- |
| 11:11:16 | 22 | In light of that, we believe the case should |
| 11:11:20 | 23 | also be dismissed under Rule 12(b)(6). |
| 11:11:25 | 24 | THE COURT: Thank you. |
| 11:11:26 | 25 | Who is going to address this for the other side? |

| 11:11:32 | 1 | MR. ROVNER:  Steve Baik is going to handle it. |
| 11:11:36 | 2 | THE COURT:  Thanks, Mr. Rovner. |
| 11:11:37 | 3 | Mr. Baik. |
| 11:11:38 | 4 | MR. BAIK:  Good morning, Your Honor.  Let me |
| 11:11:40 | 5 | address the 12(b)(6) issue first.  That is really at the |
| 11:11:47 | 6 | crux of both the Avago and Broadcom motion to dismiss. |
| 11:11:52 | 7 | The issue isn't so much about timing as to |
| 11:11:56 | 8 | whether Broadcom was ███████████████████  You need |
| 11:12:03 | 9 | to look further into the agreement as to ██████████████ |
| 11:12:06 | 10 | ████████████  Your Honor. |
| 11:12:08 | 11 | ████████████████████████████████as |
| 11:12:11 | 12 | cited by counsel for Avago ██████████████████████ |
| 11:12:17 | 13 | ████████████████████████████████ |
| 11:12:24 | 14 | ████████  The crux of their argument, in both motions to |
| 11:12:27 | 15 | dismiss, is that Avago Technologies, Ltd. acquired Broadcom |
| 11:12:33 | 16 | and they point to the SEC filings as evidence of that, |
| 11:12:38 | 17 | number one, that these filings were prospective.  There is |
| 11:12:41 | 18 | no evidence to indicate that whatever fact was laid out in |
| 11:12:45 | 19 | the merger plan agreement actually took place. |
| 11:12:48 | 20 | But the merger plan agreement also says that |
| 11:12:51 | 21 | it's contrary to their main argument, that Avago required |
| 11:12:56 | 22 | Broadcom. |
| 11:12:57 | 23 | In fact, the SEC filing, the February 1st, 2016 |
| 11:13:01 | 24 | filing said Holdco, a different entity, acquired Avago.  So |
| 11:13:09 | 25 | we have a third entity acquired Avago.  Then it says in |

11:13:13   1   summation, after all the transaction is done, Holdco owns

11:13:19   2   indirectly Avago as a subsidiary, a direct subsidiary, and

11:13:24   3   Broadcom as an indirect subsidiary.

11:13:27   4           They paint a picture that says, you know, Avago

11:13:30   5   acquired Broadcom, and that's probably just street talk from

11:13:34   6   press releases, the corporate attorneys say -- they want to

11:13:38   7   spin transactions different ways.  But if you look at the

11:13:41   8   nitty-gritty, that is not exactly what happened.

11:13:44   9           We have been asking repeatedly if you can show

11:13:47  10   us very clearly where Avago directly acquired Broadcom, we

11:13:54  11   would look at that and we would prepare our action.   In

11:13:58  12   fact, we sent in a request for admissions that says please

11:14:04  13   admit that Avago did not directly acquire Broadcom.  Rather

11:14:08  14   than giving any kind of answer or denial, they just said we

11:14:13  15   didn't understand what the term directly means and we are

11:14:16  16   not going to answer your RFP.

11:14:18  17           That goes to the point, we pled a very plausible

11:14:23  18   case here, Your Honor.  They pointed to facts outside the

11:14:28  19   complaint to say, our complaint somehow is deficient, when

11:14:33  20   we are taken to task of buttressing that, we get no

          21   response.

11:14:39  22           We believe we have a proper complaint and should

11:14:41  23   be able to move forward.

11:14:43  24           On the jurisdictional issue, there are two

11:14:48  25   things, Your Honor.  First, there is declaratory judgment

| 11:14:52 | 1 | jurisdiction. There is a pending case by Broadcom against |
| 11:14:59 | 2 | one of Realtek's customers alleging infringement based upon |
| 11:15:05 | 3 | Realtek's chip. That is a patent infringement matter. |
| 11:15:08 | 4 | So by us asserting a license here, the |
| 11:15:12 | 5 | declaratory judgment is based upon, one, the underlying |
| 11:15:18 | 6 | action in the ITC, and to stop them from suing us or any of |
| 11:15:24 | 7 | our customers in the future. That is specifically a federal |
| 11:15:27 | 8 | question that falls within declaratory judgment |
| 11:15:31 | 9 | jurisdiction. |
| 11:15:32 | 10 | With regard to the broader issue, yes, we |
| 11:15:36 | 11 | haven't danced around the issue that there is no diversity |
| 11:15:41 | 12 | jurisdiction as to Avago. Everybody agrees there is |
| 11:15:43 | 13 | diversity as to Realtek and Broadcom. As to Realtek and |
| 11:15:48 | 14 | Avago, we agree there is no diversity jurisdiction as of the |
| 11:15:51 | 15 | moment. |
| 11:15:52 | 16 | However, the underlying dispute is a breach of a |
| 11:15:57 | 17 | patent agreement. And cases have held that a breach of a |
| 11:16:01 | 18 | patent agreement can raise a federal question, but that |
| 11:16:08 | 19 | would confer federal subject matter jurisdiction. One |
| 11:16:10 | 20 | example would be if I am a licensee -- |
| 11:16:12 | 21 | THE COURT: Let me help you focus your argument |
| 11:16:15 | 22 | a little bit in the interests of time, Mr. Baik, not because |
| 11:16:23 | 23 | of pride of authorship or anything like that. I disagree |
| 11:16:27 | 24 | with your motion that Mattel was wrongly decided. You are |
| 11:16:32 | 25 | not surprised to hear that, I am sure. It could have been |

otherwise. I will say it could have been otherwise. I have been convinced in the past that maybe I should consider a ruling at one time or another. I have done that many times. This is not one of them. I want you to keep that in mind in your discussion.

MR. BAIK: Sure. Let me do my best to try to persuade you that this is a unique set of facts that should be addressed. Going back to the example where a breach of patent license agreement can confer federal jurisdiction, if I am a licensee and I stopped paying royalties on a product because I say it's no longer practicing any of those licensed patents, there would be issues about whether there was infringement or not and that would confer federal subject matter jurisdiction.

Very similar here, the bargain for rights in this patent license agreement is not to be sued. Now, a patent complaint can only be brought in a Federal District Court. It can't be brought in a State Court. What I am asking for is an injunction of Avago and Broadcom from suing me in Federal Court. That is my ultimate right that I bargained for in the patent license agreement.

If there is a breach of it because they are threatening to or they have gone ahead and sued us or a customer in federal court, what is my recourse? My recourse, I have to bring it in state court, according to

11:18:07  1   them.  State Court can't stop them from going to Federal

11:18:13  2   Court because of the supremacy issue.  I am left with no

11:18:17  3   recourse other than going to the state court and seeking

11:18:21  4   damages.

11:18:25  5          If they are threatening to go out and sue me in

11:18:27  6   Federal Court, I can't go anywhere.  We bring forth the

11:18:37  7   theory that because of that, and this Court is the only

11:18:41  8   Court that can give us any kind of relief, that can give us

11:18:45  9   the right we bargained for, must raise a federal question.

11:18:48  10         THE COURT:  Sounds nice when you say it fast,

11:18:52  11  counsel.  I am not sure I believe in your argument.  I will

11:18:54  12  let the other side respond.  I want to let you finish your

11:19:00  13  presentation.

11:19:03  14         Mr. Baik.

11:19:04  15         MR. BAIK:  Your Honor, I am done for now, unless

11:19:10  16  you have questions of the other side.

11:19:11  17         THE COURT:  Mr. Wynne.

11:19:13  18         MR. WYNNE:  Your Honor, just briefly.  I

11:19:17  19  respectfully disagree with that.  I think if the concern was

11:19:23  20  that there was a violation of the license agreement and that

11:19:29  21  the products at issue in the ITC case were licensed, I think

11:19:36  22  the proper thing to do would have been for Realtek to assert

11:19:41  23  that license and defense in the ITC or seek to intervene in

11:19:47  24  the ITC action to present that defense.  They didn't do

11:19:52  25  that.  They filed this collateral action in this Court,

11:19:58  1    seeking to -- seeking whatever rights they are seeking in

11:20:08  2    this particular case.

11:20:10  3             They wouldn't be without remedy, as Mr. Baik

11:20:16  4    suggests.  They certainly had the opportunity to present the

11:20:22  5    license issues in the ITC, but they chose not to do that.

11:20:28  6             I don't think that their tactical decision to

11:20:35  7    prefer one forum over another is sufficient to confer this

11:20:39  8    Court with federal jurisdiction.

11:20:43  9             MR. BAIK:  Your Honor, if I can respond to that?

11:20:45  10             THE COURT:  You can.  It's your motion, Mr.

11:20:48  11    Wynne, I will give the last word.

11:20:49  12             Mr. Baik, go ahead.

11:20:51  13             MR. BAIK:  With regard to that, there was a

11:20:54  14    suggestion that we could have brought this claim in the ITC.

11:20:58  15    That is incorrect.  The ITC does not have jurisdiction --

11:21:01  16             THE COURT:  Does it matter for purposes of this

11:21:04  17    Court's consideration of whether it has jurisdiction?  We

11:21:08  18    are courts of limited jurisdiction.  Does it matter whether

11:21:11  19    you have remedy in the ITC for purposes of my analysis?

11:21:14  20             MR. BAIK:  I understand, Your Honor.  I do want

11:21:16  21    to point out, if we had brought a counterclaim in the ITC,

11:21:21  22    it would have been removed back to the District Court.

11:21:23  23             THE COURT:  But we need to stop dancing around

11:21:27  24    what your action is, Mr. Baik.  That is, it's an action for

11:21:31  25    contract, for breach of contract.  That's what it is.  You

| | | |
|---|---|---|
| 11:21:35 | 1 | plead three California state law claims.  This is not a case |
| 11:21:39 | 2 | that's dependent upon a substantial question of patent law. |
| 11:21:42 | 3 | And it essentially doesn't arise under 1331.  I am just at a |
| 11:21:48 | 4 | loss as to why this case is here in the first place.  I |
| 11:21:51 | 5 | think you made a tactical judgment or mistake, quite |
| 11:21:55 | 6 | frankly, in filing it here.  Regardless of that, I don't |
| 11:21:57 | 7 | want you to have to dial up your malpractice carrier.  That |
| 11:22:02 | 8 | is my view. |
| 11:22:02 | 9 | Again, I don't know why you are here, quite |
| 11:22:08 | 10 | frankly.  You shouldn't be here.  So you are not going to be |
| 11:22:12 | 11 | here.  I am going to dismiss the case.  Okay? |
| 11:22:17 | 12 | Anything else? |
| 11:22:20 | 13 | MR. BAIK:  The Avago case but not the Broadcom |
| 11:22:25 | 14 | case? |
| 11:22:26 | 15 | THE COURT:  I am dismissing both actions, yes. |
| 11:22:30 | 16 | Anything further? |
| 11:22:33 | 17 | MR. BAIK:  One last point.  Not to draw your ire |
| 11:22:37 | 18 | any further. |
| 11:22:37 | 19 | THE COURT:  Then don't go there.  If you don't |
| 11:22:40 | 20 | want to draw my ire, don't go there.  I have ruled. |
| 11:22:46 | 21 | Are you looking for some further clarification? |
| 11:22:51 | 22 | MR. BAIK:  No, Your Honor.  Not at this time. |
| 11:22:52 | 23 | THE COURT:  Have a good holiday, gentlemen. |
| 11:22:55 | 24 | Take care. |
| 11:22:56 | 25 | (Matter concluded at 11:23 a.m.) |

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| REALTEK SEMICONDUCTOR CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-1114-GMS |
| | ) | |
| AVAGO TECHNOLOGIES GENERAL IP (SINGAPORE) PTE. LTD., | ) | |
| | ) | |
| Defendant. | ) | |

|  |  |  |
|---|---|---|
| REALTEK SEMICONDUCTOR CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-1115-GMS |
| | ) | |
| BROADCOM CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

During a teleconference held on December 19, 2017, the court ordered dismissal of the above-captioned actions. The court having reviewed the parties' contentions, the standard of review, and the applicable law;

IT IS HEREBY ORDERED that C.A. No. 17-1114-GMS and C.A. No. 17-1115-GMS are dismissed.[1]

Dated: December _19_, 2017

UNITED STATES DISTRICT JUDGE

---

[1] This Order renders Avago Technologies' Motion to Dismiss for Failure to State a Claim (D.I. 9) and Motion for Rule 11 Sanctions (D.I. 28) filed in C.A. No. 17-1114-GMS moot. This Order also renders Broadcom's Motion to Dismiss for Failure to State a Claim (D.I. 9) and Motion for Rule 11 Sanctions (D.I. 29) filed in C.A. No. 17-1115-GMS moot.

# Exhibit C

**EIP Europe LLP**
**Broadway Office**
**Breite Straße 29-31**
**40213 Düsseldorf**
**Germany**

**T +49 (0)211 9595 8500**
**F +49 (0)211 9595 8544**

**dusseldorf@eip.com**
**eip.com/litigation**

**Geschwärzte Fassung der Replik vom 25. Oktober 2024**



**Lawyers**
Dr. Christof Höhne, LL.M.[1]
Florian Schmidt-Bogatzky, LL.M.[2]
Isabelle Schaller
Dr. Sebastian Fuchs
Dimitri Kosenko
Shi-Hwa Chae
Maximilian Häger

**Patent attorney**
Felix Hütt[3]

<u>Per beA</u>

Munich Regional Court
7th Civil Chamber
Lenbachplatz 7
80333 Munich

**We provide lawyer to lawyer services in accordance with § 195 para. 1, sentence 1 ZPO.**

Florian Schmidt-Bogatzky, LL.M.
fschmidtbogatzky@eip.com
+49 211 9595 8509

Dimitri Kosenko
dkosenko@eip.com
+49 211 9595 8514

Our reference: 556.LM(DE)17

October 25, 2024

### R EPL I K (technology)

#### - Contains confidential information -

In matters of

<u>7 O 4992/24</u>

**Avago Technologies International Sales Pte. Limited**                    (EIP)

- **applicant** -

g o v e r

**Tesla Germany GmbH et al.**                    (Quinn Emanuel)

- **Defendant** -

we respond below to the statement of defense dated August 12, 2024. Contrary to the defendant's assertions, the patent in suit is both infringed and legally valid. The

**Bath** +44
(0)1225 337 843

**Cardiff** +44
[0)29 2023 0509

**Denver*** +1
720-845-6065

**Düsseldorf** +49
[0)211 9595 8500

**Leeds** +44
[0)113 245 7981

**London** +44
[0)20 7440 9510

**Stockholm**** +46
(0)8 502 461 11

EIP Europe LLP is r e g i s t e r e d  as a Limited Liability Partnership (LLP) under registration number OC345900 at Company House in England and Wales. Registered office: Fairfax House, 15 Fulwood Place, London WC1V 6HU; VAT/USt. No. 971 9863 6398. EIP Europe LLP, Düsseldorf is registered as a German branch office in the partnership register of the Essen Local Court under the number PR 3062. 1Specialist lawyer for intellectual property law. 2Attorney-at-Law (New York). 3Patent attorney, European Patent Attorney. *Office of EIP US LLP. ** Office of EIP Sweden AB. Tax number 13357091153. USt id. DE296698734.

EIP Europe LLP                                                                 page 2
Replica (technology) dated October 25,
2024

Claims are accordingly justified. The plaintiff is (naturally) also entitled to bring an action.

Some of the information highlighted below in this pleading ███ was already classified as confidential pursuant to the resolution of August 13, 2024.
§ Section 16 (1) GeschGehG. The information in recitals 125 to 134 relates to the plaintiff's contracts with third parties and the current status of negotiations between the parties. This information is not yet covered by the aforementioned decision. However, it is equally confidential information that requires secrecy within the meaning of §§ 16 para. 1, 2 no. 1 GeschGehG. In order to protect this information, which is not yet covered by the aforementioned resolutions, we therefore request the following:

1.      **The information highlighted in gray in paragraphs 125 to 134 of this pleading is classified as confidential.**

2.      **The parties, their legal representatives, witnesses, experts, other representatives and all other persons who are involved in the present proceedings or who have access to documents of such proceedings must treat the information classified as confidential in accordance with Section 1 as confidential and may not use or disclose it outside of court proceedings unless they have gained knowledge of it outside of the proceedings. These obligations shall continue to apply after the conclusion of the court proceedings. This shall not apply if the court in the main proceedings has denied the existence of the trade secret in dispute in a final judgment or as soon as the information in dispute becomes known or readily accessible to persons in the circles that normally deal with such information.**

3.      **If the duty of confidentiality is culpably breached, a fine of up to EUR 100,000.00 - in the event that the fine cannot be collected, alternatively imprisonment for up to six months - shall be imposed on the obligated party for each breach or imprisonment for up to six months shall be imposed and enforced immediately.**

EIP Europe LLP                                                                                           page 3
Replica (technology) dated October 25,
2024

4.      In the event that third parties who have a right to inspect the files exercise this
        right, the contents of the files may only be made available to them in such a
        way that the statements contained in the business secrets referred to in section
        1 have been made unrecognizable.


In addition, we request:

5.      In the event that this submission is discussed at the hearing, it is ordered,

        a.  to exclude the public for this part of the hearing due to the risk to the
            parties' interests worthy of protection;

        b.  to oblige the persons present at the oral hearing, including the party
            representatives, their legal representatives and the patent attorneys
            appointed to participate in the legal dispute, to keep secret from third
            parties facts relating to the statements highlighted in gray or the
            annexes marked "confidential" and which come to their knowledge for
            the first time through the pleadings exchanged in the proceedings or the
            statements made at the oral hearing, and to use them only for the
            purpose of conducting the proceedings in the present proceedings;

        c.  if necessary, to exclude the public for part of the delivery of the reasons
            for the judgment.

6.      Prior to any publication of the reasons for the judgment or other
        announcements, any information contained therein that is contained in the
        statements highlighted in gray or in the information marked by a
        marked "confidential" must be blacked out.

EIP Europe LLP                                                                     page 4
Replica (technology) dated October 25,
2024

The plaintiff will comment below on the legal status and will also submit the grounds for the opposition against the nullity action brought in relation to the patent in suit as soon as possible. Auxiliary requests will be submitted with the statement of grounds for opposition. For better orientation for the Board, we are displaying the updated version of the request, which we are also submitting as **Annex EIP 9**, again below.

**Applications:**

I.    **The defendants are ordered to cease and desist from enforcing this order on their board members or managing directors on pain of a fine of up to EUR 250,000 for each case of infringement, or imprisonment for up to two years in total,**

   1.    **Systems for wired communication,**

      **to offer, place on the market or use in the Federal Republic of Germany or to either import or possess for the aforementioned purposes,**

      **showing:**

         **a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream;**

         **a scrambler designed for scrambling the 3-bit packet stream;**

         **wherein the local PHY adapted to map the 3-bit packet stream of MII data to one or more ternary bit streams for communication to a remote PHY over one or more twisted pair wires has a configuration for, during an IDLE state:**

EIP Europe LLP                                                      page 5
Replica (technology) dated October 25,
2024

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the one or more ternary bit streams;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the one or more ternary bit streams,

(EP 1 903 733 B1, claim 11,
direct injury);

especially if

the one or more ternary bit streams have a first ternary bit stream and a second ternary bit stream,

(EP 1 903 733 B1, claim 12,
direct injury);

further in particular if

the local PHY is designed to communicate to the remote PHY using PAM-3;

(EP 1 903 733 B1, claim 13,
direct injury);

further in particular if,

if a single twisted pair is available, the local PHY is designed to multiplex the one or more ternary bi-currents into a single current,

(EP 1 903 733 B1, claim 15,
direct injury).

EIP Europe LLP                                                                    page 6
Replica (technology) dated October 25,
2024

**In the alternative**

**1.a        Systems for wired communication,**

**to offer, place on the market or use in the Federal Republic of Germany or to either import or possess for the aforementioned purposes,**

**showing:**

**a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream;**

**a scrambler adapted to scramble the 3-bit packet stream; wherein the local PHY adapted to map the 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY via one or m o r e twisted pair lines has a configuration for, during an IDLE state:**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream.**

**(auxiliary request 1, claim 9)**

**or**

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

EIP Europe LLP                                                                                         page 7
Replica (technology) dated October 25,
2024

    **1.b**      **Systems for wired communication,**

           **to offer, place on the market or use in the Federal Republic of Germany or to either import or possess for the aforementioned purposes,**

**showing:**

**a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream;**

**a scrambler adapted to scramble the 3-bit packet stream; wherein the local PHY adapted to map the 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY via one or m o r e twisted pair lines has a configuration for, during an IDLE state:**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream;**

**where, if a single twisted pair is available, the local PHY is designed to multiplex the first ternary bit stream and the second ternary bit stream into a single stream.**

                                                  **(auxiliary request 2, claim 8)**

**or**

EIP Europe LLP                                                                          page 8
Replica (technology) dated October 25,
2024

     **1.c**          **Systems for wired communication,**

                  **to offer, place on the market or use in the Federal Republic of Germany or to either import or possess for the aforementioned purposes,**

**showing:**

**a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream;**

**a scrambler adapted to scramble the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data, wherein the scrambler is adapted to generate, during an IDLE state, a scrambled 3-bit packet stream comprising binary 3-bit IDLE patterns;**

**wherein the local PHY adapted to map the scrambled 3-bit packet stream of MII data to one or more ternary bit streams for communication to a remote PHY over one or more twisted pair wires has a configuration for, during the IDLE state:**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the one or more ternary bit streams;**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the one or more ternary bit streams.**

                               **(auxiliary request 3, claim 11)**

**or**

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

EIP Europe LLP                                                                                           page 9
Replica (technology) dated October 25,
2024

     **1.d**        **Systems for wired communication,**

           **to offer, place on the market or use in the Federal Republic of Germany or to either import or possess for the aforementioned purposes,**

**showing:**

**a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream;**

**a scrambler adapted to scramble the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data, wherein the scrambler is adapted to generate, during an IDLE state, a scrambled 3-bit packet stream comprising binary 3-bit IDLE patterns;**

**wherein the local PHY adapted to map the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair lines has a configuration for, during the IDLE state:**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream.**

                                    **(auxiliary request 4, claim 9)**

     **or**

EIP Europe LLP                                                                                    page 10
Replica (technology) dated October 25,
2024

     **1.e**       **Systems for wired communication,**

           **to offer, place on the market or use in the Federal Republic of Germany or to either import or possess for the aforementioned purposes,**

**showing:**

**a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream;**

**a scrambler adapted to scramble the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data, the scrambler comprising a side-stream scrambler, the scrambler being adapted to generate, during an IDLE state and using the side-stream scrambler, a scrambled 3-bit packet stream comprising 3-bit binary IDLE patterns;**

**wherein the local PHY adapted to map the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair lines has a configuration for, during the IDLE state:**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream.**

                                     **(auxiliary request 5, claim 9)**

**or**

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

EIP Europe LLP                                                                  page 11
Replica (technology) dated October 25,
2024

**1.f            Systems for wired communication,**

**to offer, place on the market or use in the Federal Republic of
Germany or to either import or possess for the aforementioned
purposes,**

**showing:**

**a local PHY [physical interface] designed to convert Media Independent
Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet
stream;**

**a scrambler adapted to scramble the 3-bit packet stream to generate a
scrambled 3-bit packet stream of MII data, the scrambler comprising a side-
stream scrambler, the scrambler being adapted to generate, during an IDLE
state and using the side-stream scrambler, a scrambled 3-bit packet stream
comprising 3-bit binary IDLE patterns;**

**wherein the local PHY adapted to map the scrambled 3-bit packet stream of
MII data to a first ternary bit stream and a second ternary bit stream for
communication to a remote PHY via a twisted pair has a configuration for,
during the IDLE state: mapping binary 3-bit IDLE patterns of the scrambled
3-bit packet stream having a least significant bit of zero to a ternary non-
zero value of the first ternary bit stream;**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a
least significant bit from non-zero to a ternary zero value of the first ternary
bit stream.**

**(auxiliary request 6, claim 9)**

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

EIP Europe LLP                                                                          page 12
Replica (technology) dated October 25,
2024

2.  **Methods implemented by systems for wired communication,**

   **to customers in the territory of the Federal Republic of Germany or to apply the procedure,**

   **wherein the method comprises:**

   **Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;**

   **Scrambling of the 3-bit packet stream;**

   **Mapping the scrambled 3-bit packet stream of MII data to one or more ternary bit streams for communication to a remote PHY over one or more twisted pair lines, which includes during an IDLE state:**

   **Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the one or more ternary bit streams;**

   **Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the one or more ternary bit streams,**

   **(EP 1 903 733 B1, claim 1, direct infringement);**

   **especially if**

   **the one or more ternary bistreams have a first ternary bistream and a second ternary bistream,**

   **(EP 1 903 733 B1, claim 2, direct infringement);**

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

EIP Europe LLP
Replica (technology) dated October 25,
2024

page 13

further in particular if

the procedure includes communicating to the remote PHY using PAM-3,

(EP 1 903 733 B1, claim 3,

direct infringement);

further in particular if,

the method comprises multiplexing the one or more ternary bi-currents into a single current when a single twisted pair is available,

(EP 1 903 733 B1), claim 5,

direct injury);

further in particular if

the method comprises inserting Start Stream Delimiters, SSD, before the one or more ternary bistreams,

(EP 1 903 733 B1, claim 6,

direct infringement),

further in particular if

the method comprises inserting End Stream Delimiters, ESD, after the one or more ternary bistreams,

(EP 1 903 733 B1, claim 7,

direct infringement),

likewise in particular if

the method includes the insertion of idle signals after the inserted ESD,

(EP 1 903 733 B1, claim 8,

direct infringement).

**In the alternative**

2.a    Through  systems    realized    processes    for    wired
       communication,

       to customers in the territory of the Federal Republic of Germany or
       to apply the procedure,

       wherein the method comprises:

       Conversion of Media Independent Interface, MII, Ethernet data in a
       local PHY [physical interface] from a 4-bit packet stream to a 3-bit
       packet stream;

       Scrambling (1210) of the 3-bit packet stream;

       Mapping (1212) the scrambled 3-bit packet stream of MII data to a
       first ternary bit stream and a second ternary bit stream for
       communication to a remote PHY over one or more twisted pair lines,
       comprising during an IDLE state:
       Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream
       with a least significant bit of zero to a ternary non-zero value of the
       first ternary bit stream;

       Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream
       with a least significant bit from non-zero to a ternary zero value of
       the first ternary bit stream.

                                                       (auxiliary request 1, claim 1)

or

2.b    Through  systems    realized    processes    for    wired
       communication,

EIP Europe LLP                                              page 15
Replica (technology) dated October 25,
2024

to customers in the territory of the Federal Republic of Germany or to apply the procedure,

wherein the method comprises:

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;

Scrambling (1210) of the 3-bit packet stream;
Mapping (1212) the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair lines, comprising during an IDLE state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream;
Multiplexing the first ternary bit stream and the second ternary bit stream into a single stream when a single twisted pair is available.

(auxiliary request 2, claim 1)

or

2.c   Through systems    realized    processes    for    wired communication,

t o  customers in the territory of the Federal Republic of Germany or to apply the procedure,

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

EIP Europe LLP                                                                 page 16
Replica (technology) dated October 25,
2024

**wherein the method comprises:**

**Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;**

**Scrambling (1210) of the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data;**

**Generate, during an IDLE state, a scrambled 3-bit packet stream containing binary 3-bit IDLE patterns;**
**Mapping (1212) the scrambled 3-bit packet stream of MII data to one or more ternary bit streams for communication to a remote PHY over one or more twisted pair wires, which includes during the IDLE state:**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the one or more ternary bit streams;**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the one or more ternary bit streams.**

**(auxiliary request 3, claim 1)**

**or**

**2.d    Through   systems   realized   processes   for   wired communication,**

**t o  customers in the territory of the Federal Republic of Germany or to apply the procedure,**

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

wherein the method comprises:

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;

Scrambling (1210) of the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data;

Generate, during an IDLE state, a scrambled 3-bit packet stream containing binary 3-bit IDLE patterns;

Mapping (1212) the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair wires, which includes during the IDLE state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream.

(auxiliary request 4, claim 1)

or

2.e    Through    systems    realized    processes    for    wired
       communication,

       t o  customers in the territory of the Federal Republic of Germany or to
       apply the procedure,

EIP Europe LLP                                                                page 18
Replica (technology) dated October 25,
2024

wherein the method comprises:

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;

Scrambling (1210) of the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data;

Generate, during an IDLE state and using a side-stream scrambler, a scrambled 3-bit packet stream that has binary 3-bit IDLE patterns;

Mapping (1212) the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair wires, which includes during the IDLE state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream.

(auxiliary request 5, claim 1)


or


2.f    Through systems    realized    processes    for    wired communication,

t o  customers in the territory of the Federal Republic of Germany or to apply the procedure,


Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

EIP Europe LLP                                                                                                page 19
Replica (technology) dated October 25,
2024

**wherein the method comprises:**

**Conversion of Media Independent Interface, MII, Ethernet data in a
local PHY [physical interface] from a 4-bit packet stream to a 3-bit
packet stream;**

**Scrambling (1210) of the 3-bit packet stream to generate a scrambled
3-bit packet stream of MII data;**

**Generate, during an IDLE state and using a side-stream scrambler, a
scrambled 3-bit packet stream that has binary 3-bit IDLE patterns;**

**Mapping (1212) the scrambled 3-bit packet stream of MII data to a first
ternary bit stream and a second ternary bit stream for communication
to a remote PHY over a twisted pair, which includes during the IDLE
state:**
**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream
with a least significant bit of zero to a ternary non-zero value of the
first ternary bit stream;**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream
with a least significant bit from non-zero to a ternary zero value of the
first ternary bit stream.**

**(auxiliary request 6, claim 1)**

3.    **To offer, place on the market or use in the Federal Republic of Germany,
or to either import or possess for said purposes, machine-readable
memories on which is stored a computer program comprising at least
one code section for wire communication, said at least one code section
being executable by a machine to cause said machine to perform the
following steps:**

EIP Europe LLP                                                                      page 20
Replica (technology) dated October 25,
2024

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;

Scrambling of the 3-bit packet stream;

Mapping the scrambled 3-bit packet stream of MII data to one or more ternary bit streams for communication to a remote PHY over one or more twisted pair lines, which includes during an IDLE state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the one or more ternary bit streams;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the one or more ternary bit streams,

(EP 1 903 733 B1, claim 9, direct infringement);

especially if

the one or more ternary bistreams have a first ternary bistream and a second ternary bistream,

(EP 1 903 733 B1, claim 10, direct injury);

In the alternative

3.a      to offer, place on the market or use machine-readable memories in the Federal Republic of Germany or to either import or possess them for the aforementioned purposes,

on which is stored a computer program comprising at least one code section for wireline communication, the at least one code section being executable by a machine to cause the machine to perform the following steps:

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;

Scrambling of the 3-bit packet stream;

Mapping the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair wires, which includes during an IDLE state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream.

(auxiliary request 1, claim 8)

or

3.b    to offer, place on the market or use machine-readable memories in the Federal Republic of Germany or to either import or possess them for the aforementioned purposes,

on which a computer program with at least one code section for wired communication is stored, wherein the at least one code section is executed by a machine

EIP Europe LLP                                                                     page 22
Replica (technology) dated October 25,
2024

is executable to cause the machine to perform the following steps:

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;

Scrambling of the 3-bit packet stream;

Mapping the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair wires, which includes during an IDLE state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream;

Multiplexing the first ternary bit stream and the second ternary bit stream into a single stream when a single twisted pair is available.

(auxiliary request 2, claim 7)

or

3.c        to offer, place on the market or use machine-readable memories in the Federal Republic of Germany or to either import or possess them for the aforementioned purposes,

on    on which    a                         computer program with
       at least    at least one code section for wired communication

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

EIP Europe LLP                                                                                page 23
Replica (technology) dated October 25,
2024

**wherein the at least one code portion is executable by a machine to cause the machine to perform the following steps:**

**Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;**
**Scramble the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data;**

**Generate, during an IDLE state, a scrambled 3-bit packet stream that has binary 3-bit IDLE patterns;**

**Mapping of the scrambled 3-bit packet stream of MII data to one or more ternary bit streams for communication to a remote PHY over one or more twisted pair wires, which is performed during the                    the                    IDLE                    [Idle] -state:**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the one or more ternary bit streams;**
**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the one or more ternary bit streams.**

                                                    **(auxiliary request 3, claim 9)**

**or**

     **3.d**   **to offer, place on the market or use machine-readable memories in the Federal Republic of Germany or to either import or possess them for the aforementioned purposes,**

on which is stored a computer program comprising at least one code section for wireline communication, the at least one code section being executable by a machine to cause the machine to perform the following steps:

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;
Scramble the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data;

Generate, during an IDLE state, a scrambled 3-bit packet stream that has binary 3-bit IDLE patterns;

Mapping the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair wires, which includes during the IDLE state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream.

(auxiliary request 4, claim 8)

or

3.e    to offer, place on the market or use machine-readable memories in the Federal Republic of Germany or to either import or possess them for the aforementioned purposes,

EIP Europe LLP                                                    page 25
Replica (technology) dated October 25,
2024

on which is stored a computer program comprising at least one code section for wireline communication, the at least one code section being executable by a machine to cause the machine to perform the following steps:

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;
Scramble the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data;

Generate, during an IDLE state and using a side-stream scrambler, a scrambled 3-bit packet stream that has binary 3-bit IDLE patterns;

Mapping the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair wires, which includes during the IDLE state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream.

**(auxiliary request 5, claim 8)**

**or**

EIP Europe LLP                                                                                      page 26
Replica (technology) dated October 25,
2024

3.f    to offer, place on the market or use machine-readable memories
       in the Federal Republic of Germany or to either import or possess
       them for the aforementioned purposes,

       on which is stored a computer program comprising at least one
       code section for wireline communication, the at least one code
       section being executable by a machine to cause the machine to
       perform the following steps:

       Conversion of Media Independent Interface, MII, Ethernet data in a
       local PHY [physical interface] from a 4-bit packet stream to a 3-bit
       packet stream;

       Scramble the 3-bit packet stream to generate a scrambled 3-bit
       packet stream of MII data;

       Generate, during an IDLE state and using a side-stream
       scrambler, a scrambled 3-bit packet stream that has binary 3-bit
       IDLE patterns;

       Mapping the scrambled 3-bit packet stream of MII data to a first
       ternary bit stream and a second ternary bit stream for
       communication to a remote PHY over a twisted pair, which
       includes during the IDLE state:

       Map binary 3-bit IDLE patterns of the scrambled 3-bit packet
       stream with a least significant bit of zero to a ternary non-zero
       value of the first ternary bit stream;

       Map binary 3-bit IDLE patterns of the scrambled 3-bit packet
       stream with a least significant bit from non-zero to a ternary zero
       value of the first ternary bit stream.

                                                      (auxiliary request 6, claim 8)

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

EIP Europe LLP                                                                                page 27
Replica (technology) dated October 25,
2024

4. to offer and/or supply systems in the Federal Republic of Germany which
   are suitable for implementing a method for wireline communication, the
   method comprising

   Conversion of Media Independent Interface, MII, Ethernet data in a local PHY
   [physical interface] from a 4-bit packet stream to a 3-bit packet stream;

   Scrambling of the 3-bit packet stream;

   Mapping the scrambled 3-bit packet stream of MII data to one or more
   ternary bit streams for communication to a remote PHY over one or more
   twisted pair lines, which includes during an IDLE state:

   Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a
   least significant bit of zero to a ternary non-zero value of the one or more
   ternary bit streams;

   Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a
   least significant bit from non-zero to a ternary zero value of the one or more
   ternary bit streams,

                                        (EP 1 903 733 B1, claim 1,
                                                indirect infringement);

   especially if

   the one or more ternary bistreams have a first ternary bistream and a
   second ternary bistream,

                                        (EP 1 903 733 B1, claim 2,
                                                indirect infringement);

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

EIP Europe LLP                                                                                      page 28
Replica (technology) dated October 25,
2024

further in particular if

the procedure includes communicating to the remote PHY using PAM-3,

(EP 1 903 733 B1, claim 3,
indirect infringement);

further in particular if,

the method comprises multiplexing the one or more ternary bi-currents into a single current when a single twisted pair is available,

(EP 1 903 733 B1), claim 5,
indirect infringement);

further in particular if

the method comprises inserting Start Stream Delimiters, SSD, before the one or more ternary bistreams,

(EP 1 903 733 B1, claim 6,
indirect infringement),

further in particular if

the method comprises inserting End Stream Delimiters, ESD, after the one or more ternary bistreams,

(EP 1 903 733 B1, claim 7,
indirect infringement),

also in particular if

the method includes the insertion of idle signals after the inserted ESD,

(EP 1 903 733 B1, claim 8,
indirect infringement).

EIP Europe LLP                                                          page 29
Replica (technology) dated October 25,
2024

**In the alternative**

4.a        to offer and/or supply systems in the Federal Republic of
           Germany which are suitable for carrying out a method for wireline
           communication, the method comprising

           Conversion of Media Independent Interface, MII, Ethernet data in a
           local PHY [physical interface] from a 4-bit packet stream to a 3-bit
           packet stream;

           Scrambling (1210) of the 3-bit packet stream;

           Mapping (1212) the scrambled 3-bit packet stream of MII data to a
           first ternary bit stream and a second ternary bit stream for
           communication to a remote PHY over one or more twisted pair
           lines, which includes during an IDLE state:

           Map binary 3-bit IDLE patterns of the scrambled 3-bit packet
           stream with a least significant bit of zero to a ternary non-zero
           value of the first ternary bit stream;

           Map binary 3-bit IDLE patterns of the scrambled 3-bit packet
           stream with a least significant bit from non-zero to a ternary zero
           value of the first ternary bit stream.


                             (auxiliary request 1, claim 1, indirect infringement)


    or


4.b        to offer and/or supply systems in the Federal Republic of Germany
           which are suitable for carrying out a method for wireline
           communication, the method comprising


Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

EIP Europe LLP                                                              page 30
Replica (technology) dated October 25,
2024

**Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;**

**Scrambling (1210) of the 3-bit packet stream;**

**Mapping (1212) the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair lines, which includes during an IDLE state:**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;**

**Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream;**

**Multiplexing the first ternary bit stream and the second ternary bit stream into a single stream when a single twisted pair is available.**

**(auxiliary request  2,                claim       1, indirect infringement)**

**or**

**4.c          to offer and/or supply systems in the Federal Republic of Germany which are suitable for implementing a method for wireline communication, the method comprising**

EIP Europe LLP                                                        page 31
Replica (technology) dated October 25,
2024

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;

Scramble (1210) the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data;

Generate, during an IDLE state, a scrambled 3-bit packet stream that has binary 3-bit IDLE patterns;

Mapping (1212) the scrambled 3-bit packet stream of MII data to one or more ternary bit streams for communication to a remote PHY over one or more twisted pair wires, which includes during the IDLE state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the one or more ternary bit streams;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the one or more ternary bit streams.

(auxiliary request  3,              claim      1,
indirect infringement)

or

4.d        to offer and/or supply systems in the Federal Republic of Germany which are suitable for carrying out a method for wireline communication, the method comprising

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;

Scramble (1210) the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data;
Generate, during an IDLE state, a scrambled 3-bit packet stream that has binary 3-bit IDLE patterns;

Mapping (1212) the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair wires, which is performed during IDLE [idle].
-state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream.

(auxiliary request  4,                claim       1,
indirect infringement)


or


4.e        to offer and/or supply systems in the Federal Republic of Germany which are suitable for carrying out a method for wireline communication, the method comprising

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;

Scramble (1210) the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data;

Generate, during an IDLE state and using a side-stream scrambler, a scrambled 3-bit packet stream that has binary 3-bit IDLE patterns;

Mapping (1212) the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair wires, which is performed during IDLE [idle].

-state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream.

(auxiliary request 5,        claim     1, indirect infringement)

or

4.f        to offer and/or supply systems in the Federal Republic of Germany which are suitable for implementing a method for wireline communication, the method comprising

Conversion of Media Independent Interface, MII, Ethernet data in a local PHY [physical interface] from a 4-bit packet stream to a 3-bit packet stream;

Scramble (1210) the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data;

Generate, during an IDLE state and using a side-stream scrambler, a scrambled 3-bit packet stream that has binary 3-bit IDLE patterns;

Mapping (1212) the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over a twisted pair, which includes during the IDLE state:

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream;

Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream.

(auxiliary request  6,              claim      1,
indirect infringement)

II.   The defendants are ordered to provide the plaintiff with information by submitting a uniform, chronologically ordered list of the extent to which the defendants have committed the acts described under I. since March 15, 2017, stating

a) the names and addresses of manufacturers, suppliers and other previous owners,

EIP Europe LLP                                                                page 35
Replica (technology) dated October 25,
2024

  b)  the  names  and  addresses  of  the  commercial  customers  and  the
      points of sale for which the products were intended,

  c)  the  quantity  of  products  manufactured,  delivered,  received  or
      ordered and the prices paid for the products concerned,

whereby copies of the corresponding purchase documents (namely invoices,
alternatively  delivery  bills)  must  be  submitted  as  proof  of  the  information,
whereby details requiring confidentiality outside the data subject to disclosure
may be blacked out.

III.  The  defendants  are  ordered  to  provide  the  plaintiff  with  a  uniform,
      chronologically  ordered  list  of  the  extent  to  which  the  defendants  have
      committed the acts described under I. since March 15, 2017, stating

      a)  production quantities and times,

      b)  of  the  individual  deliveries,  broken  down  by  delivery  quantities,
          times,  prices  and  type  designations  as  well  as  the  names  and
          addresses of the commercial customers,

      c)  of the       individual       offers,          broken down        by
          offer quantities, times, prices and type designations, as well as the
          names and addresses of the commercial offerees,

      d)  of the advertising operated, broken down by advertising media, their
          circulation, distribution period and distribution area,

      e)  the  prime  costs  broken  down  by  the  individual  cost  factors  and  the
          profit generated,

whereby the defendants reserve the right to disclose the names and addresses
of the offerees and non-commercial purchasers instead of the plaintiff.

to a sworn auditor based in the Federal Republic of Germany, to be designated by the plaintiff and bound to secrecy, provided that the defendants bear his costs and authorize and oblige him to inform the plaintiff upon specific request whether a specific purchaser or a specific offeree is included in the list.

IV.    The defendants are ordered to pay the damages described in section I.1.
March 15, 2017, to recall the products placed on the market vis-à-vis the commercial customers with reference to the fact that the patent-infringing condition of the aforementioned products was established by the judgment here and with the binding undertaking to refund any fees and to bear any necessary packaging and transport costs as well as customs and storage costs associated with the return and to take back the products.

V.    The defendants are ordered to pay the damages described in section I.1.
March 15, 2017, to permanently remove products placed on the market from the distribution channels by taking them and/or ensuring that the respective owner destroys the products.

VI.    The defendants are ordered to destroy the products in their direct possession or ownership referred to in section I.1. or, at their discretion, to hand them over to a bailiff to be appointed by them for the purpose of destruction at the defendants' expense.

VII.    It is established that the defendants are obliged to compensate the plaintiff for all damage suffered by her as a result of the events described under I. and which have occurred since the
March 15, 2017 has arisen and will arise in the future.

VIII.    Orders the defendants to pay the costs.

EIP Europe LLP                                                                    page 37
Replica (technology) dated October 25,
2024

IX.    **The judgment is provisionally enforceable against the provision of security, which can also be provided in the form of a bank or savings bank guarantee. The individual parts of the operative part may be enforced individually against the provision of security in the amount of a partial amount of the total security to be determined by the court in each case**.

EIP Europe LLP
Replica (technology) dated October 25,
2024

page 38

## Table of contents

**A.**     **Patent infringement** ...................................................................................... **46**

**I.**     **IDLE patterns are not part of the MII data (user data)** ............................ **46**

**II.**     **No mapping of any IDLE pattern to any ternary value in any ternary bitstream** . **52**

**III.**     **Patent infringement** ...................................................................................... **53**

**IV.**     **About the sub-claims** ................................................................................... **57**

**B.**     **On the realization of the auxiliary requests by the contested embodiment** ........ **58**

**I.**     **Auxiliary request 1** ....................................................................................... **58**

**II.**     **Auxiliary request 2** ....................................................................................... **62**

**III.**     **Auxiliary request 3** ....................................................................................... **64**

**IV.**     **Auxiliary request 4** ....................................................................................... **67**

**V.**     **Auxiliary request 5** ....................................................................................... **68**

**VI.**     **Auxiliary request 6:** ...................................................................................... **70**

**C.**     **The plaintiff's entitlement to sue** ................................................................ **72**

**I.**     **Indicative effect of the register** .................................................................... **73**

**II.**     **Effective transfer** ......................................................................................... **74**

**III.**     **Lack of applicability of German law** ............................................................. **75**

**IV.**     **No impermissible self-dealing** ...................................................................... **77**

**V.**     **Universal succession Avago Gen IP - Avago Technologies International Sales Pte. Limited (the plaintiff)** ........................................................................... **78**

1.     Merger by absorption ..................................................................................... 78

2.     Merger by absorption under the laws of the State of Singapore ..................... 79

3.     Notes on the legal situation ............................................................................ 82

**D.**     **On the supposed exhaustion** ....................................................................... **84**

**E.**     **About the license negotiations** .................................................................... **86**

**F.**     **The legal portfolio** ....................................................................................... **88**

**I.**     **Inventive step** .............................................................................................. **88**

1.     Inventive step vis-à-vis D1 and D2 ................................................................. 89

2.     Inventive step vis-à-vis D3 and D2 ................................................................. 95

3.     Interim result ................................................................................................... 97

**II.**     **No impermissible extension** ......................................................................... **97**

1.     Feature group 1.3 - IDLE pattern of the scrambled 3-bit packet stream ......... 97

2.     Characteristic group 1.3 - no inadmissible generalization ............................... 99

EIP Europe LLP                                                                                                        page 39
Replica (technology) dated October 25,

3.  2024   Features 1.3.1 and 1.3.2 - the specific mapping is revealed ........................................102

4.        Interim result ...........................................................................................................104

EIP Europe LLP                                                                                                  page 40
Replica (technology) dated October 25,
2024

**Reason**

1.    Defendants base their flawed non-infringement arguments on a misconstruction of the claims
      that ignores, and in fact directly contradicts, the description and drawings of the patent-in-suit
      to be considered.

2.    The invention on which the patent in suit is based is a core invention for the 100Base-T
      Ethernet standard in question. This is not surprising. After all, the plaintiff invented
      "Automotive Ethernet". The Broadcom Group invests heavily in research and development
      (more than 5 billion US dollars in 2023 alone) and has long been an innovator in the field of
      Ethernet. For example, Broadcom produced the first terabit-per-second Ethernet switch chip
      (2010). Broadcom created the first-ever automotive Ethernet standard, BroadR-Reach, and
      produced the first-ever BroadR-Reach Ethernet PHY chip in 2011. In fact, the name
      "BroadR-Reach" is a play on words with the name "Broadcom". BroadR-Reach was later
      adopted by the IEEE (with some changes) as 802.3bw (100Base-T1). This is the standard
      we are talking about here.

3.    This is also seen as such in the industry. We refer briefly to the following work, Automotive
      Ethernet (Second Edition), by BMW employees Matheus and Königseder, from which we
      quote as an example:



EIP Europe LLP                                                                                    page 41
Replica (technology) dated October 25,
2024

4.    The BMW reference book vividly describes the needs and hardships of cockpit
      communication networks in the (premium) car industry from BMW's perspective. It also
      describes how BMW approached patent applicant Broadcom and other market players, and
      that only Broadcom was able to develop solutions in this highly demanding technical field.
      When Broadcom, at the request of BMW, set about the task of developing an efficient
      Ethernet technology for automotive applications, it was of course not foreseeable to
      Broadcom that the later 100Base-T1 technology would develop into a kind of important
      technology in the automotive sector.

5.    BMW believed that the use of unshielded cables could be decisive for the future of Ethernet
      in the automotive sector. BMW was therefore faced with the technical task of using the
      Ethernet technology in use at the time, 100Base-TX, via cost-effective unshielded cables and
      bringing electromagnetic emissions below a certain limit (see Matheus/Königseder
      "Automotive Ethernet", 2nd edition, 2017, p. 78 ff.):

          *"So in 2007, BMW was at a turning point. Ethernet looked promising, but was not
          quite there yet. As visualized in Figure 3.4, using 100Base-TX as a PHY
          technology either meant a restriction of use cases or not being competitive
          costwise. It required the discovery of Unshielded Twisted Single Pair (UTSP)
          Ethernet (also called BroadR-Reach, OPEN Alliance BroadR-Reach (OABR) or
          now 100Base-T1) to make Ethernet attractive for automotive (as will be described
          in the following sections).*

          *[...]*

          *[...] A key learning was that a PHY usable with unshielded cabling was decisive for
          the future of Ethernet in Automotive. [...]*

          *Thus, in summer 2007, BMW approached four well-known vendors of Ethernet
          PHYs and asked for their opinions and solutions. Colleagues at the automotive
          semiconductor supplier Freescale (now NXP) had suggested that this might be
          worthwhile. Of the companies addressed, only Broadcom responded positively,
          and in September 2007 the first meeting was held in Munich. [...]"*

      In German:

          *"So in 2007, BMW was at a turning point. Ethernet looked promising, but was not
          quite there yet. As shown in Figure 3.4, the use of 100Base-TX as a PHY
          technology either meant a limitation of use cases or was not competitive for cost
          reasons. It took the discovery of Unshielded Twisted Single Pair (UTSP) Ethernet
          (also known as BroadR-Reach, OPEN Alliance BroadR-Reach*

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

> *(OABR) or now called 100Base-T1) to make Ethernet attractive to the automotive
> industry (as described in the following sections).*
>
> *[...]*
>
> *[...] An important finding was that a PHY that can be used with unshielded cabling
> is crucial for the future of Ethernet in the automotive sector. [...]*
>
> *In the summer of 2007, BMW therefore approached four well-known suppliers of
> Ethernet PHYs and asked for their opinions and solutions. Colleagues from the
> automotive semiconductor supplier Freescale (now NXP) had suggested that this
> might be worthwhile. Of the companies contacted, only Broadcom responded
> positively, and the first meeting took place in Munich in September 2007. [...]"*

6.    With this in mind, BMW contacted four different Ethernet PHY providers in <u>the summer of
      2007</u> and asked for their opinions and proposed solutions. At the time, BMW was not in a
      position to develop its own industry-specific solution and was therefore reliant on the help of
      specialized Ethernet providers.

7.    <u>Broadcom was the only company to</u> respond positively to BMW's inquiry and offered to work
      on a technical solution to BMW's problem. Of the other three companies, one did not respond
      and one considered BMW's request to be impossible (see Matheus/Königseder "Automotive
      Ethernet", 2nd edition, 2017, p. 80):

> *"Of the other three companies one did not reply and the other thought the BMW
> request impossible."*

In German:

> *"Of the other three companies, one did not respond and the other considered
> BMW's request impossible."*

8.    Broadcom therefore developed a new, particularly advantageous technical solution, which
      others were unable to do. Broadcom's contribution to the development of Automotive
      Ethernet is also explicitly noted by Matheus and Königseder (see Matheus/Königseder
      "Automotive Ethernet", 2nd edition, 2017, p. xi; underlining by the undersigned):

> *"Yet, Thomas was taken with the effectiveness of Ethernet-based communication
> and therefore investigated ways to use 100Base-TX over unshielded cables. <u>He
> identified the problem but could not solve it.</u> So, in 2007, he contacted various
> well-*

EIP Europe LLP                                                      page 43
Replica (technology) dated October 25,
2024

> *established Ethernet semiconductor suppliers to work with him on a solution.*
> *Only Broadcom responded positively, and engineers from both companies*
> *evaluated the BMW 100Base-TX Ethernet EMC measurements. <u>Then, in January</u>*
> *<u>2008, it happened: BMW performed EMC measurements with boards the</u>*
> *<u>Broadcom engineer Neven Pischl had optimized using a 100 Mbps Ethernet PHY</u>*
> *<u>variant Broadcom had originally developed for Ethernet in the First Mile and</u>*
> *<u>which Broadcom engineers had further adapted for the automotive application</u>.*
> *The very first measurements ever performed at a car manufacturer with this*
> *technology were well below the limit lines and yielded better EMC performance*
> *results than even the existing FlexRay!*
>
> *This was when Automotive Ethernet was born. [...]"* In

German:

> *"However, Thomas was impressed by the effectiveness of Ethernet-based*
> *communication and therefore investigated ways of using 100Base-TX over*
> *unshielded cable. <u>He recognized the problem, but couldn't solve it.</u> So in 2007, he*
> *approached several established Ethernet semiconductor vendors to work with*
> *them on a solution. Only Broadcom responded positively, and engineers from*
> *both companies evaluated the EMC measurements of BMW 100Base-TX*
> *Ethernet. <u>Then, in January 2008, it happened: BMW performed EMC</u>*
> *<u>measurements with boards that Broadcom engineer Neven Pischl had optimized</u>*
> *<u>with a 100 Mbps Ethernet PHY variant that Broadcom had originally developed</u>*
> *<u>for Ethernet in the first mile and that Broadcom engineers had further adapted for</u>*
> *<u>the automotive application</u>. The very first measurements ever performed at an*
> *automotive manufacturer with this technology were well below the limit guidelines*
> *and gave better EMC performance results than even the existing FlexRay!*
>
> *This was the birth of Automotive Ethernet. [...]"*

9.    The positioning of the important market participant BMW and its recognition of the
      achievements of the patent applicant Broadcom clearly demonstrate that this was not an
      accidental invention or similar. Rather, Broadcom or the plaintiff made a significant
      contribution to the development of Automotive Ethernet with the invention on which the
      patent in suit is based. Accordingly, the patent-in-suit claims an important part of the
      standard with technical advantages that have led to the introduction and acceptance of the
      standard over other technologies. 100Base-T1 is a textbook example of the implementation
      and acceptance of a technical solution due to its superior quality.

10.   The BMW book treats the invention on which the patent in suit is based in several places as
      fundamental for 100Base-T1 or Automotive Ethernet. We will refrain from a detailed review of
      the BMW reference book at this point and only refer to the information provided by

EIP Europe LLP
Replica (technology) dated October 25,
2024

page 44

BMW Fig. 4.25 discussed in the book and Table 4.6. Both figures, which we reproduce below, show the content of the claims asserted in the present case. In particular, Table 4.6 contains, for example, one-to-one the content of the features 11.3.1 and 11.3.2 disputed by the defendants, as also shown in the patent in suit and the standard:



Figure 4.25 Overview of the PCS transmitter and transmit enable functions for 100BASE-T1.

Table 4.6 Bit to ternary symbol mapping for 100BASE-T1

| | tx_mode = SEND_Z | | tx_mode = SEND_I or tx_mode = SEND_N, tx_enable = 0, $Sx_n[1] = 0$ | | tx_mode = SEND_N, tx_enable = 0, $Sx_n[1] = 1$ | | tx_mode = SEND_N, tx_enable = 1 | |
|---|---|---|---|---|---|---|---|---|
| $Sd_n[2:0]$ | $TA_n$ | $TB_n$ | $TA_n$ | $TB_n$ | $TA_n$ | $TB_n$ | $TA_n$ | $TB_n$ |
| 000 | 0 | 0 | −1 | 0 | −1 | 0 | −1 | −1 |
| 001 | 0 | 0 | 0 | 1 | 1 | 1 | −1 | 0 |
| 011 | 0 | 0 | | | | | 0 | −1 |
| 010 | 0 | 0 | −1 | 1 | −1 | 1 | −1 | 1 |
| SSD/ESD | 0 | 0 | Not used {00}, {1}, {−1−1} | | Not used {00}, {01}, {0−1} | | 0 | 0 |
| 100 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 |
| 101 | 0 | 0 | 0 | −1 | −1 | −1 | 1 | −1 |
| 111 | 0 | 0 | | | | | 1 | 1 |
| 110 | 0 | 0 | 1 | −1 | 1 | −1 | 1 | 0 |
| Mode | "inactivity" | | "training" and/or "idle" | | "idle" | | "data" | |

11. In the present case, the defendants object to the <u>realization of features 11.3.1 and 11.3.2</u> with regard to main claim 11, according to which the local PHY has a configuration to, during an IDLE state:

| 11.3.1 | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from zero to a |
|---|---|

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

EIP Europe LLP                                                    page 45
Replica (technology) dated October 25,
2024

| | |
|---|---|
| | ternary non-zero value of the one or more ternary bit streams; |
| **11.3.2** | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the one or more ternary bit streams. |

12. The person skilled in the art is well aware that no MII or user data is processed in an IDLE state. Furthermore, the person skilled in the art also understands that the claimed mapping rule applies to all IDLE patterns in the same way.

13. Referring to the wording of features 11.3.1 and 11.3.2, the defendants argue that the PHY must also convert 4-bit packet streams into 3-bit packet streams in the IDLE state (feature 11.1) and that the scrambler (feature 11.2) must then scramble (scramble) these. The 3-bit IDLE patterns are contained in the scrambled 3-bit packet stream into which the PHY has converted the initially received 4-bit packet stream (Response, pages 15, 16). The wording of the claim and the system of claim features would provide for this. This is incorrect and in particular contradicts the direct understanding of the term "IDLE state" (see below).

14. The patent in suit is also <u>legally valid</u>. It is neither inadmissibly extended nor does it lack inventive step. Novelty is not disputed. We will comment on the validity challenges below. The plaintiff will promptly respond to the defendant's action for annulment with a statement of grounds for opposition. Together with the statement of grounds for opposition, the plaintiff will file six auxiliary requests, the use of which we also explain below.

15. Finally, the plaintiff has standing. The defendants have been contesting this unsuccessfully for a long time due to a lack of substance. Avago and the former patent owner Broadcom are group companies. Broadcom has transferred the patent in suit to the plaintiff and the latter can assert all claims arising from the patent. Recently, the Hamburg Local Chamber of the Unified Patent Court confirmed the plaintiff's legitimacy for a comparable situation (UPC_CFI_54/2023).

EIP Europe LLP                                                             page 46
Replica (technology) dated October 25,
2024

16.    In detail:


**A.    About Patent infringement**


17.    The main claim 11 asserted in the present case is as follows:


**Claim 11:**

| **11** | A system for wired communication, the system comprising: |
|---|---|
| **11.1** | a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream; |
| **11.2** | a scrambler designed for scrambling the 3-bit packet stream; |
| **11.3** | wherein the local PHY adapted to map the 3-bit packet stream of MII data to one or more ternary bit streams for communication to a remote PHY over one or more twisted pair wires has a configuration for, during an IDLE state: |
| **11.3.1** | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the one or more ternary bit streams; |
| **11.3.2** | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the one or more ternary bit streams. |


**I.    IDLE patterns are not part of the MII data (user data)**


18.    The defendants argue that the PHY c o n v e r t s 4-bit packet streams of MII data into 3-bit packet streams, which then contain IDLE patterns, even in the IDLE state

EIP Europe LLP                                                                              page 47
Replica (technology) dated October 25,
2024

and be scrambled by the scrambler (Statement of defense, page 17). This is not correct.

19.   The defendants base their opinion on their incorrect interpretation of the wording of the claim
      - they refer to the "principle of priority of the patent claim" on p. 18 of the statement of
      defense - the defendants do not refer to any further evidence (or even just references) and in
      particular disregard the contrary statements in the patent description (there are no
      contradictions between the claim and the description) as well as the technical understanding.
      They thus ignore the requirements of Section 14 PatG and Art. 69 EPC.

20.   As stated, the IDLE state is an idle state in which no (user) data is transferred. It is a core
      component of data technology. The skilled person has known (for a long time) what IDLE, as
      opposed to active data traffic, is all about. In patent infringement disputes, the underlying
      property rights repeatedly involve an IDLE mode - we therefore assume that this technical
      term is also well known to the Board. In contrast, feature 11.1 refers to "Ethernet data from a
      4-bit packet stream", which refers to an active (router) data transmission and does not
      require or refer to an IDLE pattern.

21.   Based on this expert understanding, the skilled person will not assume that the claim
      purports to scramble *IDLE patterns* (idle data) together with user data in idle mode, which are
      then contained in the 3-bit user data packet streams. On the contrary, the skilled person will
      assume just the opposite.

22.   This reasonable and skilled understanding is also supported by the patent description. We
      refer to paragraphs [0085] ff as well as to the embodiment example according to Fig. 7,
      which as an embodiment example falls under claim 11. The first sentence of paragraph
      [0085] refers to "converting the stream of 4-bit MII data packets into a stream of 3-bit MII data
      packets, txd3bn". This is (useful) data and not IDLE packets, which, as explained below, are
      provided elsewhere at a separate input of the data scrambler. Other relevant passages in the
      KPS are paragraphs [0045], [0046] and [0051] (two last sentences: "IDLE codes that may be
      communicated between data frames") as well as Fig. 10 ("IDLES" 1004 between "DATA"
      1000) and Fig. 12 (step 1218), each with an associated description. For a better overview,
      we show Fig. 10 of the patent in suit with colored markings of data (orange) and IDLE-

EIP Europe LLP                                                                    page 48
Replica (technology) dated October 25,
2024

Patterns                                    (green)                              one:



FIG. 10

23.    It is significant in this context that the defendants dispute the realization of features 11.3.1
        and 11.3.2. Both features 11.3.1 and 11.3.2 state "mapping 3-bit binary IDLE patterns of the
        scrambled 3-bit packet stream". This formulation is the first and only time IDLE patterns are
        mentioned in claim 11. This formulation refers to the presence of IDLE patterns in the
        scrambled 3-bit packet stream at the mapping steps and not in any earlier steps. Thus, it is
        the posterior features of the claim where the IDLE patterns (and not the MII data) are
        mapped to one or more ternary bit streams. At this moment - this is also recognizable from
        the feature word sounds - the MII data has already been converted into a 3-bit packet stream
        (feature 11.1), scrambled (feature 11.2) and mapped to one or more ternary bit streams for
        communication over one or more twisted pair lines (feature 11.3). In the subsequent IDLE
        state, the scrambler does not scramble any user data (MII data), but outputs a
        "scrambled bit stream" with binary 3-bit IDLE patterns. We reproduce Fig. 7 below (with color
        highlighting):

EIP Europe LLP                                                                              page 49
Replica (technology) dated October 25,
2024



**FIG. 7**

24.  The conversion of MII data into a 3-bit packet stream according to feature 11.1 takes place,
     for example, in bit re-formater 716 (feature 11.1) (outlined in red above). As an example, the
     scrambler has four blocks (outlined in blue above). The data scrambler 714 is designed to
     "scramble the 3-bit packet stream" (feature 11.2). However, it also provides the "3-bit IDLE
     patterns of the scrambled 3-bit packet stream", which are described in features

     11.3.1 and 11.3.2 are described. Data scrambler 714 receives (from the left) the MII data
     converted into 3-bit data packets $_{txd3bn}$ by bit re-formater 716 (highlighted in red). On the other
     hand, it receives (from the right) the bit scrambler values $_{Scn}$ generated in the scrambler
     blocks 722 to 718 (highlighted in blue). If user data is to be transmitted (which is not the case
     in the IDLE state), the data scrambler 714 (according to feature 11.2) outputs a (scrambled)
     3-bit packet stream of MII data $_{Sdn}$ (highlighted in green). However, if no user data is to be
     transmitted in the IDLE state, the Data Scrambler 714 transmits the stream $_{Scn}$ of bit
     scrambler values, i.e. $Sdn = {}_{Scn}$. The bit stream $_{Sdn}$ (green) output by the data scrambler thus
     represents a scrambled 3-bit packet stream with a 3-bit IDLE pattern in the IDLE state. In
     other words, the scrambler (outlined in blue) has (at least) two possible functions, depending
     on the state: it scrambles (useful or MII) data in accordance with feature 11.2 if this is to be
     transmitted, and it outputs internal scrambler bits (IDLE patterns) (in the IDLE state). In both
     cases, the output bit streams $_{Sdn}$ (green) are forwarded to the "map-to-ternary" block 704,
     which is located above the data scrambler 714 in Fig. 7. In the

EIP Europe LLP                                                                page 50
Replica (technology) dated October 25,
2024

Block "Map to ternary" 704 schematically illustrates the mapping to ternary bits (both
according to feature 11.3 and according to features 11.3.1 and 11.3.2).

25.    The above also follows from the formula reproduced in paragraph [0085], which -
undisputedly - has in principle found its way into the standard pursuant to Annex EIP 6 (see
statement of defense, page 22). The formula reads:

$$Sd_n[2] = \begin{cases} Sc_n[2] \wedge txd3b_n[2] & \text{if } (tx\_enable_{n-3} = 1) \\ Sc_n[2] \wedge 1 & \text{else if } (loc\_rcvr\_status = OK) \\ \\ Sc_n[2] & \text{else} \end{cases}$$

$$Sd_n[1:0] = \begin{cases} Sc_n[1:0] \wedge txd3b_n[1:0] & \text{if } (tx\_enable_{n-3} = 1) \\ Sc_n[1:0] & \text{else} \end{cases}$$

26.    The formula above shows an example of the scrambling of MII data in the first line
(highlighted in red), while the last line (highlighted in blue) deals with the IDLE state (there is
no MII data here and therefore no data transfer). The formula therefore also illustrates the
different treatment of the functionalities of (user) data and IDLE mode. This is shown again
below in Fig. 7. The data scrambler 714 outputs $Sd_n$ to map-to-ternary 704. According to the
above formula, $Sd_n$ represents either MII data from txd3bn (from the left) or IDLE pattern $Sc_n$
(from the right).

EIP Europe LLP                                                                                          page 51
Replica (technology) dated October 25,
2024



**FIG. 7**

27.  The 3-bit IDLE patterns are therefore contained in the scrambled 3-bit packet stream $_{Sdn}$,
     which is output by the data scrambler 714 to the "map-to-ternary" block 704. Thus, the IDLE
     patterns are literally described in features 11.3.1 and 11.3.2: "Mapping binary 3-bit IDLE
     patterns of the scrambled 3-bit packet stream". The IDLE patterns are "of" or belong to the
     scrambled 3-bit packet stream used in "mapping" as described above, and not to the MII bit
     stream of earlier steps, such as the conversion step. The data goes to block 704 in Fig. 7 as
     $_{Sdn}$ (green) after scrambler 714, but this is not because the PHY converts 4-bit packet streams
     to 3-bit packet streams even in an IDLE state - it does not. Instead, the IDLE patterns are
     contained in $_{Scn}$, which are generated by the scrambler (blue). This is where the defendants
     are wrong.

28.  This is also addressed in paragraphs [0085] and [0088] of the patent in suit. According to
     para [0088], with regard to IDLE patterns and mapping to ternary bits, it is stated (KPS, page
     11, lines 2ff) that 3-bit IDLE patterns are generated by the side stream scrambler 722 (in Fig.
     7, far right in the blue box above). Paragraph [0088] of the CP describes the following:
     "During an IDLE state, 3-bit binary IDLE patterns may be generated by the side stream
     scrambler 722". The 3-bit IDLE patterns therefore do not come from the conversion of the 4-
     bit packet stream into a 3-bit packet stream according to feature 11.1 (bottom left in Fig. 7) -
     this only concerns the user data (MII data). Instead, the IDLE patterns come from the side
     stream scrambler 722 (bottom right in Fig. 7). This is in line with the claim. The defendant's
     submission is therefore incorrect.

EIP Europe LLP                                                                page 52
Replica (technology) dated October 25,
2024

29.   On the other hand, the MII payloads are described as input to the red boxes shown above, with no mention of IDLE patterns. The payload data where 4-bit packet streams are converted to 3-bit packet streams $_{tx3dbn}$ is again dealt with in para [0085] of the patent-in-suit:

> [0085]   The bit re-formatter 716 may comprise suitable logic, circuitry, and/or code that may enable receiving a stream of MII data for transmission, MII TXD, and converting the stream of 4-bit MII data packets into a stream of 3-bit MII data packets, txd3b$_n$, which may be communicated to the data scrambler 714. The data scrambler 714 may comprise suitable

30.   Paragraph [0085] continues:

> packets, txd3b$_n$, which may be communicated to the data scrambler 714. The data scrambler 714 may comprise suitable logic, circuitry, and/or code that may enable receiving a stream of scrambler bits values, Sc$_n$, from the bits scrambler 718 and the stream of converted 3-bit MII data packets, txd3b$_n$, and generating a stream of data scrambler values, Sd$_n$.

31.   The data scrambler 714 in Fig. 7 therefore receives the IDLE mode scrambler bits from the block 718 (right) and separately the converted 3-bit MII (user) data packets (from the left). This is clearly illustrated in Fig. 7.

32.   The location in different paragraphs clarifies the separation of the processes for (user) data and the IDLE patterns. The "IDLE patterns of the scrambled 3-bit packet stream" in features 11.3.1 and 11.3.2 are not contained in the sophisticated MII data stream, but come from the scrambler. This can also be seen from the wording of features 11.3.1 and 11.3.2. The features do not deal with MII data, but with the scrambled 3-bit packet stream itself.

## II.   No mapping of any IDLE pattern to any ternary value in any ternary bitstream

33.   In fact, it cannot be inferred from the claim with the required functional interpretation that some IDLE patterns are mapped to a ternary bit stream and other IDLE patterns are mapped to another ternary bit stream. This would be the case, for example, if 3-bit IDLE patterns with a least significant bit of zero are mapped to a ternary non-zero value in one bit stream, while 3-bit IDLE patterns with a least significant bit of non-zero are mapped to a ternary zero value in another bit stream. The person skilled in the art would recognize such a "mixing" of IDLE patterns on several bit streams from

EIP Europe LLP
Replica (technology) dated October 25,
2024

technical point of view, as the technical advantages of the invention (e.g. synchronization) would be lost.

34.    The incorrect interpretation is also not supported by the patent description. We refer by way of example to paragraph [0088] on p. 11 above and to the table ("Table 2") in paragraph [0090]. The patent here is based on a claimed embodiment in which each IDLE pattern is mapped to the same ternary bit A.

5    patterns may be generated by the side stream scrambler 722. When the least significant bit of IDLE pattern is '0', one of the ternary bits, such as the ternary bit A, for example, may be assigned a non-zero ternary value, such as '-1' or '1'. Otherwise, when the least significant bit of the IDLE pattern is '1', the appropriate ternary bit may be assigned the ternary value of '0'. Such a rule or approach may enable the descrambler on the receiver's side to synchronize with the scrambler

Table 2. Binary to ternary bit mapping during IDLE transmission.

| Sdn[2:0] | Ternary A | Ternary B |
|----------|-----------|-----------|
| 000      | -1        | 0         |
| 001      | 0         | 1         |
| 010      | -1        | 1         |
| 011      | 0         | 1         |
| 100      | 1         | 0         |
| 101      | 0         | -1        |
| 110      | 1         | -1        |
| 111      | 0         | -1        |

35.    The above confirms the view expressed here.

36.    The defendant's interpretation of the claim is therefore incorrect. On the other hand, what the plaintiff has stated in the complaint applies. We therefore refer to our statements in the complaint in order to avoid repetition.

37.    We offer **evidence** for the entire claim by means of                Expert opinion

### III.    About Patent infringement

38.    Features 11.3.1 and 11.3.2 of claim 11 are thus realized, as are the other features whose use has not been disputed.

EIP Europe LLP                                                                                    page 54
Replica (technology) dated October 25,
2024

39.    The ▮▮▮▮ Ethernet chip used by the defendants, as claimed, is configured in accordance
       with the claim to be used during an IDLE state (such as a
       "idle state" in which no MII data is to be transmitted) mapping binary 3-bit IDLE patterns of
       the scrambled 3-bit packet stream on the <u>one hand with a least significant bit of zero to a</u>
       <u>ternary non-zero value</u> of the one or more ternary bit streams, and on the other hand for
       mapping <u>with a least significant bit of non-zero to a ternary zero value</u> of the one or more
       ternary bit streams. We have already pointed out that the chip works by default either in an
       active mode ("normal mode") or in an IDLE mode when transmitting certain codes. The IDLE
       mode is used via the variable SEND_I. Below we reproduce the corresponding specifications
       from the standard with highlighting on this side:

---

### 96.4.4 PHY Control function

For the 100BASE-T1 PHY, FORCE mode is used to achieve link acquisition between two 100BASE-T1
link partners. Using FORCE mode, PMA_CONFIG is pre-determined to be MASTER or SLAVE via man-
agement control during initialization or via default hardware set-up. It governs the control actions needed to
bring the PHY into the 100BASE-T1 mode of operation so that frames can be exchanged with the link part-
ner. <u>PMA PHY Control also generates the signals that control PCS and PMA sublayer operations. It deter-</u>
<u>mines whether the PHY operates in the normal mode, enabling data transmission over the link segment, or</u>
<u>whether the PHY sends special code-groups that represent the idle mode. PHY Control shall comply with</u>
<u>the state diagram shown in Figure 96–18. PHY Control sets tx_mode to SEND_N (transmission of normal</u>
<u>MII Data Stream, Control Information, or idle),</u> <u>SEND_I (transmission of IDLE code-groups)</u>, or SEND_Z
(transmission of zero code-groups).

---

### 96.2.3.1 Semantics of the primitive

PMA_TXMODE.indication (tx_mode)

PMA_TXMODE.indication specifies via PCS Transmit via the parameter tx_mode what sequence of code-
groups the PCS should be transmitting. The parameter tx_mode can take on one of the following three
values:

| | |
|---|---|
| SEND_N | <u>This value is continuously asserted when transmission of sequences of code-groups representing a MII data stream (data mode), control mode or <u>idle mode</u> is to take place.</u> |
| SEND_I | This value is continuously asserted in case transmission of sequences of code-groups representing the idle mode is to take place. |
| SEND_Z | This value is continuously asserted in case transmission of zeros is required. |

EIP Europe LLP                                                           Page 55
Replica (technology) dated October 25,
2024

40. The 802.3bw standard contains the mapping of binary 3-bit IDLE patterns of the scrambled 3-bit packet stream in sections 96.3.3.6 to 96.3.3.8. With regard to the ternary values TAn and TBn, we also refer once again to the schematic diagram in 96.3.3.3 (in the "Symbol Mapping" section after scrambling):





96.3.3.3.8 Generation of *(TAB,TB \*                    forwhen tx_mode=SEND_N

The extra scrambling bit $Sx_n$ is introduced to balance the power density for ternary pair $(TA_n, TB_n)$. $Sx_n$ shall be generated as follows:

$$Sx_n = Scr_n[7] \wedge Scr_n[9] \wedge Scr_n[12] \wedge Scr_n[14]$$

41. The mapping of the bit values specified in features 11.3.1 and 11.3.2 in the form that on the one hand a least significant bit is mapped from zero to a ternary non-zero value and on the other hand a least significant bit is mapped from non-zero to a ternary zero value can be found in Table 96-1 of the 802.3bw standard (Annex EIP 7), as we had already explained in the complaint. The relevant values are shown there in accordance with Tables 1 and 2 of the patent in suit. We reproduce this below with comments on this side. The entire procedure takes place at the beginning of a data transmission between the sender and the receiver and serves to tune the transmission quality. This is why Table 96-1 also refers to "training".

EIP Europe LLP                                                          Page 56
Replica (technology) dated October 25,
2024



42.  The defendant additionally refers to the "SEND_N" mode (KE, p. 26f.), in which IDLE
     patterns can also be transmitted, and initially asserts, with reference to its erroneous
     interpretation, that this mode does not fall under claim 11 of the patent in suit either. This is
     not correct for the reasons given above, because claim 11 does not require the IDLE patterns
     to be contained in the scrambled MII data stream. For the sake of completeness, we also
     point out that IDLE patterns are also mapped in the same way in SEND_N mode in
     accordance with features 11.3.1 and 11.3.2. This can be seen in Table 96-3 of the standard
     shown below (with colored markings on this side):

EIP Europe LLP                                                                                page 57
Replica (technology) dated October 25,
2024

| Table 96-Idle symbols when tx mode=SEND_N | | | | |
|---|---|---|---|---|
| | tx_mode = SEND_N | | | |
| | $Sx_n = 0$ | | $Sx_n = 1$ | |
| $Sd_n[2:0]$ | $TA_n$ | $TB_n$ | $TA_n$ | $TB_n$ |
| 000 | −1 | 0 | −1 | 0 |
| 001 | 0 | 1 | 1 | 1 |
| 010 | −1 | 1 | −1 | 1 |
| 011 | 0 | 1 | 1 | 1 |
| 100 | 1 | 0 | 1 | 0 |
| 101 | 0 | −1 | −1 | −1 |
| 110 | 1 | −1 | 1 | −1 |
| 111 | 0 | −1 | −1 | −1 |

43.    On a correct interpretation, there is no doubt that the challenged embodiments infringe the
       patent in suit.


       **Evidence:** Expert opinion


       **IV.    About the sub-claims**


44.    The sub-claims have also been realized as explained. There is also no need for legal
       protection here. The plaintiff considers the assertion of "in particular if" claims to be
       appropriate. We also refer to Kühnen, Hdb der Patentverletzung,
       15th ed., D. para. 570, which explains the appropriateness of "in particular applications".


45.    An "in particular if" request allows the plaintiff to specify the claim at a later stage - at first or
       second instance - if necessary. The asserted sub-claims are each related back to the
       independent claims. Only the realization of the independent claims is disputed on the merits.

EIP Europe LLP                                                                                    Page 58
Replica (technology) dated October 25,
2024

**B.    On the realization of the auxiliary requests by the challenged embodiment**

46.    In the following, we explain the use of the alternative applications.

**I.    Auxiliary application 1**

47.    Claim 9 according to auxiliary request 1 differs from granted claim 11 in that the local PHY according to feature 9.3 is configured to map the 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream for communication to a remote PHY over one or more twisted pair wires. Further, feature 9.3.1 describes a mapping of binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream. Accordingly, feature 9.3.2 describes a mapping of binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of non-zero to a ternary zero value of the first ternary bit stream. Claim 9 according to auxiliary request 1 can be illustrated with the differences from granted claim 11 as follows:

**Claim 9:**

| **9** | A system for wired communication, the system comprising: |
|-------|----------------------------------------------------------|
| **9.1** | a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream; |
| **9.2** | a scrambler designed for scrambling the 3-bit packet stream; |
| **9.3** | wherein the local PHY adapted to map the 3-bit packet stream of MII data to a <u>first ternary bit stream and a second ternary bit stream</u> ~~or multiple ternary bit streams~~ for communication to a remote PHY over one or more twisted pair lines has a configuration for, during an IDLE state: |

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

EIP Europe LLP                                                    Page 59
Replica (technology) dated October 25,
2024

| | |
|---|---|
| **9.3.1** | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the <u>first</u> ~~one or more~~ ternary <u>bit stream</u> ~~bit streams~~; |
| **9.3.2** | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the <u>first</u> ~~one or more~~ ternary <u>bit stream</u> ~~bit streams~~. |

48.   Features 9 to 9.3.2 are used by the attacked embodiment.

49.   With regard to the realization of <u>features 9, 9.1 and 9.2</u>, we refer to the statements in the application (para. 57-67) on the respective identical features 11, 11.1 and 11.2 of claim 11 as granted.

50.   <u>Feature 9.3</u> is realized by the attacked embodiment, because section 96.3.3.3 and Figure 96-8 of the 802.3bw standard (Appendix EIP 6) show that the block "SYMBOL MAPPING" outputs a pair of ternary bit streams $_{TAn}$ and $_{TBn}$, i.e. a first ternary bit stream $_{TAn}$ and a second ternary bit stream $_{TBn}$ (emphasis on this side):



51.    The challenged embodiment also realizes <u>features 9.3.1 and 9.3.2</u> of claim 9 according to auxiliary claim 1.For the                Ethernetchip is also configured for, during an IDLE state, mapping binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ternary bit stream (feature 9.3.1) and mapping binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ternary bit stream (feature 9.3.2).

52.    This is shown in Table 96-1 of the 802.3bw standard (Appendix EIP 6) shown in recital 78, which we show again below (with colored highlights). The table shows that binary 3-bit IDLE patterns of the scrambled 3-bit packet stream $Sdn$ $C\dot{i}t$ change a least significant bit (highlighted in green) from zero to a ternary non-zero value of the

EIP Europe LLP                                                                          Page 61
Replica (technology) dated October 25,
2024

first ternary bitstream TA (highlighted in red), while binary 3-bit IDLE patterns of the

scrambled 3-bit packet stream with a least significant bit (highlighted in green) are mapped

from non-zero to a ternary zero value of the first ternary bitstream TA (highlighted in blue):



EIP Europe LLP                                                              Page 62
Replica (technology) dated October 25,
2024

## II.    Auxiliary application 2

53.   Claim 8 according to auxiliary request 2 has all the features of claim 9 according to auxiliary
      request 1 as well as the features of claim 15 as granted:

**Claim 8:**

| 8 | A system for wired communication, the system comprising: |
|---|---|
| 8.1 | a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream; |
| 8.2 | a scrambler designed for scrambling the 3-bit packet stream; |
| 8.3 | wherein the local PHY adapted to map the 3-bit packet stream of MII data to a <u>first ternary bit stream and a second ternary bit stream</u> ~~or multiple ternary bit streams~~ for communication to a remote PHY over one or more twisted pair lines has a configuration for, during an IDLE state: |
| 8.3.1 | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the <u>first</u> ~~one or more~~ ternary <u>bit</u> stream ~~bit streams~~; |
| 8.3.2 | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the <u>first</u> ~~one or more~~ ternary <u>bit</u> stream ~~bit streams~~; |
| 8.4 | <u>wherein, if a single twisted pair is available, the local PHY is designed to multiplex the first ternary bit stream and the second ternary bit stream into a single stream</u>. |

EIP Europe LLP
Replica (technology) dated October 25,
2024

Page 63

54.    Features 8 to 8.4 are used.

55.    With regard to the realization of features 8 to 8.3.2, we refer to the above comments on the
       respective identical features 9 to 9.3.2 of claim 9 according to auxiliary request 1.

56.    The claimed embodiment also realizes the additional feature 8.4. The use of a single
       balanced twisted pair had already been set out in the application (para. 71) in conjunction
       with feature 11.3 of granted claim 11. The multiplexing of the first ternary bit stream TA and
       the second ternary bit stream TB into a single stream ("serialized stream") is recited in
       section 96.3.3.1 of Annex EIP 6 and shown in Figure 96-8 in section 96.3.3.3 of the standard
       (multiplexer = block "2D to 1D"):



**Figure 96-8-PCI** transmit symbol generation

EIP Europe LLP                                                          Page 64
Replica (technology) dated October 25,
2024

### III.        Auxiliary application 3

57.    Claim 11 according to auxiliary request 3 differs from granted claim 11 in that the scrambler
       according to feature 11.2 is adapted to scramble the 3-bit packet stream to generate a
       scrambled 3-bit packet stream and is adapted to generate, during an IDLE state, a scrambled
       3-bit packet stream comprising binary 3-bit IDLE patterns. Further, feature 11.3 of auxiliary
       claim 3 is slightly different from feature 11.3 of granted claim 11 in that it refers to the
       scrambled 3-bit packet stream of MII data and the IDLE state in feature 11.2.

**Claim 11:**

| 11 | A system for wired communication, the system comprising: |
|---|---|
| 11.1 | a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream; |
| 11.2 | a scrambler adapted to scramble the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data, wherein the scrambler is adapted to generate, during an IDLE state, a scrambled 3-bit packet stream comprising binary 3-bit IDLE patterns; |
| 11.3 | wherein the local PHY adapted to map the scrambled 3-bit packet stream of MII data to one or more ternary bit streams for communication to a remote PHY over one or more twisted pair wires has a configuration for, during one of the IDLE state: |
| 11.3.1 | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the one or more ternary bit streams; |
| 11.3.2 | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a |

EIP Europe LLP                                                                                    Page 65
Replica (technology) dated October 25,
2024

|  | ternary    zero value  of the one    or    of the several ternary bit streams. |

58.    Features 11 to 11.3.2 are used here.

59.    With regard to the realization of features 11, 11.1, 11.3.1 and 11.3.2, we refer to the
        statements in the statement of claim (paras. 57-66, 76-79) on the respective identical
        features 11, 11.1, 11.3.1 and 11.3.2 of claim 11 as granted. With regard to feature 11.3, we
        refer to the statements in the statement of claim (paras. 68-75) on feature 11.3 of claim 11 as
        granted, which is identical in content.

60.    The attacked embodiment also realizes feature 11.2. In the application (para. 67) it was
        already explained with reference, inter alia to the excerpt from the standard shown again
        below (Annex EIP 6) that the attacked embodiment has a scrambler which is designed to
        scramble the 3-bit packet stream "tx_data<2:0>" (which was provided by conversion
        according to feature 11.1 from a 4-bit packet stream "TXD<3:0>" of MII Ethernet data):



61.    The result is a scrambled 3-bit packet stream of MII data Sd [2:0], which is sent from block
"DATA SCRAMBLER" is output to the "SYMBOL MAPPING" block. Thus, the attacked
embodiment realizes a scrambler designed to scramble the 3-bit packet stream
to generate. This is also confirmed, to generate a            scrambled 3-bit packet stream of MII
on this page):                                         data

### 96.3.3.3.4 Generation of scrambled bits Sd [2:0]

The tx dota" 2.0> is a three bis vector after 4B/'3B conversion.

From scrambler bits Sc"[2:0] and tx dat <2.0>, bits S@[2:0] shall be geneiated as follows.



Theie ^ denotes the VOR logic ogei atoi.

62.    In the lines highlighted in yellow, the calculation of the scrambled bits "Sd" is defined by
using the logical XOR operator "^" on scrambler bits "Scn" and converted MII data "tx data".
This formula applies in the event that the condition "tx enable
= 1" is fulfilled, i.e. if MII data is to be converted and transmitted (see Appendix EIP 6,
section 96.3.3.1.2).

63.    If the condition just mentioned is not fulfilled, e.g. during an IDLE state, the scrambler bits
"Sc" are passed through unchanged. This c a n be seen from the lines highlighted in
turquoise. In the IDLE state, the scrambled 3-bit packet stream Sdn therefore does not
contain any MII data, but is equal to the 3-bit packet stream Scn provided by the "SIDE
STREAM SCRAMBLER" block. In Table 96-1 of the standard (Appendix EIP 6), which is
shown several times, the IDLE patterns (left column) are also referred to as Sd:

EIP Europe LLP                                                                     Page 67
Replica (technology) dated October 25,
2024

**Table 96–1—Idle symbol mapping in training**

| $Sd_n[2:0]$ | $TA_n$ | $TB_n$ |
|:---:|:---:|:---:|
| 000 | −1 | 0 |
| 001 | 0 | 1 |
| 010 | −1 | 1 |
| 011 | 0 | 1 |
| 100 | 1 | 0 |
| 101 | 0 | −1 |
| 110 | 1 | −1 |
| 111 | 0 | −1 |

64. The scrambler is thus also designed to generate, during an IDLE state, a scrambled 3-bit packet stream that has binary 3-bit IDLE patterns.

65. Overall, the attacked embodiment therefore also realizes feature 11.2 of claim 11 according to auxiliary request 3.


IV.    **Auxiliary application 4**

66. Claim 9 according to auxiliary request 4 combines the features of claim 11 according to auxiliary request 3 with the features of claim 9 according to auxiliary request 1:

**Claim 9:**

| 9 | A system for wired communication, the system comprising: |
|---|---|
| 9.1 | a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream; |
| 9.2 | a scrambler adapted to scramble the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data, wherein the scrambler is adapted to generate while |

EIP Europe LLP                                                    Page 68
Replica (technology) dated October 25,
2024

| | |
|---|---|
| | of an IDLE state, a scrambled 3-bit packet stream that has binary 3-bit IDLE patterns; |
| **9.3** | wherein the local PHY adapted to map the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream ~~or multiple ternary bit streams~~ for communication to a remote PHY over one or more twisted pair lines has a configuration for, during ~~one of the~~ IDLE state: |
| **9.3.1** | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first ~~one or more~~ ternary bit streams ~~Bitstreams~~; |
| **9.3.2** | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first ~~one or more~~ ternary bit streams ~~Bitstreams~~. |

67.     Features 9 to 9.3.2 are used. This is already apparent from the above comments on auxiliary requests 1 and 3, to which we refer.


**V.      Auxiliary application 5**

68.     Claim 9 according to auxiliary claim 5 has all features of claim 9 according to auxiliary claim 4 and additionally describes that the scrambler (feature 9.2) comprises a side-stream scrambler and is adapted to generate, during an IDLE state and using the side-stream scrambler, a scrambled 3-bit packet stream comprising binary 3-bit IDLE patterns:

**Claim 9:**

| | |
|---|---|
| **9** | A system for wired communication, the system comprising: |

EIP Europe LLP                                                                Page 69
Replica (technology) dated October 25,
2024

| 9.1 | a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream; |
|---|---|
| 9.2 | a scrambler adapted to scramble the 3-bit packet stream to generate a scrambled 3-bit packet stream of MII data, **the scrambler comprising a side-stream scrambler,** wherein the scrambler is adapted to generate, during an IDLE state **and using the side-stream scrambler**, a scrambled 3-bit packet stream comprising binary 3-bit IDLE patterns; |
| 9.3 | wherein the local PHY adapted to map the scrambled 3-bit packet stream of MII data to a first ternary bit stream and a second ternary bit stream or multiple ternary bit streams for communication to a remote PHY over one or more twisted pair lines has a configuration for, during one of the IDLE state: |
| 9.3.1 | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the first one or more ternary bit streams Bitstreams; |
| 9.3.2 | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the first one or more ternary bit streams Bitstreams. |

69.   The additional features in feature group 9.2 are used. The contested embodiment has a side-
      stream scrambler. This can be seen in section 96.3.3.3 of the standard (Annex EIP 6), which
      we show again (with colored marking on this side):

EIP Europe LLP                                                                                     Page 70
Replica (technology) dated October 25,
2024

### 96.3.3.3 PCS transmit symbol generation

The reference diagram of PCS transmit symbol generation is indicated in Figure 96–8. The tx_symb_pair is the ternary pair ($TA_n$, $TB_n$).



**Figure 96–8—PCS transmit symbol generation**

70.  The block "SIDE STREAM SCRAMBLER" is marked orange and is also used to generate the scrambled 3-bit packet stream, which has binary 3-bit IDLE patterns. This is because, as explained above in connection with auxiliary request 4, in the IDLE state the packet stream generated by block
"DATA SCRAMBLER", the scrambled 3-bit packet stream $Sd_n$ containing the IDLE patterns is equal to the 3-bit packet stream $Sc_n$ provided by the "SIDE STREAM SCRAMBLER" block. The scrambled 3-bit packet stream, which has binary 3-bit IDLE patterns, is therefore generated <u>using the side-stream scrambler (</u>"SIDE STREAM SCRAMBLER").

### VI.    Auxiliary application 6:

71.  Claim 9 according to auxiliary request 6 has all the features of claim 9 according to auxiliary request 5, with feature 9.3 being limited to the variant that the communication to a remote PHY takes place via a twisted pair:

EIP Europe LLP                                                                Page 71
Replica (technology) dated October 25,
2024

**Claim 9:**

| 9 | A system for wired communication, the system comprising: |
|---|---|
| **9.1** | a local PHY [physical interface] designed to convert Media Independent Interface, MII, Ethernet data from a 4-bit packet stream to a 3-bit packet stream; |
| **9.2** | a scrambler adapted to scramble the 3-bit packet stream <u>to generate a scrambled 3-bit packet stream of MII data, the scrambler comprising a side-stream scrambler, wherein the scrambler is adapted to generate, during an IDLE state and using the side-stream scrambler, a scrambled 3-bit packet stream comprising binary 3-bit IDLE patterns</u>; |
| **9.3** | wherein the local PHY adapted to map the <u>scrambled</u> 3-bit packet stream of MII data to a <u>first ternary bit stream and a second ternary bit stream</u> ~~or multiple ternary bit streams~~ for communication to a remote PHY over ~~one or more~~ **twisted** ~~pair lines~~ has a configuration for, during ~~one~~ <u>of the</u> IDLE state: |
| **9.3.1** | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit of zero to a ternary non-zero value of the <u>first</u> ~~one or more~~ ternary <u>bit streams</u> ~~Bitstreams~~; |
| **9.3.2** | Map binary 3-bit IDLE patterns of the scrambled 3-bit packet stream with a least significant bit from non-zero to a ternary zero value of the <u>first</u> ~~one or more~~ ternary <u>bit streams</u> ~~Bitstreams~~. |

72. The attacked embodiment uses a single twisted wire. We had already explained this - as also stated above in connection with auxiliary request 2 - in the application (para. 71) in connection with feature 11.3 of claim 11 as granted.

EIP Europe LLP                                                            Page 72
Replica (technology) dated October 25,
2024

73. According to all of the above, the challenged embodiment also makes use of all of the features of the applications filed in the alternative - also in the parallel nullity proceedings.

    **Evidence**: Expert opinion

    **C.      Legitimacy of the plaintiff**

74. The defendants dispute the plaintiff's right to bring an action - also in the present proceedings without any real evidence. The plaintiff is entitled to all asserted claims as the patentee entered in the register and legitimized under substantive law. It is formally and substantively entitled to and from the patent in suit. In legal disputes before German courts, the respective defendants have been repeatedly asserting for years that the plaintiff does not have the right to sue in the same way and in some cases in a similar way to the present case. This was also the case, for example, in Case 7 O 1971/22 pending before the 7th Civil Chamber of the Munich Regional Court. At the hearing on July 20, 2023, the parallel chamber rightly expressed no doubts about the active legitimacy of the plaintiff there and here and did not even address the defendants' arguments.

75. The plaintiff is only asserting claims from the date of entry in the register, i.e. from 15.03.2017. This means that it is not necessary to comment in more detail on the material ownership of the patent (see *Kühnen*, Handbuch der Patentverletzung, 16th edition, Chapter D, para. 312 with reference to OLG Düsseldorf, BeckRS 2013, 17381). The only point raised by the defendants, however, predates the plaintiff's registration in the register and therefore does not need to be taken into account.

76. However, the defendants now refer in their statement of defence to the transfer of the patent in suit from the original patent holder (and member of the plaintiff's group) Broadcom Corporation to Avago Technologies General IP at the beginning of 2017. They question this process and assert (without evidence) that the plaintiff cannot effectively assert the claims sued for. They suggest (with ignorance) that the register is incorrect and that its indicative effect is invalidated.

77. The defendant's submission is inaccurate and is made in the blue. The present status of the register is correct in both formal and material respects. Neither is the circumstantial effect of the register shaken, nor did anything in the relevant Californian or Singaporean law stand in the way of the effective transfer of the patent in suit.

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

EIP Europe LLP                                                          Page 73
Replica (technology) dated October 25,
2024

contrary. The defendants have not substantiated any doubts as to the accuracy of the register and have therefore not shaken the indicative effect of the register. In the following, we present the facts - already known to the Chamber from other proceedings - in order to conclude this issue in the present proceedings. In detail:

### I.    Indicative effect of the register

78.    Only the formal role status is decisive for the <u>injunctive relief</u> (see milling procedure - BGH judgment of 07.05.2013 - X ZR 69/11 = GRUR 2013, 713, 716; *Kühnen*, Handbuch der Patentverletzung, 12th edition, chapter D, p. 438 para. 105; LG Mannheim, judgment of 10.03.2015 - 2 O 103/14 = GRUR-RS 2015, 15918, para. 49; LG Mannheim, judgment of 27.11.2015
- 2 O 106/14 = GRUR-RS 2015, 20077, para. 77; Pitz, GRUR 2010, 688, 689). The substantive legal validity of the transfer of the patent in suit is irrelevant in this respect from the outset, since the infringing defendant is obliged to cease and desist per se and not vis-à-vis a specific beneficiary (see milling proceedings - BGH judgment of 07.05.2013
- X ZR 69/11 = GRUR 2013, 713, 716; OLG Düsseldorf, decision of May 9, 2016 - I- 15 U 36/16 = GRUR-RS 2016, 9323, para. 11; Mes, PatG 4th edition 2015 § 30 para. 20; Pitz, GRUR 2010, 688, 689). Consequently, the registered plaintiff is authorized to assert the claim for injunctive relief.

79.    With regard to the claims for information, invoicing, damages and recall, the plaintiff benefits from the presumed accuracy of the register according to case law. Therefore, no further submission or evidence is required with regard to the substantive legal situation (see also milling procedure - BGH judgment of 07.05.2013 - X ZR 69/11 = GRUR 2013, 713, 717).

80.    A blanket denial with ignorance on individual points is inadmissible in accordance with *the milling procedure* decision of the BGH. Rather, specific evidence must be provided which allegedly shows that the register is incorrect. The defendants ignore the fact that the BGH expects more detailed explanations as to why a transfer of rights on file did not take place or from which the invalidity of a transfer of rights should result, cf. also *Kühnen*, Handbuch der Patentverletzung, 16th ed.

EIP Europe LLP                                                                       Page 74
Replica (technology) dated October 25,
2024

81.   A blanket denial does not meet these requirements (see also decision of the Mannheim Regional Court
      (judgment of November 27, 2015 - 2 O 106/14 = GRUR-RS 2015, 20077 para. 79f.)).

      **II.   Effective transfer**

82.   The assignment of the patent-in-suit from the original owner Broadcom Corporation to Avago
      Technologies General IP (Singapore) Pte. Ltd. was effective. We submit a copy of the
      underlying patent assignment between the two group companies as **Annex EIP 10**. The
      patent-in-suit was transferred as part of the patent assignment - as were thousands of other
      property rights. This process was also undisputed by the Chamber in other proceedings. The
      undersigned Jeyhan Karaoguz was authorized to represent Broadcom and Avago. This is
      evident from the powers of attorney of both companies, which were signed by Mr. Krause as
      CFO and Secretary respectively. Mr. Krause was also duly authorized. We submit a copy of
      the notarized powers of attorney dated 17.10.2016 as **Annex EIP 11** and **Annex EIP 12** in
      English and as **Annex EIP 11a** and **Annex EIP 12a** in German. According to the preamble,
      Mr. Krause was duly authorized by the Board of Directors (see Annex EIP 10, and Annex EIP
      11: "[...] the undersigned, being duly authorized by the Company's Board of Directors").

83.   In addition, we submit two filings of Broadcom Corporation as **Annex EIP 13** and **Annex EIP
      14** in English and as **Annex EIP 13a** and **Annex EIP 14a** in German translation.

84.   These are a "*Statement of Information*" dated May 18, 2016, and a "*Statement of
      Information*" dated November 15, 2017. Both documents show that Mr. Krause is an elected
      *officer* of Broadcom Corporation in the function of "*Secretary*" and "*Chief Financial Officer*". In
      addition, we submit an excerpt of the former website of Broadcom Corporation as **Annex EIP
      15**, as well as a German translation as **Annex EIP 15a.**

85.   On behalf of Avago Gen IP, we submit a "*Business Profile*" in English and a German
      translation as **Annex EIP 16** and **Annex EIP 16a.** This shows that Mr. Krause has been an
      "*Officer/Authorized Representative*" of the plaintiff since 17.10.2016 (page 3 of 4 of the
      Business Profile). Mr. Karaoguz was also authorized to represent both the

Avago Gen IP as well as Broadcom Corporation. In particular, Section 181 of the German Civil Code (BGB) does not preclude representation, as there are no comparable restrictions on representation in the relevant legal systems (see below).

86.    It is clear from the preamble to the powers of attorney (Annexes EIP 10 and EIP 11) that a patent assignment is not dependent on approval by the Management Board (emphasis added):

> "[...] hereby constitutes and appoints the individuals named below, **with the power and authority <u>to act singly</u>, on behalf of the Company**, as is true and lawful attorney-in-fact for the purposes specified below:"

In German translation:

> "[...] hereby constitutes and appoints the following persons **with the power and authority** to **<u>act individually</u> on behalf of the Company** as its true and lawful attorney for the purposes hereinafter set forth:"

87.    The purpose of a power of attorney is precisely to increase the company's ability to act, in this case by giving the authorized representatives the power to act individually as representatives of the company. The patent transfer was embedded in a comprehensive restructuring of the Broadcom/Avago group of companies, in the course of which intellectual property rights were transferred to Avago. Accordingly, the Board of Directors of Broadcom Corporation naturally also authorized the transfer (of the application) of the patent in suit.

### III.    Lack of applicability of German law

88.    Furthermore, Section 181 of the German Civil Code (BGB) does not prevent the effective transfer of the patent.

89.    German law is not applicable to the question of effective representation. Singapore law applies with regard to Avago and Californian law for Broadcom Corporation.

90.    The power of attorney statute also applies in the case of multiple representation (see Thorn in: Palandt EGBGB 77th edition 2018, Art. 8 para. 6 and also in Palandt EGBGB 74th edition 2015
Art. 10 Anh EGBGB para. 3; Mäsch in Bamberger/Roth EGBGB 3rd edition 2012, Art. 10 Anh

EIP Europe LLP                                                                          Page 76
Replica (technology) dated October 25,
2024

EGBGB para. 88). The BGH also ruled in the same way (BGH NJW 1992, 618 - although the
Senate speaks misleadingly of "self-contracting", it was - as in the present case - a case of
multiple representation). Accordingly, Californian law is decisive for the power of attorney of
Broadcom Corporation and Singapore law for the power of attorney of the plaintiff (see BGH
NJW 1992, 618). A decision by the Regional Court of Düsseldorf from 2018 is also consistent
with this, according to which the applicable law is determined by the legal system to which
the company in question is subject (Regional Court of Düsseldorf, judgment of 01.03.2018 -
4c O 59/16). The court states the following:

> *"Section 181 BGB, which regulates the admissibility of self-dealing under German
> law, is not applicable to the respective acts of transfer. According to the
> unanimous opinion in case law and literature, the personal statute of the
> company concerned applies to the management, in particular the power of
> representation of the organs of companies, its scope and its restrictions (see
> BGH, MittRhnotK 1992, 17 ff; BGH, IPRax 1985, 221, 222; OLG Hamm, RIW
> 1984,*
> *653; OLG Frankfurt a. M., IPRspr 1984 No. 21; MüKoBGB/Ebenroth, Kn 245, 153
> ff. according to Art. 10 EGBGB; Palandt/Heldrich, BGB, 51st ed., Annex to Art. 12
> EGBGB Kn. 10; Reithmann/Martiny, Internationales Vertragsrecht, 4th ed., para.
> 844 mwN.; Schlechtriem, EWiR 1991, 1167). Thus, the question of the power of
> representation of the managing director of a Dutch company as an organ is
> governed by Dutch law."*

91.    In any case, a choice of law by the principal is possible (Mäsch, in Bamberger/Roth EGBGB
       3rd edition 2012, Art. 10 Anh EGBGB para. 78, 100 ff.). This also applied before the
       codification in Art. 8 EGBGB and corresponds to the freedom of choice of law for contracts
       under the law of obligations (see MüKoBGB/Spellenberg EGBGB 7th edition 2018, Art. 8
       para. 65).

92.    The powers of attorney determine the application of Singapore law for Avago Technologies
       General IP (Annex EIP 10, p. 2) and California law for Broadcom Corporation (Annex EIP 11,
       p. 2).

93.    Both legal systems do not have a provision corresponding to Section 181 BGB, and the
       representation by Mr. Karaoguz is therefore effective. We submit as evidence the legal
       opinion of Jason S. Angell, an attorney licensed to practice law in California, as **Annex EIP
       17** and in German translation as **Annex EIP 17a** as well as the legal opinion of Mei Ling Sim,
       an attorney licensed to practice law in Singapore, as **Annex EIP 18** and in German
       translation as **Annex EIP 18a**.

94.    The expert opinions relate to the German part of the European patent EP 1 260 910 B1 (file number

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

EIP Europe LLP                                                                                    Page 77

Replica (technology) dated October 25,
2024 (EP 24 602 15 417.0), which has an identical assignment agreement to the present patent.

EIP Europe LLP                                                              Page 78
Replica (technology) dated October 25,
2024

patent at issue was transferred, so that the statements also apply to the present proceedings. The expert opinions according to Annexes EIP 17, 17a and EIP 18, 18a were prepared for an earlier patent infringement proceeding with comparable facts and corresponding defendant submissions.

### IV.    No inadmissible self-dealing

95.    The plaintiff merely makes the following supplementary submissions with regard to Section 181 BGB:

96.    Even if Section 181 BGB were applicable, Mr. Karaoguz would of course have been exempt from the restrictions of Section 181 BGB. This follows from the fact that the parties deliberately decided to apply legal systems that do not have restrictions on representation within the meaning of Section 181 BGB. § Section 181 BGB would therefore be excluded by implication.

97.    In addition, the transfer of the application for the patent in suit is merely the fulfillment of an obligation within the meaning of Section 181 BGB (old version), namely an obligation arising from the underlying purchase agreement. The prohibition of self-dealing in § 181 BGB would not apply, as the transaction is not disadvantageous for either party.

98.    The Intellectual Property Purchase Agreement dated November 28, 2016 (mentioned in the second paragraph of Annex EIP 10) forms the basis of the patent transfer as an effective commitment transaction. Otherwise, Broadcom Corporation would not have had any reason to transfer the patents and patent applications. Paragraph 2 of the transfer agreement already shows that an effective commitment transaction exists:

> *"WHEREAS, Assignor and Assignee are parties to a certain Intellectual Property Purchase Agreement dated November 28, 2016 whereupon Assignor has agreed to assign the Patents (as defined below) to Assignee."*

EIP Europe LLP                                                                        Page 79
Replica (technology) dated October 25,
2024

In German translation:

> *"WHEREAS, the Transferor and the Acquiror are parties to a certain Intellectual Property Purchase Agreement dated November 28, 2016, the Transferor has agreed to transfer the Patents (as defined below) to the Acquiror."*

99.    The defendants do not provide any evidence to suggest any other - completely atypical - course of events. Accordingly, Section 181 BGB would not stand in the way of effective representation anyway. Even in view of this, the indicative effect of the register (Section 30 (3) sentence 2 PatG) is not shaken. Rather, the patent register reflects the correct status of the formal and substantive legal situation.


**V.    Universal succession Avago Gen IP - Avago Technologies International Sales Pte. Limited (local plaintiff)**

100.   The then new patent proprietor Avago Technologies General IP (Singapore) Pte. Ltd. was then merged by way of universal succession into the plaintiff here, Avago Technologies International Sales Pte. Limited. In detail, we note the following:


**1.    Merger through Admission**

101.   As we will explain in detail below, the former plaintiff and patent holder, Avago Technologies General IP (Singapore) Pte. Ltd, was merged into the plaintiff, Avago Technologies International Sales Pte. Limited, by way of absorption with effect from September 5, 2018 ( under the laws of the State of Singapore:

"amalgamation of companies"). The plaintiff, Avago Technologies International Sales Pte. Limited, is thus the universal successor of the former patent proprietor, Avago Technologies General IP (Singapore) Pte. Ltd. The consequence of this is that the patent in suit has been transferred to the plaintiff by way of universal succession.

102.   The effects of a merger outlined here - as will also be explained in detail - are attested by a corresponding certificate from the registry court ("Certificate of Confirmation of Amalgamation") under Singapore law and thus take effect vis-à-vis everyone.

103.   It goes without saying that the German Transformation Act also recognizes a merger by absorption. Section 20 UmwG stipulates that upon entry of the merger in the register, the assets of the transferring legal entity and its liabilities are transferred to the acquiring legal entity and the transferring legal entity ceases to exist. The merger by absorption under Singapore law is carried out in a similar manner, as we will explain below.

**2.      Merger by absorption in accordance with the law of the state of Singapore**

104.   Both the former patent proprietor - Avago Technologies General IP (Singapore) Pte. Ltd - and the current patent proprietor and plaintiff - Avago Technologies International Sales Pte. Limited - have their registered office in Singapore and were also founded there. Under the conflict of laws rules, the merger of these two companies is therefore governed by Singapore law.

105.   For this purpose, we submit (in copy) a certified copy of the expert opinion of our colleagues Baker McKenzie Wong & Leow from Singapore with the annexes A - E as **Annex EIP 19**, as well as a German translation as **Annex EIP 20**.

106.   We submit a legalized copy of the above-mentioned Certificate of Confirmation of Amalgamation as **Annex EIP 21** and a copy of the certified copy of the certified German translation as **Annex EIP 22**.

107.   The authenticity of the certificate was confirmed by the Ministry of Foreign Affairs of the State of Singapore; this confirmation was in turn legalized by the German Embassy in Singapore.

108.   The Singapore Companies Act is available on the website https://sso.agc.gov.sg/Act/CoA1967. The excerpt on the conversion law relevant to the present case is attached to the expert opinion (Annex EIP 18) as Appendix C.

109.   Furthermore, it should be noted that under Singapore law - as described in the expert opinion pursuant to Annex EIP 18 (p. 1, 2nd paragraph) - the Accounting and Corporate Regulatory Authority (ACRA) performs the functions of the registry court under Singapore company law. ACRA has issued the certificates pursuant to Annexes B and D.

EIP Europe LLP                                                                                                    Page 81
Replica (technology) dated October 25,
2024

110.   The former patent proprietor was the wholly-owned parent company of the current plaintiff
       and patent proprietor, Avago Technologies International Sales Pte. Limited. A corresponding
       confirmation from the Singapore Commercial Register is attached to the expert opinion
       pursuant to Annex EIP 18 as Annex E. This fact is expressly confirmed in the expert opinion
       pursuant to Annex EIP 18 (p. 2, 5th paragraph).

111.   Furthermore, the expert opinion pursuant to Annex EIP 18 refers to the commercial register
       entry (Certificate confirming Incorporation of Company) of the plaintiff - Avago Technologies
       International Sales Pte. Limited - in the form of Exhibit D (p. 1, 3rd paragraph). This is thus
       also proven.

112.   As explained in the expert opinion in Annex EIP 18 (p. 2), the merger of companies is
       regulated in the Singapore Companies Act in Art. 215A - 215G. Art. 215D now provides for a
       special form of merger for the merger of parent companies and subsidiaries, namely a so-
       called "short form amalgamation", whereby "amalgamation" means
       "fusion" is to be translated.

113.   The prerequisite for such a merger is that one of the companies - the
       "amalgamating holding company" - which is the sole shareholder of the other company
       involved - the so-called "amalgamating subsidiary company". According to Art. 215D (1) (a)
       (ii), the parent company - in this case Avago Technologies General IP (Singapore) Pte. Ltd. -
       can then be merged into the subsidiary ("amalgamated subsidiary company"), which
       continues to exist as the absorbing legal entity. As set out in the expert opinion pursuant to
       Annex EIP 18 (p. 2, 6th paragraph), the procedure was followed accordingly in the present
       case. The former patent proprietor - Avago Technologies General IP (Singapore) Pte. Ltd -
       was merged into its subsidiary, the current patent proprietor and plaintiff - Avago
       Technologies International Sales Pte. limited.

114.   The consequence of this is that Avago Technologies International Sales Pte.
       "amalgamated subsidiary company" pursuant to Art. 215D (1) (a) (ii) continues to exist as the
       absorbing legal entity and Avago Technologies General IP (Singapore) Pte. Ltd. as the
       transferring legal entity (amalgamating holding company) has ceased to exist with the
       effectiveness of the merger. This is also set out in the expert opinion pursuant to Annex EIP
       18 (p. 3 below/p. 4 above); reference may be made to this.

EIP Europe LLP                                                                          Page 82
Replica (technology) dated October 25,
2024

115.  Accordingly, ACRA, in its capacity as the Commercial Registry Court of the State of
      Singapore, confirms in the certificate pursuant to Art. 215F (4) ("Certificate of Confirmation of
      Amalgamation") submitted as Annex B to Annex EIP 18 that with effect from 05.09.2018 the

                -Avago Technologies General IP (Singapore) Pte. Ltd. and
                -Avago Technologies International Sales Pte. Limited

      (amalgamating companies) were merged with each other and the absorbing and continuing company
      (amalgamated company)

                Avago Technologies International Sales Pte. limited.

      This is set out and confirmed in the expert opinion in accordance with Annex EIP

      18 (p. 3).

116.  We also submit a copy of an excerpt from the local commercial register at that time as
      **Exhibit EIP 23**, which shows that Avago Technologies General IP (Singapore) Pte. Ltd no
      longer exists as a separate legal entity, but has been merged with Avago Technologies
      International Sales Pte. Limited (to form an entity with registration number 200512231).

117.  According to Art. 215G lit. (c) and (d), the merger becomes effective on the date stated in the
      certificate (Annex B to Annex EIP 18) with the legal consequence that assets and liabilities
      are transferred to the acquiring legal entity ("amalgamated company") by way of universal
      succession. This is also set out and confirmed in the expert opinion pursuant to Annex EIP
      18 (p. 3+4).

118.  It can therefore be concluded that both the patent-in-suit and the claims arising from
      infringement of the patent-in-suit were transferred to the current plaintiff by way of universal
      succession under Singapore law. For reasons of legal caution, we **offer <u>evidence</u>** on the
      subject matter and the legal consequences of the law of the State of Singapore on the
      merger of companies by

                Expert opinion.

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

EIP Europe LLP                                                                              Page 83
Replica (technology) dated October 25,
2024

### 3.      Notes on the legal situation

119.    As a precaution, we would like to point out that the decision BGH GRUR 2013, 713 -
Fräsverfahren is not applicable in the present case, as this decision only deals with the case
that the former patentee continues to exist as a legal entity after the legal transfer of the
patent-in-suit to the new patentee. In this case, the Federal Court of Justice ruled that the
former patent proprietor must assert the claims for patent infringement in the name of the
new patent proprietor for the period until the new patent proprietor is entered in the patent
register, as the former patent proprietor remains entitled and obliged in accordance with the
Patent Act pursuant to Section 30 (3) sentence 2 PatG as long as the new proprietor is not
entered in the patent register.

120.    The fact that this decision cannot be applied in the present case is already evident from the
fact that the former patent proprietor - Avago Technologies General IP (Singapore) Pte. Ltd -
ceased to exist as a legal entity as a result of the merger. Accordingly, the provision of
Section 30 (3) sentence 2 PatG does not apply in the case of universal succession. This
applies not only to universal succession by succession, but also to universal succession
under company law by merger (Busse, Patentgesetz, § 30 para. 99; Schulte, Patentgesetz, §
30 para. 52; Benkard, Patentgesetz, § 30 para. 12a a.E.). Accordingly, the BGH stated the
following in GRUR 2016, 1280 - Everytime we touch (there: para. 16): If a transferring legal
entity, which is represented by an attorney in a pending legal dispute, is merged into another
legal entity, the latter enters the legal dispute as legal successor without further ado and
without interrupting the proceedings pursuant to Sec. 30 para. 1 lit.
§ section 246 (1) ZPO. Accordingly, this is only a case of a correction of the rubric in
accordance with Section 319 ZPO if this legal succession had not yet been taken into
account in the judgment itself (BGH, loc. cit.).

121.    Since the present case is a universal succession, all claims for damages and other
consequential claims for patent infringement have also been transferred ex lege to the
present plaintiff.

122.    We also note that the original patent holder Broadcom Corporation has neither disputed the
patent ownership of the plaintiff (both companies belong to the same group) nor taken any
action to reverse the transfer process or similar, despite the time that has now passed. On
the contrary: Broadcom and Avago are

EIP Europe LLP                                                                Page 84
Replica (technology) dated October 25,
2024

was in any case informed of the status of the patent in suit on the basis of the respective
annual financial statements and the original patent holder Broadcom has in any case
repeatedly approved the transactions (with ex tunc effect). This also applies to the present
action. Avago has been asserting the former Broadcom property rights covered by the
transfer for years. Against this background, we consider this issue to be settled. However, we
request a judicial reference if, in the opinion of the Chamber, further submissions are
required.

123.    Finally, we inform you that the Hamburg Local Division of the Unified Patent Court in case
        UPC_CFI_54/2023 followed the plaintiff's arguments here, after the defendants there had
        disputed the active legitimacy. Contrary to the defendants' statements in the statement of
        defense, the decision of the local division is neither contradictory, illogical nor anything else.
        The Local Chamber stated, inter alia, on pages 16 et seq. of the decision:

        I.

        Die Klägerin kann sich mit Erfolg auf ihre Eintragung als Inhaberin des Klagepatents berufen.

        1.

        Grundsätzlich richtet sich die Aktivlegitimation für die Geltendmachung von Annexansprüchen
        aus Europäischen Patenten nach der materiellen Berechtigung (vgl. BGH, Urteil vom 7.
        Mai 2013 - X ZR 69/11, GRUR 2013, 713, Rn. 57 f. - Fräsverfahren). Damit gilt die sich aus Art 60
        Abs. 3 EPÜ und § 7 PatG folgende unwiderlegliche Fiktion der Berechtigung des Anmelders
        (vgl. Benkard EPÜ/Melullis, 3. Aufl. 2019, EPÜ Art. 60 Rn. 38) nicht für das
        Verletzungsverfahren; ihr Anwendungsbereich ist auf das Eintragungsverfahren selbst
        beschränkt. Der Eintrag im Patentregister bietet keine Gewähr für seine inhaltliche Richtigkeit,
        da dem Register weder eine positive Publizitätswirkung wie dem Grundbuch, noch eine
        negative Publizitätswirkung wie dem Handelsregister zukommt. Eintragungen in einem
        öffentlichen, von einer Verwaltungsbehörde geführten Register vermitteln jedoch eine
        Vermutung der Richtigkeit und damit einen beachtlichen Rechtsschein (BeckOK PatR/Otten-
        Dünnweber, 13. Ed. 25.7.2019, PatG § 30 Rn. 12). Der Eintragung im Patentregister kommt
        daher für die Beurteilung der Frage, wer materiell-rechtlich Inhaber des Patents ist, eine
        erhebliche Indizwirkung zu (BGH, Urteil vom 7. Mai 2013 - X ZR 69/11, GRUR 2013, 713, Rn.
        59 - Fräsverfahren).

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

EIP Europe LLP                                                                    Page 85
Replica (technology) dated October 25,
2024

3.

Soweit die Beklagten rügen, die Klägerin sei aufgrund eines unzulässigen In-sich-Geschäfts nicht Inhaberin des Klagepatents geworden, vermag dieser Einwand die gesetzliche Vermutung nicht zu schüttern.

a)

In den Art. 71-74 EPÜ sind Formvorgaben in Bezug auf die Übertragung von Rechten enthalten. Nach Art. 71 EPÜ kann die europäische Patentanmeldung für einen oder mehrere der benannten Vertragsstaaten übertragen werden oder Gegenstand von Rechten sein. Das schließt die Übertragung oder Belastung des Rechts auf Erteilung des Patents ein. Für die Übertragung durch Rechtsgeschäft gilt die besondere Regelung des Art. 72 EPÜ (Benkard/Grabinski, EPÜ, 3. Aufl., EPÜ Art. 71 Rn. 4). Nach dieser Vorschrift muss die rechtsgeschäftliche Übertragung der europäischen Patentanmeldung schriftlich erfolgen und bedarf der Unterschrift der Vertragsparteien. Demnach ist die nach Art. 72 EPÜ vorgeschriebene Schriftform gewahrt, wenn beide Vertragsparteien in einer Urkunde die Erklärung unterzeichnen, die die Übertragung bewirken soll. Dabei ist erforderlich, dass die Identität der Vertragsparteien aus der Urkunde hervorgeht (Benkard/Grabinski, EPÜ Art. 72 Rn. 4). Weitere Wirksamkeitsvoraussetzungen enthält das EPÜ nicht (Hans. OLG Hamburg, Urteil vom 19. September 2019 – 3 U 181/17, GRUR-RR 2020, 294 Rn. 35 f. – Verpackung für Rauchwaren).

b)

Diese Voraussetzungen sind daher entgegen der Ansicht der Beklagten im Streitfall gewahrt. Die Übertragung des Klagepatents ist schriftlich erfolgt und die Identität der Vertragsparteien geht aus den vorgelegten Urkunden hervor. Soweit die Beklagten die Unterzeichnung der Vereinbarung für beide Parteien durch ein und dieselbe Person – hier Herrn Jeyhan Karaoguz (vgl. Anlage B 1) – als ein unzulässiges Insichgeschäft ansehen, hat die Klägerin sich zu Recht darauf berufen, dass auf die Frage der wirksamen Stellvertretung deutsches Recht nicht

anwendbar ist. Mit Blick auf den jeweiligen Unternehmenssitz ist vielmehr insoweit singapurisches Recht (Avago Technologies General IP (Singapore) Pte. Ltd.) bzw. kalifornisches Recht (Broadcom Corporation) anzuwenden. Die Klägerin hat dargetan, dass eine § 181 BGB vergleichbare Regelung der Vertretung schon deshalb nicht entgegenstünde, da es in den maßgeblichen Rechtsordnungen keine vergleichbaren Vertretungsbeschränkungen gebe. Die von der Klägerin insoweit vorgelegten Rechtsgutachten in den Anlagen EIP 9 und 10 haben die Beklagten nicht inhaltlich in Abrede genommen.

Beschlüssen nicht. Zudem kann die Klägerin zu Recht für sich in Anspruch nehmen, dass es um die Rechteübertragung innerhalb eines Konzerns geht und nicht um eine Übertragung zugunsten eines unbeteiligten Dritten.

## D.     On the supposed exhaustion

124.    The defendant's exhaustion objection is obviously unfounded. For example, there is no submission on all the necessary requirements for exhaustion, so that this,

EIP Europe LLP
Replica (technology) dated October 25, 2024

Page 86

assuming that the defendant's submission is correct (as it is not), is not given anyway. Furthermore, the defendant's submission is based on speculation and unsubstantiated factual allegations, which also do not lead to exhaustion.

███ ██ burden of proof    and              burden of proof         defendants must for    a successful exhaustion objection that the claimed product was intentionally put on the market in one of the contracting states of the EU or the EEA with the consent of the entitled party. It should also be noted that the exhaustion defense is strictly object-related (see *Kühnen,* Hdb. Patentverletzung, 16th ed., chapter E, para. 789 ff., with further references). Due to the strict object-relatedness, placing parts of a protected device on the market is generally not sufficient for exhaustion. An exception can only be considered if the invention is practically fully realized with the component placed on the market and only an "all-round ingredient" that is secondary to the idea of the invention is missing *(Kühnen,* loc. cit.). The defendants have not provided any information on this

presented. ██████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████ The exhaustion objection does not a p p l y for this reason alone. The submission of license agreements is therefore not relevant.

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████  ████████      ████████      ████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

EIP Europe LLP
Replica (technology) dated October 25, 2024

Page 87

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████

█████████ █████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

E.    About the license negotiations

███████ █████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

████████ █████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

EIP Europe LLP
Replica (technology) dated October 25, 2024

Page 88

EIP Europe LLP                                                                    Page 89
Replica (technology) dated October 25,
2024



135.   In view of this behavior, the plaintiff had no choice but to enforce its patent rights here. There can be no question of the defendants being willing to license. Consequently, the defendants are not exposed to any pressure contrary to antitrust law - the SEP holder is not obliged to tolerate the infringer's delaying tactics (BGH GRUR 2021, 585, para. 67 - *FRAND-Einwand II*).

136.   Should the defendants raise the FRAND objection, in the context of which they will make submissions on the negotiations and their counter-offer, we expressly reserve the right to make such submissions.

        F.     The legal portfolio

137.   The patent in suit is legally valid. The nullity action was only served on the plaintiff on October 8, 2024. We will submit the grounds for the opposition to the nullity action filed by Tesla as soon as possible. In the following, we show that the statements in the statement of defense regarding inventive step and original disclosure are not convincing.

        I.     The inventive activity

138.   Defendant contends that the subject matter of independent claims 1, 9, and 11 is suggested by both D1 in combination with D2 (KE, H.I.) and D3 in combination with D2 (KE, H.II.). More specifically, the defendant argues that both D1 and D3 disclose features 11 to 11.3 except for the IDLE state, whereas features 11.3.1 and
        11.3.2 are disclosed in D2 and are thus suggested in each case by looking at them together with D2.

EIP Europe LLP                                                              Page 90
Replica (technology) dated October 25,
2024

139.    D1 and D3 were already taken into account by the Examining Division of the EPO during the examination procedure. Accordingly, both documents are also cited on the cover sheet of the patent in suit (emphasis added):



### 1.    Inventive activity vis-à-vis D1 and D2

140.    In particular, D1 deals with methods and devices for baseband encoding/decoding for increasing the transmission rate over a communication medium while maintaining the desired bandwidth, bit error rate and Hamming distance (D1, column 1, lines 8-12). In particular, D1 describes an encoding device ("encoder") that encodes binary data bits provided by a data source into pulse amplitude modulated multilevel symbols (D1, column 2, lines 42-44). D1 mentions various such encoding concepts in passing, including the so-called 3B-2T encoding, in which three binary bits are represented by two pulse symbols, each of which can take one of three values (D1, column 3, lines 61-63). Specifically, however, D1 only describes the use of the so-called 2B-1Q coding, in which two binary bits are represented by a pulse symbol that can take on one of four values (D1, column 10, lines 31-40).

141.    An encoding device 82 for Ethernet-based communication is shown in D1 in Fig. 3:

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 -
7 O 4992/24 LG Munich I

EIP Europe LLP
Replica (technology) dated October 25, 2024



142.    The corresponding description in D1 (column 7, line 52 to column 10, line 64) can be summarized as follows: A scrambler 90 receives a data bit stream from data source 52, scrambles it and supplies a scrambled bit stream to a splitter 92. The splitter 92 divides the bits of the scrambled bit stream into two channels (CHANNEL A and CHANNEL B). This is done in such a way that of two consecutive bits in the scrambled bit stream, the first bit is fed to channel A and the second bit to channel B, see D1, column 8, lines 19-27 (emphasis added):

$(R_{DBITMAXA})$. Thus, for example, if the input to splitter **92** was the following bit stream, 00101100, the output on channels A and B would be:
   Channel A output 0110

lii 'ilic r i- it Is, I *i c < r p.ii i i i:I iiip ii i loils, splitter 92 delays t'uitxiiting rbc lirn bit until it hax rcccivetl the sccr'nd bit, at which lime it t utputs the first bil c'n channel A "bilc outputting the second bit on channel B.

143.    The two bit streams output by the splitter 92 are treated identically in the respective channel A or B. First, Gray coding takes place in Gray encoders 94A, 94B. Then "descriptive bits", e.g. start and stop limiters, are inserted into bit stages 96A, 96B. The modified bit streams are then fed to modulators 102A, 102B, in which 2B-1Q coding takes place. The modulated signals are subsequently transmitted via

EIP Europe LLP
Replica (technology) dated October 25, 2024

Page 92

Differential drivers 106A, 106B, filters 108A, 108B and transformers 110A, 110B are output to the respective twisted pair cables.

144.    Contrary to the defendant's assertions, D1 not only does not disclose features 11.3.1 and 11.3.2, it does not disclose any of features 11 to 11.3. in detail:

145.    D1 does not disclose any details regarding the data source 52. It only mentions that the data bits arrive at the scrambler 90 at a first data bit rate $_{RDBIT1}$. In particular, D1 does not describe that the data is MII Ethernet data, nor that a conversion from a 4-bit packet stream to a 3-bit packet stream is performed. Thus, feature 11.1 is not explicitly disclosed in D1.

146.    There is also no implicit disclosure. In that case, the skilled person would have to consider the existence of an MII interface as mandatory and the only possibility. Contrary to the defendant's assertions, the passages quoted (in Chapter D.II.1 of the KE) from the IEEE 802.3u standard from 1995 submitted as Annex B3 do not prove that an MII interface must necessarily be present. B3 only states what such an interface - if present - is used for, namely to connect a Fast Ethernet MAC block to a PHY. B3 does not state that an MII interface is mandatory and therefore does not rule out other possibilities.

147.    D1 therefore does not anticipate feature 11.1.

148.    The scrambler 90 in D1 scrambles a bitstream. As mentioned above, D1 does not disclose any details about this bitstream. In particular, D1 does not disclose that the scrambler 90 scrambles a 3-bit packet stream.

149.    Therefore, D1 does not anticipate feature 11.2.

150.    According to feature 11.3, the scrambled 3-bit packet stream of MII data must be mapped to one or more ternary bit streams.

151.    Since D1, as explained above, does not disclose a scrambled 3-bit packet stream and no MII data, D1 consequently does not disclose feature 1.3 either.

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

152. As mentioned at the beginning, D1 in connection with Fig. 3 describes a mapping from two binary bits to a quaternary bit (2B-1Q) in each modulator 102A, 102B.

153. Even if we were to assume that the scrambler 90 in Fig. 3 of D1 - as claimed by the defendant - would output a 3-bit packet stream, then D1 would have the feature 1.3 still cannot be oPened, because this "3-bit packet stream" is not recognized by the splitter 92 "torn apart" and distributed to the two channels A, B. We refer once again to D1, column 8, lines 19-27:

> ($R_{DBITMAXA}$). Thus, for example, if the input to splitter **92** was the following bit stream, 00101100, the output on channels A and B would be:
> f 'ii:i niicl .h "iii }iiit i{l II
> Channel B output 0010.
>
> J it ' it lie r xt-i' i tls, t i*i c x'c r J' ]::i ii i: l' i ii{ ti l l*i ls. 's{i}t fl<fi 92 ijc];t}'g ouipuitin the iitai bit uriiil it has rmvivctl tt scn'nJ hit. at which limo it t utputs lhc first to ten channcl A whilc ouipultiii¡; lhr coixJ tiii ori cli "nnc1 11.

154. This means that two consecutive 3-bit packets X1x2xs and y1y2y3 output by the scrambler 90, i.e. the bit sequence x1x2xsy1y2 3, would be broken up in the splitter 92 as follows and mixed in the two channels A, B:

Channel A: X1  2

Channel B: X2 1 3

155. It follows that none of the modulators 102A, 102B receives a 3-bit packet stream, because the packet stream is decomposed and resolved in the splitter 92. Thus, even if the defendant's incorrect assumption is assumed to be correct, D1 does not oPenbart feature 11.3.

156. Therefore, D1 does not anticipate <u>feature 11.3.</u>

157. As the defendant has recognized (KE, p. 32), D1 does not disclose an IDLE state and also no provision for mapping binary 3-bit IDLE patterns to one or more ternary bit streams depending on a least significant bit of a 3-bit IDLE pattern according to <u>features 11.3.1 and 11.3.2.</u>

158.   These features are neither revealed nor suggested by D2. This is because D2 does not describe a mapping of IDLE patterns to <u>ternary</u> values.

159.   D2 is part 3 of the 2002 version of the IEEE 802.3 standard and contains specifications for a range of media types and technologies for transmission rates from 1Mbit/s to 1000Mbit/s.

160.   The defendant refers in particular to paragraph 40.1.3 in D2, which deals specifically with the 1000BASE-T standard (emphasis added):

### 40.1.3 Operation of 1000BASE-T

The 1000BASE-T PHY employs full duplex baseband transmission over four pairs of Category 5 balanced cabling. The aggregate data rate of 1000 Mb/s is achieved by transmission at a data rate of 250 Mb/s over each wire pair, as shown in Figure 40–2. The use of hybrids and cancellers enables full duplex transmission by allowing symbols to be transmitted and received on the same wire pairs at the same time. Baseband signaling with a modulation rate of 125 Mbaud is used on each of the wire pairs. The transmitted symbols are selected from a four-dimensional 5-level symbol constellation. Each four-dimensional symbol can be viewed as a 4-tuple $(A_n, B_n, C_n, D_n)$ of one-dimensional quinary symbols taken from the set $\{2, 1, 0, -1, -2\}$. 1000BASE-T uses a continuous signaling system; in the absence of data, Idle symbols are transmitted. Idle mode is a subset of code-groups in that each symbol is restricted to the set $\{2, 0, -2\}$ to improve synchronization. Five-level Pulse Amplitude Modulation (PAM5) is employed for transmission over each wire pair. The modulation rate of 125 MBaud matches the GMII clock rate of 125 MHz and results in a symbol period of 8 ns.

161.   In para 40.1.3, D2 describes that 1000BASE-T uses full-duplex transmission over four cable pairs, where each of four data symbols $A_n, B_n, C_n, D_n$ are <u>quinary</u> symbols, i.e. they can each take five values from the set {2, 1, 0, -1, -2}. Idle symbols are transmitted in the absence of data, whereby each idle symbol is initially restricted to the subset {2, 0, -2}. A five-stage pulse amplitude modulation (PAM5) is used for transmission. With 1000BASE-T, both the data symbols and the idle symbols are therefore <u>quinary</u> symbols, whereby the idle symbols may only assume some of the five possible values.

162.   The section of Table 40-1 in D2 reproduced by the defendant (KE, p. 38), which we show below for ease of reference, shows a mapping from <u>6-bit i</u>dle symbols ($s_{dn}$[5:0] in the second column from the left) to four <u>quinary</u> bits $T_{An}, T_{Bn}, T_{Cn}, T_{Dn}$ (in the third column from the left):

EIP Europe LLP                                                                 Page 95
Replica (technology) dated October 25, 2024

| Idle/Carrier Extension | 000000 | 0,0,0,0 | — | — | — |
| Idle/Carrier Extension | 000001 | −2,0,0,0 | — | — | — |
| Idle/Carrier Extension | 000010 | 0,−2,0,0 | — | — | — |

IEEE Std 802.3-2002, Section Three                     LOCAL AND METROPOLITAN AREA NETWORKS:

Table 40–1—Bit-to-symbol mapping (even subsets) *(continued)*

| Condition | $Sd_n[5:0]$ | $Sd_n[6:8] =$ [000]<br>$TA_n,TB_n,TC_n,$<br>$TD_n$ | $Sd_n[6:8] =$ [010]<br>$TA_n,TB_n,TC_n,$<br>$TD_n$ | $Sd_n[6:8] =$ [100]<br>$TA_n,TB_n,TC_n,$<br>$TD_n$ | $Sd_n[6:8] =$ [110]<br>$TA_n,TB_n,TC_n,$<br>$TD_n$ |
|---|---|---|---|---|---|
| Idle/Carrier Extension | 000011 | −2,−2,0,0 | — | — | — |
| Idle/Carrier Extension | 000100 | 0,0,−2,0 | — | — | — |
| Idle/Carrier Extension | 000101 | −2,0,−2,0 | — | — | — |
| Idle/Carrier Extension | 000110 | 0,−2,−2,0 | — | — | — |
| Idle/Carrier Extension | 000111 | −2,−2,−2,0 | — | — | — |
| Idle/Carrier Extension | 001000 | 0,0,0,−2 | — | — | — |
| Idle/Carrier Extension | 001001 | −2,0,0,−2 | — | — | — |
| Idle/Carrier Extension | 001010 | 0,−2,0,−2 | — | — | — |
| Idle/Carrier Extension | 001011 | −2,−2,0,−2 | — | — | — |
| Idle/Carrier Extension | 001100 | 0,0,−2,−2 | — | — | — |
| Idle/Carrier Extension | 001101 | −2,0,−2,−2 | — | — | — |
| Idle/Carrier Extension | 001110 | 0,−2,−2,−2 | — | — | — |
| Idle/Carrier Extension | 001111 | −2,−2,−2,−2 | — | — | — |

EIP Europe LLP
Replica (technology) dated October 25, 2024

Page 96

163.    For the mapping of the alleged IDLE patterns to the first quinary bit $_{TAn}$, only two of the five available (quinary) values are used, namely 0 and -2. According to the (incorrect) logic of the defendant, these should then not (as claimed) be ternary values, but <u>binary</u> values.

164.    Furthermore, according to Table 40-1, binary <u>6-bit</u> symbols (and no binary 3-bit symbols) with a least significant bit equal to 0 are also mapped to the <u>quinary</u> value 0, while binary <u>6-bit</u> symbols with a least significant bit equal to 1 are mapped to the <u>quinary</u> value -2.

165.    The figure shown in Table 40-1 of D2 therefore does not correspond to characteristics 11.3.1 and 11.3.2 at all.

166.    The defendant's assertion that the illustration shown differs from the one in the features 11.3.1 and 11.3.2 merely differ in that they are "inverse" is therefore incorrect.

167.    Thus, even an arbitrary combination of D1 and D2 does not result in all the features of claim 11. It follows directly from this that the subject-matter of claim 11 is not suggested by looking at D1 and D2 together.

## 2.      Inventive activity vis-à-vis D3 and D2

168.    The defendant's incorrect argumentation on the synopsis of D3 and D2 (KE, H.II) follows the same pattern as the argumentation on the synopsis of D1 and D2 just discussed: D3 discloses features 11 to 11.3 except for the IDLE state, while D3 discloses the mapping of IDLE patterns according to features 11.3.1 and
11.3.2 are not disclosed. However, these distinguishing features were disclosed by D2 and thus allegedly suggested.

169.    This line of argumentation already fails for the reasons given in chapter 6.1 above, because D2 does not disclose features 11.3.1 and 11.3.2 and does not suggest them. Even if the defendant's submission on the disclosure of features 11 to 11.3 by D3 were (as not) correct, the subject-matter of claim 1 of the patent in suit is therefore not obvious from a combination of D3 with D2.

170.    However, as shown below, D3 does not disclose any of the features 11.1 to 11.3 of claim 1 of the patent in suit.

171.    With regard to feature 1.1, the defendant refers to the first paragraph in section 5.3.9. in D3. This describes the general mathematical relationship between the number of binary symbols $n$ and the number of ternary symbols $m$ required for ternary coding. Contrary to the defendant's assertion, the highlighted half-sentence "*By forming blocks of n consecutive bits*..." does not disclose a conversion from a 4-bit packet stream to a 3-bit packet stream according to feature 11.1. This also applies to the "specific embodiment example" described from page 11 in D3. There, a conversion from a 4-bit packet stream to a 5-bit packet stream is shown, which is referred to as 4B/5B encoding, cf. Figure 5-29 on page 11 and in particular the second paragraph on page 12 of D3 (emphasis added):

> Die 4B/5B-Kodierung wandelt Nibble bzw. 4 Datenbits in 5-Bit-Symbole um, so dass die Länge einer Nullsequenz limitiert wird. Dadurch wird sichergestellt, dass ausreichend Takt-information im Datenstrom enthalten ist. Ausserdem wird eine gewisse DC-Freiheit erzwungen. Zusätzlich können die 16 nicht benutzten 5-Bit-Symbole zur Signalisierung und zur Fehlererkennung eingesetzt werden. In Tabelle 5-4 ist die 4B/5B-Kodiertabelle dargestellt.

172.    MII data is not mentioned at all in D3.

173.    In summary, feature 11.1 is therefore not disclosed in D3.

174.    Since D3 does not disclose feature 1.1, the scrambling of a 3-bit packet stream generated according to feature 11.1 is logically also not disclosed. The general description of a scrambler in D3 (page 9f.) therefore does not anticipate feature 11.2.

175.    Feature 11.3 is also not disclosed in D3, because the general mention of a "3B2T code" and twisted-pair cables in D3 has no reference to a 3-bit packet stream of MII data scrambled in accordance with feature 1.2. Feature 11.3 is therefore also not anticipated by D3.

176.    Since D3 (like D1) also does not anticipate any of the features 11.1 to 11.3.2 and D2 does not disclose features 11.3.1 and 11.3.2 (see para. 161-168 above), even an arbitrary combination of D3 and D2 does not therefore result in all the features of claim 11.

EIP Europe LLP                                                        Page 98
Replica (technology) dated October 25,
2024

From this follows            directly,    that        the    object    of the        claim
            11        is not            is suggested by considering D3 and D2 together.


**3.      Interim result:**

177.    It has been shown above that the subject-matter of independent claim 11 as granted is not
        suggested by the prior art. This result applies mutatis mutandis to the subject-matter of
        independent claims 1 and 9. Thus, the subject-matter of the patent in suit is based on
        inventive step.


**II.      No impermissible extension**

178.    The defendant's submission (KE, H.III.) on the alleged inadmissible extension of the patent in
        suit is based on its incorrect interpretation of claim 11 of the patent in suit, which contradicts
        both the teaching described in the original application documents and the technical
        understanding of the skilled person (see A.I. and A.II above).


**1.      Feature group 1.3 - IDLE pattern of the scrambled 3-bit packet stream**

179.    The defendant first claims that the wording "mapping binary 3-bit IDLE patterns of the
        scrambled 3-bit packet stream" in features 1.3.1 and 1.3.2 is to be understood as meaning
        that the binary 3-bit IDLE patterns go back to the MII data converted in accordance with
        feature 1.1.

180.    In other words, Defendant construes the claim to mean that MII data is also processed and
        scrambled in the IDLE state, and that the 3-bit IDLE patterns are part of the resulting
        "scrambled 3-bit packet stream" (i.e., generated based on the MII data).

181.    This interpretation is wrong for several reasons.

182.    As explained above, a state in which user data is converted, scrambled and transmitted on
        the basis of the MII data differs from an IDLE state in which no user data is  transmitted.
        With a technically correct assessment of the

EIP Europe LLP                                                                      Page 99
Replica (technology) dated October 25,
2024

claim 1 - in particular in the light of the description and the figures - the skilled person would therefore never consider the interpretation put forward by the defendant. Instead, the skilled person would recognize that the phrase "mapping binary 3-bit IDLE patterns of the scrambled 3-bit packet stream" in features 1.3.1 and 1.3.2 is to be understood as meaning that the scrambler outputs the 3-bit IDLE patterns as a 3-bit packet stream, which is consequently referred to as a "scrambled 3-bit packet stream". In the embodiment according to Fig. 7 in the patent in suit or in the original application, this 3-bit packet stream is referred to as $S_{dn}$. Paragraph [0065] of the original application describes how this 3-bit packet stream $S_{dn}$ is calculated during transmission of user data ($tx\_enable_{n-3} = 1$, highlighted in yellow below) and in the IDLE state (highlighted in turquoise below):

$$Sd_n[2] = \begin{cases} Sc_n[2] \land txd3b_n[2] \text{ if } (tx\_enable_{n-3} = 1) \\ Sc_n[2] \land 1 \text{ else if } (loc\_rcvr\_status = OK) \\ \\ Sc_n[2] \text{ else} \end{cases}$$

$$Sd_n[1:0] = \begin{cases} Sc_n[1:0] \land txd3b_n[1:0] \text{ if } (tx\_enable_{n-3} = 1) \\ Sc_n[1:0] \text{ else} \end{cases}$$

183.  The defendant itself recognizes and explains on pages 53-57 of its nullity action that a teaching corresponding to its incorrect interpretation is not described in the original application. Nevertheless, the defendant unabashedly interprets the claim without regard to - and even contrary to - the description and figures, which consequently leads to false conclusions and contradicts the well-known established case law of the Federal Supreme Court on interpretation.

184.  Even if (as is not the case) the claim were in alleged contradiction to the description and drawings, an interpretation of the claim quasi contrary to the description and drawings would not be appropriate. In this regard, reference should be made to the BGH decision *Rotorelemente* (GRUR 2015, 875) (para. 16 in excerpts, emphasis added here):

> *"The principle that, in the event of contradictions between the claim and the description, the claim takes precedence because it is the claim and not the description that defines the protected subject-matter and thus also limits its scope.*

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

EIP Europe LLP
Replica (technology) dated October 25, 2024

Page 100

> *(BGH, judgment of May 10, 2011 - X ZR 16/09, BGHZ 189, 330, para. 23 - occlusion device)* <u>*does not preclude an understanding of the patent claim from the description and drawings that differs from that conveyed by the mere wording of the claim.*</u> *The function of the description is to explain the protected invention.* <u>*In case of doubt, an understanding of the description and the claim is therefore required which does not bring the two parts of the patent specification into contradiction with each other, but rather understands them as interrelated parts of the technical teaching made available to the skilled person with the patent as a meaningful whole.*</u> *Only if and to the extent that this is not possible is the conclusion justified that parts of the description may not be used for interpretation. An interpretation of the patent claim that would result in none of the embodiments described in the patent specification being covered by the subject matter of the patent can therefore only be considered if other possible interpretations leading to the inclusion of at least part of the embodiments are necessarily ruled out or if sufficiently clear indications can be inferred from the patent claim that something is actually claimed that deviates so extensively from the description (BGH, judgment of 14 October 2014 - X ZR 35/11 October 2014 - X ZR 35/11, GRUR 2015, 159, para. 26 - Access rights)."*

185.   Thus, if the skilled person reading claim 1 (as is not the case) is subject to the defendant's (incorrect) assumption that the wording "mapping binary 3-bit IDLE patterns of the scrambled 3-bit packet stream" in features 1.3.1 and 1.3.2 could be 3-bit IDLE patterns that are part of a 3-bit packet stream generated and scrambled on the basis of MII data during the IDLE state, then it would become clear to him on reading the associated description that this interpretation would have to be rejected as contradictory and technically untenable.

186.   Thus, if the claim is correctly interpreted, the binary 3-bit IDLE patterns of the scrambled 3-bit packet stream contained in feature group 1.3 do not go beyond the original disclosure.


**2.    Characteristic group 1.3 - no inadmissible generalization**

187.   The defendant claims that the binary 3-bit IDLE patterns in the original application are not disclosed separately from "mandatory features", namely the generation of the IDLE patterns in the side stream scrambler 722 and the prior insertion of end stream delimiters (ESD), which would therefore constitute an impermissible generalization.

188.   On the one hand, this is not correct on the merits and, moreover, contradicts BGH case law with regard to the generalization of a characteristic in a claim. We

EIP Europe LLP
Replica (technology) dated October 25, 2024

Page 101

first summarize this case law and then address the plaintiff's objection on the merits.

189.   According to the case law of the Federal Court of Justice described below, it is permissible to include in the claim by way of an amendment the binary 3-bit IDLE patterns in general, and not only specifically those generated by a side stream scrambler and inserted after prior insertion of end stream delimiters.

190.   According to the established case law of the Federal Court of Justice, "*generalizations ... are generally unobjectionable if an example of an embodiment of the invention described in the application presents itself to the skilled person as an embodiment of the more general technical teaching described in the claim and this teaching in the claimed generality is already apparent to him from the application - whether in the form of a claim formulated in the application or according to the overall context of the documents - as belonging to the invention applied for*" (Federal Court of Justice, judgment of 11 February 2014 - X ZR 107/12 - BGHZ 200, 63 = GRUR 2014*, marginal no.* 1, underlining added). February 2014 - X ZR 107/12, BGHZ 200, 63 = GRUR 2014, 542 para. 24 - Kommunikationskanal, emphasis added).

191.   With this decision, the Federal Court of Justice has once again confirmed its established case law, according to which individual features from the original application documents can also be included in a claim if they are conducive to the success of the invention and the applicant - in contrast to the practice of the EPO on so-called intermediate generalizations - is not obliged to include all features of an embodiment example (cf. only BGH GRUR 2012, 475 - Elektronenstrahltherapiesystem; BGH GRUR 2012, 1125 - Polymerschaum I and already BGH GRUR 1990, 432 - Spleißkammer). The admissibility of the generalization of individual features in accordance with the "Schleifprodukt" decision just presented goes back to the "Kommunikationskanal" decision on priority right cited there. There, the Federal Court of Justice once stated that the requirement of disclosure must be applied in a way that takes into account that the determination of what is disclosed to the skilled person as an invention and what is disclosed as an embodiment of the invention is of an evaluative nature and that an unreasonable restriction of the applicant in exhausting the disclosure content of the prior application must be avoided. Therefore, it must be assumed that the applicant's interest is regularly directed towards obtaining the broadest possible protection, i.e. to present the invention in as general a manner as possible and not to limit it to examples of use. This

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

The principles of the "Kommunikationskanal" decision apply accordingly to the examination of the inadmissible amendment: On the one hand, this results from the fact that the Federal Court of Justice cited the "Kommunikationskanal" decision in the "Schleifprodukt" decision on the inadmissible amendment. Secondly, the factual connection is obvious: In both constellations, the extent to which the features of a claim are disclosed in the respective relevant documents - original application or priority pre-application - must be examined.

192. With regard to the side-stream scrambler as a "mandatory feature", the defendant refers to paragraph [0068] of the original application. However, the following is stated there (with underlining on this side):
"During an IDLE state, 3-bit binary IDLE patterns may be generated by the side stream scrambler 722."

193. Contrary to what the defendant suggests, the original application does not describe that the IDLE patterns must "necessarily" be generated by the side-stream scrambler, but only that this may or can be the case ("may be generated").

194. Regarding the insertion of End Stream Delimiters (ESDs) as a "mandatory feature" prior to the insertion of IDLE patterns, we first note that claim 1 does not have a step for inserting IDLE patterns. Rather, features 1.3.1 and 1.3.2 describe a particular mapping of binary 3-bit IDLE patterns to ternary values during an IDLE state. For this reason alone, the defendant's argumentation is misguided.

195. According to para. [0024], Figure 12 of the original application, which is highlighted in the statement of defense, merely shows a flow chart showing exemplary steps according to one embodiment of the invention:

[0024]      FIG. 12 is a flow diagram illustrating exemplary steps for extended range Ethernet line code operation, in accordance with an embodiment of the invention.

196. In the sentence quoted by the defendant in paragraph [0079] of the application, no "compulsion" is recognizable either. Rather, these are also possible, rather than forced, connections: "In step 1218, after the ESD is inserted the IDLE codes may be generated, mapped to ternary bits, and inserted into the transmission stream as disclosed in FIGS. 7-11."

EIP Europe LLP
Replica (technology) dated October 25, 2024

Page 103

197. The same applies to the cited paragraph [0071] of the original application. In the first sentence, a number of codes are mentioned, whereby the wording "and/or" does not indicate a forced connection between them (underlining added):

*"The insert SSDfESD/IDLE block 706 ja comprise suitable logic, circuitry, and/or code that <u>maY be utilized</u> to insert start-stream delimiters (SSD), end-stream delimiters (ESD), an error code, xmt error, <u>and/or</u> IDLE codes to the stream of information to be transmitted from the PHY device."*

198. There is therefore no inadmissible generalization.

3.      Features 1.3.1 and 1.3.2 - the specific mapping is revealed

199. The defendant claims that the specific mapping of IDLE patterns corresponding to features 1.3.1 and 1.3.2 was not originally disclosed for several reasons.

200. First, the defendant claims that the original application only discloses a mapping of IDLE patterns to exactly two ternary bit streams and not to any number of ternary bit streams. This is because the embodiment example in Fig. 7 and para. [0068] of the original application would only show two ternary bit streams.

201. This is not correct. Firstly, Fig. 7 shows that the two ternary bits A and B can be transmitted both in one bit stream (ABAB...) via a single line 712a and in two separate bit streams via two lines 712a, 712b. This depends on the position of the exemplary switch 710 shown in Fig. 7. To illustrate this, we show a section of Fig. 7 twice below, with the first option highlighted in green and the second option highlighted in purple:



202.   Moreover, the wording "mapping said 3-bit packet stream of MII data to one or more ternary bits streams" was already contained in all independent claims of the original application, e.g. in the original claim 8:

> 8.    A system for wired communication, the system comprising:
>
> a local PHY that enables converting Ethernet media independent interface (MII) data from a 4-bit packet stream to a 3-bit packet stream; and
>
> said local PHY enables mapping of said 3-bit packet stream of MII data to one or more ternary bits streams for communication to a remote PHY over one or more twisted-pair wires.

203.   It is thus clear that the original application is generally directed to any number of ternary bit streams, whereas Fig. 7 and para. [0068] show a specific embodiment with one or two ternary bit streams purely by way of example. For the skilled person, the generalization to any number of ternary bit streams - also for mapping the IDLE patterns - is thus directly and unambiguously disclosed in the original application. It

204.   The defendant further claims that a mapping to any bitstream of several bitstreams in the sense that not all IDLE patterns necessarily have to be mapped in the same ternary bitstream is not originally disclosed. This is because in para [0068] the mapping for all IDLE patterns is to the ternary bit "A".

205.   This assertion is also incorrect. The skilled person would not understand the claim wording to mean that mapping to an arbitrary ternary value in any bitstream can occur. Instead, under a reasonable interpretation considering the description, the skilled person would recognize that the mapping is from each IDLE pattern to a value in the same bitstream. Defendant's overly broad understanding only serves to construct an artificial objection.

206.   Furthermore, the defendant claims that a least significant bit of non-zero, which does not equal "1" was not originally revealed. Again, this is obviously an artificial objection. It should be clear to a person skilled in the art that binary bits can have two values. If one of these two possible values is zero, then it is immediate and clear to a person skilled in the art that the other value is different from zero, i.e.

is non-zero. Whether this other value is then displayed as "1", "-1", "Q" or "+" makes no difference.

**4.      Interim result:**

207.    It has been shown above that, correctly construed, the subject-matter of independent claim 1 as granted is covered by the original disclosure. This result applies mutatis mutandis to the subject-matter of independent claims 9 and 11.

208.    Since none of the stated grounds for invalidity oppose the subject-matter of independent claims 1, 9 and 11 as granted, this also applies directly to dependent claims 2 to 8, 10 and 12 to 15.

209.    The patent in suit is therefore legally valid.

Dimitri Kosenko Attorney at Law

EIP Europe LLP
Replica (technology) dated October 25, 2024

page 106

**List of attachments**

| | |
|---|---|
| **Annex EIP 9** | Applications |
| **Attachment EIP 10** | Patent Assignment |
| **Annex EIP 11/11a** | PoA Avago/German translation |
| **Annex EIP 12/12a** | PoA Broadcom/German translation |
| **Annex EIP 13/13a** | Filing 18_05_2016/German translation |
| **Annex EIP 14/14a** | Filing 15_11_2017/German translation |
| **Annex EIP** 15/15aInternet **presence** Broadcom Inc. | |
| **Annex EIP 16/16a** | Business Profile Avago Gen IP/German translation |
| **Annex EIP 17/17a** | Expert opinion Jason S. Angell/German translation |
| **Annex EIP 18/18a** | Expert opinion Mei Ling Sim/German translation |
| **Annex EIP 19** | Expert opinion Baker McKenzie Wong & Leow |
| **Appendix EIP 20** Wong & | German translation of the expert opinion of Baker McKenzie Leow |
| **Appendix EIP 21** | Certificate of Confirmation of Amalgamation |
| **Annex EIP 22** | German     German translation     Certificate     of Confirmation     of Amalgamation |
| **Annex EIP 23** | Extracts from the local commercial register |

Avago Technologies International Sales Pte. Limited ./. Tesla Germany GmbH and others - EP 733 - 7 O 4992/24 LG Munich I

# Exhibit D

EIP Europe LLP
Broadway Office
Breite Straße 29-31
40213 Düsseldorf
Germany

T  +49 (0)211 9595 8500
F  +49 (0)211 9595 8544

dusseldorf@eip.com
eip.com/litigation

Unified Patent Court
- Local Chamber Munich -
Denisstrasse 3
80335 Munich

*Electronic address for service pursuant to
Rule 13 (c) of the Rules of Procedure of the
Unified Patent Court ("VerfOEPG") to the
plaintiff's authorized representative for service
of process, Mr. Florian Schmidt-Bogatzky, at-
torney-at-law:*
*fschmidtbogatzky@eip.com*



**Rechtsanwälte**
Dr. Christof Höhne, LL.M.[1]
Florian Schmidt-Bogatzky, LL.M.[2]
Isabelle Schaller
Dr. Sebastian Fuchs
Dimitri Kosenko
Schi-Hwa Chae
Maximilian Häger

Florian Schmidt-Bogatzky, LL.M.
fschmidtbogatzky@eip.com
+49 211 9595 85 09

May 1, 2024

████████████████

# C O M P L A I N T

of

**Avago Technologies International Sales Pte. limited,**
1 Yishun Avenue 7, Singapore 768923, represented by
the management, ibid.

**- Plaintiff -**

Authorized representatives:

Florian Schmidt-Bogatzky, as well as all other lawyers of
EIP Europe LLP, Breite Straße 29-31, 40213 Düsseldorf,
admitted to practice in Germany

Contributing:

Dilg, Haeusler, Schindelmann Patentanwaltsgesellschaft
mbH, Leonrodstr. 58, 80636 Munich, Germany

| Bath +44 | Cardiff +44 | Denver* +1 | Düsseldorf +49 | Leeds +44 | London +44 | Stockholm** +46 |
|---|---|---|---|---|---|---|
| (0)1225 337 843 | (0)29 2023 0509 | 720-845-6065 | (0)211 9595 8500 | (0)113 245 7981 | (0)20 7440 9510 | (0)8 502 461 11 |

EIP Europe LLP is als Limited Liability Partnership (LLP - Partnerschaft mit beschränkter Haftung) unter der Registernummer OC345900 in England und Wales beim Company House registriert. Registersitz: Fairfax House, 15 Fulwood Place, London WC1V 6HU, VAT/USt. Nr. 9863 6398. EIP Europe LLP, Düsseldorf ist als deutsche Zweigniederlassung in dem Partnerschaftsregister des Amtsgerichts Essen unter der Nummer PR 3062 eingetragen. ¹Fachanwalt für gewerblichen Rechtsschutz. ²Attorney-at-Law (New York). *Büro der EIP US LLP. **Büro der EIP Sweden AB. Steuernummer 13357091153. USt Id. DE296698734

EIP Europe LLP
Lawsuit from May 1, 2024

Page 2

vs

███████████████████████████
███████████████████████████
███████████████████████████
████

**- Defendant 1 -,**

███████████████████████████
███████████████████████████
███████████████████████████
██████████████████

**- Defendant 2 -**

because                          **Patent infringement EP 1 770 912 B1)**

Language of the proceedings:                    German

Value in dispute (provisionally estimated):    ██████████████

Court costs:                     We will pay the court fees due as soon as we have recei-
                                 ved the court reference number required for payment
                                 (Rule 371 (1) of the Rules of Procedure of the Unified
                                 Patent Court, hereinafter referred to as "Rules of Proce-
                                 dure of the Unified Patent Court").

EIP Europe LLP
Lawsuit from May 1, 2024

Page 3

In the name of and on behalf of the plaintiff, we

**Complaint**

**to the Unified Patent Court**
**- Local Chamber Munich -**
**Denisstrasse 3**
**80335 Munich**

and submit the following **motions**:

I.



EIP Europe LLP                                                                Page 14
Lawsuit from May 1, 2024

**B.      The patent in suit EP 1 770 912 B1**

**I.      Formalities**

11.     The plaintiff is the sole owner of the European patent EP 1 770 912 B1 (patent in suit) entitled
        "Method and device for initializing 10BASE-T networks", a copy of the patent specification
        ("KPS") of which is available as

                                          **Annex EIP 3**

        hand over.

12.     The patent in suit is based on an application with a filing date of June 21, 2006 and claims the
        priority of the patent applications US 722677 P and US 410172. The application was published
        on April 4, 2007 and the notice of grant was published on November 5, 2008.

13.     The patent in suit is in force in Germany. We submit a current excerpt from the register of the
        German Patent and Trademark Office as

                                          **Annex EIP 4** .

14.     The patent-in-suit has not yet been the subject of proceedings before any other court or office;
        the patent-in-suit has not been subject to opposition or nullity proceedings (RoP 13.1(h)).

15.     We would already like to point out that a universal succession on the plaintiff's side has since
        taken place and is also documented in the register: With effect from October 29, 2018, Avago
        Technologies General IP (Singapore) Pte. Ltd, formerly registered (since March 15, 2017),
        was merged into the plaintiff, Avago Technologies International Sales Pte. Limited, by way of
        absorption. The plaintiff is thus the universal successor of the former patent owner, Avago
        Technologies General IP (Singapore) Pte. Ltd. As a result, the patent in suit was transferred
        to the plaintiff by way of universal succession. The amendment was published on 06.12.2018.

EIP Europe LLP
Lawsuit from May 1, 2024

Page 15

## II.  Technical background and referenced state of the art

16.  The patent-in-suit generally relates to network connections. In particular, the patent-in-suit re-
     lates to the "training" of Ethernet transceivers at the beginning of a connection setup using
     twisted pair cables (para. [0002, 0003] KPS).

17.  "Transceiver" refers to a transmitter and receiver device. According to Wikipedia, "twisted-pair
     cables" are cable types in which the wires of the electrical cables are twisted together in pairs.
     Twisted wire pairs offer better protection against electrical and magnetic interference fields
     than parallel wires (see https://de.wikipedia.org/wiki/Twisted-Pair-Kabel). "Ethernet" is a net-
     work technology by means of which communication partners or devices realized in hardware
     can communicate with each other via cable connections. This takes place, for example, via
     Local Area Network (LAN) connections. This enables data transmission between devices
     connected in a local area network. Various transmission rates are specified, e.g. 10, 100 or
     1000 megabit/s (see https://de.wikipedia.org/wiki/Ethernet). The patent in suit does not specify
     the transmission rates in its independent patent claims.

18.  The patent in suit explains in paragraph [0003] the need to develop new and advanced trans-
     mission techniques with higher transmission rates using twisted pair cables, as more and more
     devices are being connected in data networks and higher data rates are required. In this
     context, the patent in suit cites the 10Gbit/s Ethernet as an example, which was under deve-
     lopment at the time of filing.

19.  In Ethernet cable connections, there is a transmitter and receiver device (transceiver) at both
     ends of the cable. With regard to the prior art, the patent in suit emphasizes in paragraph
     [0004] that transceivers on both sides of the connection undergo a kind of "connection training"
     as part of a start-up procedure prior to data transmission. This is intended to harmonize the
     respective settings and thus enable subsequent data transmission in good quality. The start-
     up procedure can include, for example, initial synchronization, determination of transmission
     power levels, adjustment of echo and crosstalk suppressors, etc. Some such "start-up" func-
     tions can be performed quickly, depending on the intended data transmission, while others are
     less time-critical, for example in the case of signal transmission at low data rates. If the time
     factor only plays a subordinate role in the coordination and initialization between transmitter
     and receiver in an Ethernet transmission, the focus can instead be placed on reducing the
     hardware required for the procedure.

EIP Europe LLP
Lawsuit from May 1, 2024

Page 16

### III.    Technical problem and task

20.    Against the technical background described above, the technical problem underlying the patent in suit is to provide a start-up procedure for an Ethernet connection which can be carried out - even at the expense of a longer procedure duration - with shared hardware, firmware or software (KPS, para. [0004]).

### IV.    Solution

21.    To solve this technical problem, the patent in suit specifies in independent claims 7 and 1 (together with dependent claims 8 and 2) a system and a method for setting up Ethernet-based communication networks and corresponding data transmission. The inventive teaching is realized by the system described in claim 7 and the - corresponding - method mentioned in claim 1. In particular, it concerns the setting of the communication devices involved (para. [0009] KPS). Claim 7, which is of particular interest in the present case, can be reproduced in the form of a feature analysis as follows:

EIP Europe LLP
Lawsuit from May 1, 2024

Page 17

**Claim 7:**

| 7 | A system for setting up communication devices, the system comprising: |
|---|---|
| 7.1 | a transceiver enabling the periodic exchange of Physical Medium Attachment, PMA, training frames between link partners during a training period; wherein |
| 7.2 | a majority of each of the PMA training frames consists of pseudo-random known sequences used to build transceiver operations for communication between the link partners, and where |
| 7.3 | the link partners are communicatively coupled via a wired Ethernet connection. |

22.    We submit a reading copy of the above feature breakdown as

**Annex EIP 5** .

23.    The content of method claim 1 corresponds to that of claim 7, which is why claim 1 is not reproduced here in the form of a breakdown of features.

24.    The relevant expert is a graduate engineer (or an engineer with a comparable university degree) in the field of electrical engineering, has knowledge in the field of electronics and signal transmission technology and is familiar with the functionalities of Ethernet cable connections.

**V.    Interpretation of the patent in suit - claim 7 and claim 1**

25.    Both system claim 7 and method claim 1 are independent claims directed to the same teaching from a technical point of view. The following remarks on claim 7 apply to both independent claims.

26.    <u>Feature 7 </u>of claim 7 describes a system for setting up communication devices. The communication devices according to the feature are devices participating in an Ethernet connection in

EIP Europe LLP
Lawsuit from May 1, 2024

Page 18

data networks for the purpose of transmitting data, as is also apparent from feature 7.3. The devices may be transmitters or receivers of data and may be located at the respective ends of a data link (realized by cable pairs). The patent in suit also uses the terms "master" and "slave" for the communication devices by way of example (e.g. para. [0046] KPS). The embodiment example according to Fig. 1 of the patent in suit schematically shows such a system:



**FIG. 1**

27.    With reference to the further content of the claim, "master" and "slave" are each also referred to as "link partner" (e.g. paragraphs [0046] and [0048] KPS), i.e. as "link partner", by which the communication devices involved in a data link are meant. Fig. 2 is an embodiment example of such a link partner (200) with a transceiver (202). More specifically, a link partner (200) with a transceiver (202) is shown here, which has (a) a memory (216), (b) a physical block PHY (212) that provides functionalities on the physical layer and converts logical communication requests from the data link layer on the hardware layer so that electronic signals can be transmitted and received, and (c) transmitters and receivers (214a to 214h) that are connected with cable pairs for data transmission and data reception (see para. [0049, 0050]):



FIG. 2

28.    According to feature 7.1, the system has a transceiver that enables the periodic exchange of Physical Medium Attachment, PMA, training frames between link partners during a training period. A transceiver here is a device that can both send and receive data as required in the case of wired signal transmission. According to Fig. 1, both the master link partner has a transceiver (110a) and the slave link partner has a transceiver (110b). According to par. [0047] KPS, the transceivers 110a and 110b comprise logic, circuitry and/or program code that enable the transmission or reception of data between the master link partner and another link partner, e.g. the slave link partner. The transceivers enable Ethernet communication. In this embodiment example, the exchanged data is formatted according to the IEEE 802 LAN/MAN standard in accordance with section [0047] KPS.

29.    In both embodiment examples according to Fig. 1 and Fig. 2, data is transmitted via a so-called UTP cable, see section [0050] KPS. UPT stands for "Unshielded Twisted Pair", see par. [0046] KPS.

30.    According to the claim, the periodic exchange of Physical Medium Attachment, PMA, training frames between link partners (via their transceivers) during a training period should be made possible. The state diagram according to Fig. 3 illustrates different operating modes of a link

EIP Europe LLP
Lawsuit from May 1, 2024

Page 20

partner. These operating modes include a negotiation mode (auto-negotiation mode 302), a start-up mode (start-up mode 304) and a data mode (data mode 306):



**FIG. 3**

31.    In negotiation mode, for example, the method of transmission is coordinated at the so-called physical layer of the Ethernet transmission (para. [0042] KPS). In the embodiment example shown in Fig. 2, this is performed by PHY block 212.

32.    The link partners then switch to start-up mode to exchange training signals and/or control information and establish the network connection (par. [0052] KPS). Under certain circumstances, it is also possible to switch back to negotiation mode (par. [0052] KPS).

33.    Once a network connection has been established, the link partners switch to data mode and data is transferred (section [0053] KPS). Once the data transfer is complete, the link partners switch back to negotiation mode. Under certain circumstances, it is also possible to switch back to start-up mode (Para. [0054] KPS).

34.    The sophisticated exchange of PMA training frames during a training period takes place in the aforementioned start-up mode or start-up state according to the exemplary state diagram in Fig. 4. We illustrate Fig. 4 below:

EIP Europe LLP
Lawsuit from May 1, 2024



FIG. 4

35.    After termination of the negotiation mode or negotiation state (402), the PHY block (212) of a
link partner changes (via two intermediate states (404, 406) not relevant here concerning a
deactivation of the PHY block (212)) to a PMA training master state (408), provided that the
link partner is configured as a master link partner. Otherwise, the PHY block (212) changes to
a PMA training slave state (para. [0054]) KPS. The master and slave link partners then
exchange PMA training frames (par. [0055]) KPS. The PMA training frames are exchanged
periodically as required. The patent-in-suit does not contain any restrictions with regard to the
duration or frequency of the periodicity. The periodicity may concern the structure of the frames

(similar length, similar frame content, etc.). We refer to the beginning of paragraph [0056] as an example:

> **[0056]** The PMA training frames may be long, repetitive or periodic frames that comprise a pseudo random portion or sequence and an information field or InfoField, for example. The pseudo random portion may be generated from seed values determined during the auto-negotiation state 402. The PMA training frames may be 16k symbols in length and have a duration of approximately 20.48 μs, for example. The PMA training frames are mod-

36.     PMA training frames can be exchanged with a regular repetition rate, but they do not necessarily have to be, according to the patent in suit. Para. [0020] clarifies this as optional ("advantageously"):

> **[0020]** Advantageously, the method further comprises transmitting PMA training frames periodically from a slave link partner to a master link partner after said slave link partner recovers a master clock during said training period.

37.     The PMA training frames are also called PAM-2 or 2-PAM training frames in the patent in suit (see e.g. para. [0056]). This is because they are modulated by performing a 2-level pulse amplitude modulation. Para [0056] reads as follows:

> **[0056]** The PMA training frames may be long, repetitive or periodic frames that comprise a pseudo random portion or sequence and an information field or InfoField, for example. The pseudo random portion may be generated from seed values determined during the auto-negotiation state 402. The PMA training frames may be 16k symbols in length and have a duration of approximately 20.48 μs, for example. The PMA training frames are modulated using 2-level pulse amplitude modulation (2-PAM), for example. The Info Field portion of the PMA training frames comprises information that enables the Master and Slave link partners to train echo and/or near-end crosstalk cancellers, to train receivers, and to establish appropriate transmitter power levels, for example.

EIP Europe LLP
Lawsuit from May 1, 2024

Page 23

> The contents of the pseudo random portion of PMA train-
> ing frames shall be known while the contents of the In-
> foFields vary in accordance with progress in the start-up
> procedure. Processing of information in response of to
> received InfoFields need not be performed in real time.

38.    The periodic exchange of PMA training frames is also shown in Fig. 5 of the patent in suit (see below). Fig. 5 shows PMA training sequences that are exchanged at regular intervals (either in terms of time or in terms of data sequences).

39.    According to feature 7.2, a majority of each of the PMA training frames consists of pseudo-random known sequences which are used to establish transceiver operations for communication between the link partners. According to [0043] KPS, a majority of each of the PMA training frames consists of pseudo-random known sequences, in particular if, for example, an - optional - additional information field ("InfoField") of the frames is short compared to the length of the PMA training frames.

40.    According to para [0056] KPS, the PMA training frames may have a pseudo-random portion. Claims 1 and 7 call for a pseudo-random known sequence. The term "pseudo-random known sequence" by itself clarifies that the pseudo-random sequence is known to the link partners and has characteristics of substantially random sequences ([0044], [0056] KPS). Moreover, the sequence is pseudo-random and can be generated during said negotiation phase (402) based on seed values ([0056] KPS). The patent-in-suit does not contain any restrictions with regard to the length and duration of the pseudo-random sequences.

41.    The embodiment example of Fig. 5 shown below illustrates an exchange of PMA training frames between master (M) and slave (S) link partners (para. [0062]). Highlighted on this side in Fig. 5 shown below is an exemplary PMA training frame (500a) sent by the master (M) to the slave (S):

EIP Europe LLP
Lawsuit from May 1, 2024

Page 24



FIG. 5

42.    It can be seen from Fig. 5 that in the embodiment example shown, the PMA training frames (500a) are transmitted one after the other or repeatedly within a PMA training period (501) - for example of less than 2 seconds. The periodicity of the PMA training frames (500a) is illustrated in this embodiment example by their repeated sequence, whereby for reasons of clarity a number of PMA training frames are also symbolically represented by dots.

43.    According to the embodiment example of Fig. 5, each PMA training frame (500a) sent from the master (M) to the slave (S) comprises a pseudo-random section (502a) and an information field (InfoField, 504a) - already mentioned and optional in view of the independent patent claims - with information that enables the master and slave link partners to train and establish various link characteristics (such as echo and crosstalk suppressors and transmission power levels) (para. [0056] KPS). The InfoField can be encrypted (encoded) - therefore the patent specification also states that it is occasionally decoded ("occasionally decoding an InfoField", column 6, line 23 KPS). The encoding can take place via a pseudo-random known sequence. The pseudo-random part of the PMA training frames is known to both link partners (para. [0056] KPS). This can be a pseudo-random sequence of binary modulation symbols (par. [0043] KPS). The content of the information fields varies as the start-up procedure progresses.

44.    Finally, according to feature 7.3, the link partners are communicatively coupled via a wired Ethernet connection. This is illustrated by the UTP (Unshielded Twisted Pair) cable (112) in Fig. 1 of the patent in suit shown above. According to Fig. 2, the UTP cable according to one embodiment example has four wire pairs.

EIP Europe LLP
Lawsuit from May 1, 2024

Page 25

## VI.    Claims 7a to 7c and 1a to 1c

45.    Claims 7a to 7c and 1a to 1c are discussed below. These explanations relate only to the features which have been supplemented in relation to the main claims 7 and 1 as granted. With regard to the unchanged features (of the main claims as granted), we refer to the above explanations.

46.    The supplemented features (see applications) of <u>claims 7a and 1a</u> are readily recognizable to the skilled person in the original documents.

47.    Claim 7a, which has a direct reference back to the granted independent claim 7, reads as follows:

> "... wherein a PMA training frame further comprises an information field, the content of which varies as the set-up of the communication devices progresses ."

48.    This claim arises from the original application version filed on June 21, 2006, paragraph [0032] (corresponding to KPS paragraph [0056]). In this paragraph [0033], which is shown here highlighted in color, it is stated, inter alia, that a PMA training frame (in addition to the claimed pseudo-random known sequence) also has an information field. Furthermore, the penultimate sentence, which is highlighted in color, states that the content of the information field varies as the start-up progresses.

> [0032]    The PMA training frames may be long, repetitive or periodic frames that comprise a pseudo random portion or sequence and an information field or InfoField, for example. The pseudo random portion may be generated from seed values determined during the auto-negotiation state 402. The PMA training frames may be 16k symbols in length and have a duration of approximately 20.48 µs, for example. The PMA training frames are modulated using 2-level pulse amplitude modulation (2-PAM), for example. The InfoField portion of the PMA training frames comprises information that enables the Master and Slave link partners to train echo and/or near-end crosstalk cancellers, to train receivers, and to establish appropriate transmitter power levels, for example. The contents of the pseudo random portion of PMA training frames shall be known while the contents of the InfoFields vary in accordance with progress in the start-up procedure. Processing of information in response to of received InfoFields need not be performed in real time.

49.    In this context, it is obvious that the start-up relates to the setting up of the communication devices (with each other) in accordance with the claim. The term "start-up" is already used in

EIP Europe LLP
Lawsuit from May 1, 2024

Page 26

paragraph [0005] of the original application when describing the technical field of the technical teaching according to the invention. Accordingly, the start-up and thus the sophisticated setting up of the communication devices (Ethernet transceivers) involved in the Ethernet communication link comprises training of the communication devices. This is also apparent from the first sentence of paragraph [0007] of the original application, which states that the settings of the transceivers involved must be adapted to the specification of the communication link during commissioning. The transceivers or communication devices involved must therefore be set up in accordance with the claim. The new claim 7a is therefore supported by the original application.

50.     The same applies mutatis mutandis to claim 1a.

51.     The supplemented features (see applications) of <u>claims 7b and 1b</u> are also readily recognizable to the skilled person in the original documents.

52.     Claim 7b, which has a direct reference back to the granted independent claim 7, reads as follows:

> *"whereby the PMA training frames are periodically transferred from a slave link partner to a master link partner after this link partner recovers a master clock during this training period."*

53.     This claim arises from the original application version filed on June 21, 2006, p. 4, paragraph 2 (corresponding to KPS paragraphs [0020] and [0031]). The same applies mutatis mutandis to claim 1b.

54.     Finally, the supplemented features (see applications) of <u>claims 7c and 1c</u> can also be found by the skilled person in the original documents.

55.     Claim 7c, which also has a direct reference back to the granted independent claim 7, reads as follows:

> *"where the PMA training frames are modulated using two-level pulse amplitude modulation."*

56.     This claim arises from the original application version filed on June 21, 2006, para. [0032] (corresponding to KPS para. [0056]). The same applies mutatis mutandis to claim 1c.

EIP Europe LLP
Lawsuit from May 1, 2024

Page 27

## C.    Patent infringement

57.    As already mentioned, the plaintiff purchased and examined a ████████████, which was manufactured, offered and distributed in Germany. The following infringement analysis also applies to other ████ models such as the ████████████. The ████████ formed the basis for the ████████ and both vehicles consist of predominantly the same components. Wikipedia states ██████████████████████████████



58.    In addition, ████ itself provides schematics of the Ethernet connections used in the ████████ for the interested public. This is done on the ████ website at ██████████████████████ ██████████. These schematics are also used below for the proof of infringement.

59.    This case concerns the ██████████████████████ and the driving and assistance systems it contains. In this context, there are a number of relevant Ethernet communication connections between different hardware components of the ████ computer, which are located on different printed circuit boards (PCBs) in the ████ computer (see above). The structure of the communication link at least between the various hardware components or PCBs is covered by the presently asserted patent claims.

EIP Europe LLP
Lawsuit from May 1, 2024

Page 28

60.     Specifically, the ███ computer comprises a host computer which has a so-called ███████ ████████████████ as the main computing <u>unit</u> (MCU) and whose hardware components are mounted on a printed circuit board and electrically interconnected. This circuit board is herein-after referred to as the "MCU circuit board" or "██████████████". There are various relevant Ethernet connections between the hardware of the █████████ board and the hardware of other circuit boards of the ████ computer.

61.     For example, there is a relevant Ethernet connection between the █████ circuit board and the radio or entertainment system. In addition, the invention protected by the patent in suit is also used in vehicle diagnostics (for example, car mechanics connect the █████ computer to a di-agnostic computer using █████ software). As set forth in detail below, there is also an Ethernet connection in the █████ computer between the Ryzen circuit board and a hardware, which is a so-called ████████████████████████ (█████) and is also built on a circuit board. This circuit board is referred to below as the "█████ circuit board".

62.     The █████ computer enables the user to call up data on the vehicle in question. The information from the █████ computer is shown graphically on the vehicle display.

63.     The "██████████" mentioned above is specified as the infotainment processor on the vehicle display.



64.     As part of a detailed examination of the █████ computer, a circuit board with a number of electronic components or semiconductor chips was first identified. The top of this PCB is shown

in the figure below and labeled "███████████". A large number of components assembled on the PCB are labeled with numbers in this figure for better reference below.



65.    The ██████ printed circuit board (PCB) of the █████ computer contains an Ethernet chip, labeled with the ████████ in the "█████████████" shown above. This chip is an Ethernet transceiver with which, among other things, the 1000Base-T1 interface generally known in network technology for data transmission via twisted pair cables is realized. The 1000Base-T1 interface was specially developed for use in vehicles (see https://de.wikipedia.org/wiki/Ethernet). The defendants integrate the aforementioned Ethernet switch into their own Ethernet functions.

66.    The ████████████ computer also contains and uses the aforementioned ███████████ ███████████████████, which is a driver assistance system. The plaintiff has also examined the printed circuit board (PCB) of the ████████████ circuit board). It contains a chip from ████████ namely the ████████████ Ethernet PHY. This is also an Ethernet transceiver that operates according to the Ethernet IEEE 802.3bp standard (1000Base-T1). The front of the

EIP Europe LLP
Lawsuit from May 1, 2024

Page 30

██████ circuit board and the ██████ Ethernet chip, which is difficult to see in the image of the entire ██████ circuit board due to its size and is labeled with the number 22 (circled in ==yellow== below), are shown below:



67.   Functionalities relating to Ethernet in the 1000Base-T1 variant are also contained in the IEEE document 802.3bp, among others. ██████ refers to this standard in information regarding the ██████ and confirms the corresponding design:

EIP Europe LLP
Lawsuit from May 1, 2024



EIP Europe LLP
Lawsuit from May 1, 2024

Page 32



68.     The above-mentioned chips also incorporate some relevant functions of the IEEE 802.3bp Ethernet standard. IEEE 802.3bp corresponds to the 1000Base-T1 standard. The content of the claims asserted in the present case can be read in part onto the Ethernet standard. For the other features, tests by the plaintiff or a professional test facility commissioned by it have confirmed their use by the attacked embodiments. Thus, the Ethernet-capable embodiments used by the defendants make use of the teaching according to the patent in suit.

69.     Reference is also made below to some technical specifications of the IEEE 802.3bp Ethernet standard (in particular to section 97, the excerpt here with emphasis on this side), **Appendix EIP 6**:



# 97. Physical Coding Sublayer (PCS), Physical Medium Attachment (PMA) sublayer, and baseband medium, type 1000BASE-T1

## 97.1 Overview

This clause defines the type 1000BASE-T1 Physical Coding Sublayer (PCS) and type 1000BASE-T1 Physical Medium Attachment (PMA) sublayer. Together, the PCS and PMA sublayers comprise a 1000BASE-T1 Physical Layer (PHY). Provided in this clause are fully functional and electrical specifications for the type 1000BASE-T1 PCS and PMA.

The 1000BASE-T1 PHY is one of the Gigabit Ethernet family of high-speed full-duplex PHY specifications, capable of operating at 1000 Mb/s. The 1000BASE-T1 PHY is intended to be operated over a single twisted-pair copper cable, referred to as an *automotive link segment* (Type A) or *optional link segment* (Type B), defined in 97.6. The automotive link segment specifications defined in 97.6 may also be used for other applications that have similar link segment requirements. The cabling supporting the operation of the 1000BASE-T1 PHY is defined in terms of performance requirements between the attachment points [Medium Dependent Interface (MDI)], allowing implementers to provide their own cabling to operate the 1000BASE-T1 PHY as long as the normative requirements included in this clause are met.

EIP Europe LLP
Lawsuit from May 1, 2024

Page 34

I.    **Design and mode of operation of the contested embodiment**

70.    The █████████ uses an Ethernet connection between (i) the printed circuit board (PCB) of the ████ computer, hereinafter referred to as the MCU (microcontroller unit) PCB or ████ PCB, and (ii) the PCB of the aforementioned ██████████████████████████████████, a driver assistance system, hereinafter referred to as the ████ PCB. The ████ PCB uses the aforementioned ████████████████ chip, which also functions according to some specifications of the 802.3bp (1000Base-T1) standard. The ████ PCB of the ████ computer uses the above mentioned Ethernet switch ████████████████ with integrated 1000Base-T1 compatible transceiver. We reproduce below excerpts from the above-mentioned "████████████" (available on the website ██████████████████ ████) (with emphasis on the Ethernet chips and their functionalities on this side) and submit the relevant documents as **Annex EIP 7.** On ████████ you will find the schematic shown below in the relevant sections (with emphasis on this side):



71.    As can be seen from the abbreviation LHD (= Left Hand Drive), this illustration relates to a left-hand drive vehicle. The large block represents the ████ circuit board. This can be seen from the text field "████████████" at the top left. The autopilot is a driver assistance system.

EIP Europe LLP
Lawsuit from May 1, 2024

Page 35

Highlighted further down in this large block is the functionality of an Ethernet chip, which is connected to a cable running to the right. This results from the designation "█████████". The smaller block at the bottom right represents the MCU circuit board or the Ryzen circuit board. This results from the designation MCU. The designation "████████" can also be found here, meaning that an Ethernet device must also be present here. This is also connected with a cable running to the left. This means that (i) the █████ PCB (or more precisely the ██████████ chip on the █████ PCB explained above) and (ii) the MCU or █████ PCB (or more precisely the Ethernet chip on the █████ PCB - ████████████████) are Ethernet communication devices.

72.    The █████ documentation also shows a relevant Ethernet connection between the █████ computer and the "██████████████████". This connection is used by █████ mechanics when they connect a diagnostic computer to a vehicle to read and check data.

73.    There is also a relevant Ethernet connection between the █████ computer and the radio.

74.    We focus here on the first Ethernet connection within the █████ computer between (i) the host computer with its █████ circuit board and (ii) the █████ system with its █████ circuit board.

## II.    Use of claim 7 of the patent in suit

### 1.    Feature 7

*"A system for setting up communication devices, the system comprising:"*

is realized in the ██████████.

75.    The attacked embodiment, the ██████████, uses a █████ computer in which a host computer, formed on the MCU or █████ circuit board, is connected to the █████ driving assistance system, formed on the █████ circuit board, by means of an Ethernet connection. Of course, the communication devices involved must be prepared or configured for this communication to function properly. The █████ computer is therefore a system for setting up communication devices according to feature 7.

EIP Europe LLP
Lawsuit from May 1, 2024

Page 36

76.   For illustration purposes, we have reproduced below a schematic documentation from ▮▮▮
      itself (Appendix EIP 7, ▮ ▮- excerpts), which we have already shown in a similar form above.
      The MCU circuit board of the master computer with the relevant Ethernet chip is shown at the
      bottom right of the figure copied below. This is connected to the Ethernet chip on the left on
      the ▮▮▮ circuit board of the driver assistance system. The MCU circuit board and the ▮▮▮
      circuit board - each with relevant Ethernet chips - are sophisticated communication devices or
      link partners:



77.   According to ▮▮▮ own explanation (**Appendix EIP 8**), the ▮▮▮ Ethernet chip on the
      ▮▮▮ circuit board is a "Single Pair Ethernet Physical Layer Transceiver (PHY)" that imple-
      ments the Ethernet physical layer portion of the 1000BASE-T1 standard. Due to the existing
      circuits, it is able to send and receive data on a twisted pair cable:



The same naturally applies to the other Ethernet chip (No. 9 in the "███████████").

78.     The setup of the communication devices is described, for example, in sections 97.1.2.2 and 97.4.5 of the 802.3bp standard (see Appendix EIP 6). Ethernet 1000Base-T1 PHY operates on the so-called physical layer, which can also be recognized by the designation PHY. Figure 97-1 of the 802.3bp standard, shown below, shows this PHY layer, consisting of the sub-layers (i) PCS (Physical Coding Sublayer) and (ii) PMA (Physical Medium Attachment) sub-layer (emphasis on this side), whereby the latter is particularly relevant here and is therefore marked below:

EIP Europe LLP
Lawsuit from May 1, 2024

Page 38



**Figure 97–1—Relationship of 1000BASE-T1 PHY to the ISO/IEC OSI reference model
and the IEEE 802.3 Ethernet Model**

79.   According to section 97.1.2.2 of the 802.3bp standard, the two sublayers PCS and PMA (or
the Ethernet devices operating there) exchange signals to synchronize the communication de-
vices involved in the Ethernet communication, thus establishing (i.e. making operational) the
sophisticated communication devices. This is done by providing the startup functions required
for successful Ethernet 1000BASE-T1 communication operation. This synchronization mode
is also referred to as training or training mode. We reproduce relevant excerpts from section
97.1.2.2 of the 802.3bp standard (as well as the immediately preceding paragraph of section
97.1.2.1) below with emphasis on this side:

In the training mode (see 97.4.2.4), the PCS transmits and receives PAM2 training sequences to synchronize to the PHY frame, learns the data mode scrambler seed, and exchanges EEE and 1000BASE-T1 OAM capabilities. The training mode uses PAM2 encoding.

### 97.1.2.2 Physical Medium Attachment (PMA) sublayer

The 1000BASE-T1 PMA transmits/receives symbol streams to/from the PCS onto the single balanced twisted-pair and provides the clock recovery, link monitor, and the 1000BASE-T1 PHY Control function. The PMA provides full duplex communications at 750 MBd.

The PMA PHY Control function generates signals that control the PCS and PMA sublayer operations. PHY Control is enabled following the completion of Auto-Negotiation or PHY Link Synchronization and provides the start-up functions required for successful 1000BASE-T1 operation. It determines whether the PHY operates in a disabled state, a training state, or a data state where MAC frames can be exchanged between the link partners.

The Link Monitor determines the status of the underlying link channel and communicates this status to other functional blocks. A failure of the receive channel causes the data mode operation to stop and Auto-Negotiation or Link Synchronization to restart.

## 2.    Feature 7.1

*"[comprising] a transceiver that enables the periodic exchange of Physical Medium Attachment, PMA, training frames between link partners during a training period; wherein"*

is also realized by the contested embodiment.

80.    This is because the Ethernet system of the ▉▉▉ computer in question has a transceiver that enables the periodic exchange of Physical Medium Attachment, PMA, training frames between link partners during a training period.

81.    The PMA training frames are data frames that have already played a role above in connection with feature 7 and the signal exchange on the PCS and PMA sub-layers for the purpose of synchronization. This is because the Ethernet device operating on the PMA sub-layer sends and receives these training frames to and from the other Ethernet communication device (on the PMA sub-layer) with which it wishes to synchronize.

82.    In this context, as mentioned in para. [0056], the patent in suit refers to PMA-2 or 2-PAM training frames.

83.    Feature 7.1 has been incorporated into the standard in accordance with Annex EIP 6. Please
       refer to the last paragraph of section 97.1.3 (followed by the heading "97.1.1 Interfaces" in the
       next section) and to section 97.4.2.4. The aforementioned PCS (Physical Coding Sublayer)
       then generates the PMA training frames in the form of PAM2 patterns, which are sent to the
       respective link partner. These PMA training frames each contain an information field (Info-
       Field), which is transmitted to the link partner 256 times as standard. This 256-fold repetition
       fulfills the sub-characteristic "periodic" in characteristic 7.1. The sections referenced here are
       highlighted on this page:

In the training mode, the PCS generates only a PAM2 pattern with periodic embedded data that enables the
receiver at the other end to train and synchronize timing, scrambler seeds, and capabilities. The LPI mode is
enabled separately in each direction (see LPI signaling in 97.3.5). When transmitting in LPI mode, the PCS
generates zero symbols and periodically send a REFRESH pattern to keep the two PHYs synchronized (see
97.3.2.2.15).

**97.1.4 Interfaces**

**97.4.2.4 PHY Control function**

PHY Control generates the control actions that are needed to bring the PHY into a mode of operation during
which frames can be exchanged with the link partner. PHY Control shall comply with the state diagram
description given in Figure 97–26.

During PMA training (TRAINING and COUNTDOWN states in Figure 97–26), PHY Control information
is exchanged between link partners with a 12-octet InfoField, which is XORed with the first 96 bits of the
15th partial PHY frame (bits 2520 to 2615) of the PHY frame. The InfoField is also denoted IF. The link
partner is not required to decode every IF transmitted but is required to decode IFs at a rate that enables the
correct actions prior to the PAM2 to PAM3 transition.

The 12-octet InfoField shall include the fields in 97.4.2.4.2 through 97.4.2.4.8, also shown in the overview
Figure 97–20, and the more detailed Figure 97–21 and Figure 97–22. Each InfoField shall be transmitted at
least 256 times to ensure detection at link partner.

84.    The periodic PMA training also results from the following section 97.3.4.1 of Annex EIP 6.
       Here, the embedding of a last PHY frame of the respective PMA training frame in the informa-
       tion field transmitted at least 256 times as described above is specified (emphasis added):

EIP Europe LLP
Lawsuit from May 1, 2024

### 97.3.4.1 Generation of $S_n$

During PMA training, the training pattern is embedded with indicators to establish alignment to the RS-FEC block and the 15 partial PHY frames that comprise the block. The last partial PHY frame is embedded with an information field used to exchange messages between link partners. PMA training signal encoding is based on the generation, at time n, of the bit $S_n$. The first bit is inverted in the first 14 partial PHY frames of each RS-FEC block. The first 96 bits of the 15th partial PHY frame is XORed with the contents of the InfoField. Each partial PHY frame is 180 bits long, beginning at $S_n$ where ($n$ mod 180) = 0. See Equation (97–7).

85.    In addition, the plaintiff had the attacked embodiment acquired within the scope of the patent
       in suit tested, inter alia, with regard to the periodic exchange of PMA training frames within the
       meaning of feature 7.1. This examination confirmed the use of feature 7.1 by the attacked
       embodiment. In simplified terms, in the challenged embodiment, the master transceiver starts
       by transmitting PAM-2 training frames. The slave transceiver then "responds" accordingly. The
       commissioning or start-up procedure can be summarized as follows:

   1) Link Synchronization occurs via the "Master" link partner issuing a series of SEND_S
      pulses (approximately 1 μs in duration, with a 4 μs gap).
   2) Link Synchronization completes when the "Slave" link partner detects the SEND_S pulse
      and issues its own SEND_S.
   3) Link Training commences when the "Master" commences transmission of SEND_T,
      while the "Slave" remains silent.
   4) Link Training progresses as the "Master" then indicates to the "Slave" to commence
      transmissions, and the "Slave" then starts SEND_T transmission.
   5) Link Training then proceeds through the remainder of the TRAINING state, through
      COUNTDOWN, SEND_IDLE_1, SEND_IDLE_2, and then to the final SEND_DATA state
      of the PHY Control state machine.
   6) If the SEND_DATA state is reached, the Link Monitor state machine then proceeds to
      the LINK_UP state.

86.    The result of the investigation confirms the realization of feature 7.1 (yellow highlighting ad-
       ded):

EIP Europe LLP                                                                  Page 42
Lawsuit from May 1, 2024

DECODE OF FIRST 75,000 SAMPLES OF SLAVE AND MASTER SIGNALING



Figure 47 - Initial PAM-2 Training Decode

Above is at the very start of SLAVE signaling. The PAM-2 Training decode shown above is
explained as follows: The first 2 plots (DUT and TS) are the SLAVE and MASTER signals as
captured from the scope. The next 2 plots (DUT Pre-slicer and TS Pre-slicer) shows the
equalized and clock-recovered sample point for each PAM-2 symbol, prior to 'slicing'
(determining if the PAM-2 signal is "+1" or "-1") The next two plots (DUT Scr vs RxPAM2, and
TS Scr vs RxPAM2) represents whether the recovered scrambler matches with the received
PAM-2 signal, where a match does not occur, a +1 is shown, otherwise a zero is shown. During
1000BASE-T1 Training, this then identifies the Partial PHY-Frame boundaries (15 such Partial
PHY-Frames form a PHY Frame) and the 14th Partial PHY-Frame (indexed from 0) contains the
encoded value of the "InfoField". One PHY-Frame is shown here:

The InfoField encoding is then broken out in the final plots, PFC24 through CRC16.


87.    As explained below with reference to an enlarged section of Figure 47 superimposed above,
       the periodicity or periodic exchange of the PMA training frames is shown in this figure, in par-
       ticular the regular time intervals of the successive PMA training frames, each of which has a
       plurality of 14 individual PMA signals:

EIP Europe LLP
Lawsuit from May 1, 2024

Page 43



88.  The individual PMA signals are numbered consecutively in the enlarged section of Figure 47 shown here.



89.  The InfoField is transmitted after the 14th PMA signal within a PMA training frame. Due to its higher information content, it has a longer transmission time compared to a single PMA signal and therefore appears wider on the time scale in Figure 47.

90.  Specifically, a PMA training frame in the attacked embodiment thus consists of 15 partial PHY frames, which are sent at regular time intervals, and the InfoField with the training and synchronization information is always located in the 15th partial PHY frame. This means that the periodicity required by feature 7.1 is present in the exchange of frames.

### 3.    Feature 7.2

> "[wherein] a majority of each of the PMA training frames consists of pseudo-random known sequences used to construct transceiver operations for communication between link partners, and wherein"

has also been realized.

91.  This is because a large part of each of the PMA training frames consists of pseudo-random known sequences that are used to set up transceiver operations for communication between the link partners, as will be explained below:

92.    Since, according to the above-quoted chapter 97.4.2.4 of the standard, the information field has a length of 96 bits and corresponds to bits 2520-2615 of the - much longer - physical frame, it follows that, according to the example in paragraph [0043], lines 46-51 of the patent in suit, the information field is short compared to the length of the PMA training frames consisting of pseudo-random known sequences. Thus, by default, a *majority* of each of the PMA training frames consists of pseudo-random known sequences, as required by feature 7.2.

93.    The sub-feature of feature 7.2 relating to the *pseudo-random known sequences* is also realized: This is because the sophisticated training procedure using training frames (included in the 802.3bp standard) makes use of scrambling and descrambling of data sequences to bring about synchronization. Scrambling ensures that the frequency spectrum is evened out.

94.    First, the technical background of the term *pseudo-random known sequences will* be explained according to the professional understanding. Here we refer to https://en.wikipedia.org/wiki/Scramblerbeziehen, where it says:

> *A scrambler (or randomizer) can be either: 1. An algorithm that converts an input string into a seemingly* <u>random</u> *output string of the same length (e.g., by* <u>pseudorandomly</u> *selecting bits to invert), thus avoiding long sequences of bits of the same value; in this context, a randomizer is also referred to as a scrambler.*

In German:

> *A scrambler (or randomizer) can be either: 1. an algorithm that converts an input string into a seemingly* <u>random</u> *output string of the same length (e.g. by* <u>pseudorandomly</u> *selecting bits to invert), thereby avoiding long sequences of bits with the same value; in this context, a randomizer is also called a scrambler.*

95.    In the following passage of the Wikipedia quote, seed values are also mentioned.

96.    A person skilled in the art therefore knows that scrambling using seed values leads to pseudo random known sequences. The patent in suit also generates pseudo random known sequences from seed values [0056] KPS.

97.    Against this technical background, an expert can see from the following quotes that *pseudo-random known sequences are* also *generated* by default:

EIP Europe LLP                                                                    Page 45
Lawsuit from May 1, 2024

98.    Scrambling is defined in various sections of Section 97 of the Standard (emphasis added):

---

**97.1.2 Operation of 1000BASE-T1**

The 1000BASE-T1 PHY utilizes 3 level Pulse Amplitude Modulation (PAM3) transmitted at a 750 MBd rate. A 15-bit scrambler is used to improve the EMC performance. GMII TX_D, TX_EN, and TX_ER are encoded together using 80B/81B encoding, where 10 cycles of GMII data and control are encoded together

---

**97.3.4 PMA training side-stream scrambler polynomials**

The PCS Transmit function employs side-stream scrambling. If the parameter config provided to the PCS by the PMA PHY Control function via the PMA_CONFIG indication message assumes the value MASTER, PCS Transmit shall employ Equation (97–5)

---

**97.3.4.3 PMA training mode descrambler polynomials**

The PHY shall acquire descrambler state synchronization to the PAM2 training sequence and report success through scr_status. For side-stream descrambling, the MASTER PHY employs the receiver descrambler generator polynomial per Equation (97–6) and the SLAVE PHY employs the receiver descrambler generator polynomial per Equation (97–5).

---

99.    During scrambling, bits contained in a data signal are converted into a pseudo-random known
       sequence. This is exactly what is done in the PMA training frames for synchronization with
       regard to the data sequences covered by the 802.3bp standard. Figure 97-7 of the 802.3 stan-
       dard shows the scrambling process (emphasis on this side):



Figure 97–7—PCS detailed transmit bit ordering

EIP Europe LLP                                                     Page 46
Lawsuit from May 1, 2024

100.    The XOR (Exclusive Or) operation mentioned above is a logical operation that can be used to generate random numbers. This can be seen, for example, in the section of https://en.wikipedia.org/wiki/Exclusive_or#Bitwise_operation shown here.

> Similarly, XOR can be used in generating entropy pools for hardware random number generators. The XOR operation preserves randomness, meaning that a random bit XORed with a non-random bit will result in a random bit. Multiple sources of potentially random data can be combined using XOR, and the unpredictability of the output is guaranteed to be at least as good as the best individual source.[18]

101.    When generating random numbers in accordance with the 802.3bp standard, such an Exclusive Or function is obviously used, as shown in Figure 97-7 of the 802.3 standard shown above.

102.    In the attacked embodiment, the pseudo-random known sequences are also used to establish transceiver operations for communication between the link partners. This follows straightforwardly from section 97.1.3 of the 802.3bp standard (emphasis on this side):

---

**97.1.3 Signaling**

The PHY may operate in three basic modes: the normal data mode, the training mode, or an optional LPI mode.

In the normal data mode, PCS generates symbols that represent data, control, or idles for transmission by the PMA.

In the training mode, the PCS generates only a PAM2 pattern with periodic embedded data that enables the receiver at the other end to train and synchronize timing, scrambler seeds, and capabilities. The LPI mode is enabled separately in each direction (see LPI signaling in 97.3.5). When transmitting in LPI mode, the PCS generates zero symbols and periodically send a REFRESH pattern to keep the two PHYs synchronized (see 97.3.2.2.15).

---

103.    We also refer to the bridge sections 97.1.2.1 and 97.1.2.2:

---

In the training mode (see 97.4.2.4), the PCS transmits and receives PAM2 training sequences to synchronize to the PHY frame, learns the data mode scrambler seed, and exchanges EEE and 1000BASE-T1 OAM capabilities. The training mode uses PAM2 encoding.

**97.1.2.2 Physical Medium Attachment (PMA) sublayer**

The 1000BASE-T1 PMA transmits/receives symbol streams to/from the PCS onto the single balanced twisted-pair and provides the clock recovery, link monitor, and the 1000BASE-T1 PHY Control function. The PMA provides full duplex communications at 750 MBd.

---

104.    The training frames and their data are then exchanged between the link partners in the PCS and the PMA sub-layer and synchronization is performed using scrambling.

EIP Europe LLP                                                                                    Page 47
Lawsuit from May 1, 2024

105.  Furthermore, we refer to the following section from chapter "97.3.2.2.12 PCS scrambler" of the
      IEEE 802.3bp standard, in which "seed values" are specified that are used for scrambling on
      the PCS.

> The initial seed values for the MASTER and SLAVE scramblers are left to the implementor. The seed values
> shall be non-zero and shall be transmitted during the InfoField exchange. (See 97.4.2.5.5). The scrambler is
> run continuously on all RS frame output bits.

106.  This is also in line with the following paragraph [0056] of KPS, which also describes "seed
      values" for the generation of pseudo-random sequences (emphasis on this side).

> [0056]  The PMA training frames may be long, repeti-
> tive or periodic frames that comprise a pseudo random
> portion or sequence and an information field or InfoField,
> for example. The pseudo random portion may be gener-
> ated from seed values determined during the auto-nego-
> tiation state 402. The PMA training frames may be 16k

107.  This corresponds - once again - with the previously quoted section 97.1.2.1, which specifies a
      sophisticated, pseudo-random known sequence. The link partner then learns the start values
      (seeds) for the pseudo-random sequence, among other things:

> In the training mode (see 97.4.2.4), the PCS transmits and receives PAM2 training sequences to synchronize
> to the PHY frame, learns the data mode scrambler seed, and exchanges EEE and 1000BASE-T1 OAM
> capabilities. The training mode uses PAM2 encoding.

**4.    Feature 7.3**

      *"[and whereby] the link partners are communicatively coupled via a wired Ethernet
      connection."*

has finally been realized.

108.  This is because the link partners communicate via a wired Ethernet connection. We have al-
      ready described the Ethernet connection between the Ethernet chips used by ▮▮▮▮ regarding

EIP Europe LLP
Lawsuit from May 1, 2024

Page 48

the 1000Base-T1 connection above. In the following, we reproduce the relevant excerpt from the ▇▇▇▇▇▇▇▇▇▇, Appendix EIP 7, ▇▇▇ - Excerpts (emphasis on this side):



109.   The sophisticated wired Ethernet connection is marked here with two thick red arrows.

110.   In addition, two photos of the attacked model taken from the purchased ▇▇▇ vehicle are shown for illustration purposes. You can see the Ethernet cable (twisted pair cable) with a white and a black plug, which connects two circuit boards of the ▇▇▇ computer with each other in terms of data technology:

EIP Europe LLP
Lawsuit from May 1, 2024



111.    The contested embodiment makes use of all the features of claim 7. This also applies to the features of the technically corresponding claim 1.

**Evidence**: Expert opinion.

### III.    Direct use of the further asserted, granted claims

112.    The other **claims** asserted **8**

> *"[whereby] each of the periodically transmitted PMA training frames has a further part for exchanging parameters and control information."*

and **10**

> *"[wherein] the further part for exchanging parameters and control information comprises one or more of a current power backoff, PBO, field, a next PBO field, a requested PBO field, a transition count field, and at least one control field."*

are also used directly according to the meaning of the word. This is because parameters and control information are also transferred or exchanged in the PMA training frame for the PHY layer (or in another part of the frame). In this context, we again refer to the 802.3bp standard, section 97.4.2.4 ("PHY control function"), which we again show here with the corresponding highlighting on this page.

#### 97.4.2.4 PHY Control function

PHY Control generates the control actions that are needed to bring the PHY into a mode of operation during which frames can be exchanged with the link partner. PHY Control shall comply with the state diagram description given in Figure 97–26.

During PMA training (TRAINING and COUNTDOWN states in Figure 97–26), PHY Control information is exchanged between link partners with a 12-octet InfoField, which is XORed with the first 96 bits of the 15th partial PHY frame (bits 2520 to 2615) of the PHY frame. The InfoField is also denoted IF. The link partner is not required to decode every IF transmitted but is required to decode IFs at a rate that enables the correct actions prior to the PAM2 to PAM3 transition.

The 12-octet InfoField shall include the fields in 97.4.2.4.2 through 97.4.2.4.8, also shown in the overview Figure 97–20, and the more detailed Figure 97–21 and Figure 97–22. Each InfoField shall be transmitted at least 256 times to ensure detection at link partner.

113.    It is therefore explicitly described here that control information and parameters (for the PHY layer) are also exchanged between the two (future) Ethernet communication partners (in

EIP Europe LLP
Lawsuit from May 1, 2024

another part of the PMA training frames) during PMA training. This is because the PMA training frames have an info field that transmits this control information and parameters (control actions). Claim 8 is thus realized.

**Evidence**: Expert opinion.

114.  Claim 10, which is also asserted, is also realized. This is because the InfoField already identified above as a further part of the PMA training frame with regard to claim 8 in any case contains the variant mentioned at the end of claim 10, namely "at least one control field". According to the IEEE 802.3bp standard (Annex EIP 6), the InfoField consists of 12 fields (12 octets). According to section 9.4.2.4, it looks as follows:

The 12-octet InfoField shall include the fields in 97.4.2.4.2 through 97.4.2.4.8, also shown in the overview Figure 97–20, and the more detailed Figure 97–21 and Figure 97–22. Each InfoField shall be transmitted at least 256 times to ensure detection at link partner.

| octet 1 | octet 2 | octet 3 | octets 4/5/6 | octet 7 | octets 8/9/10 | | | octets 11/12 |
|---------|---------|---------|--------------|---------|---------------|---|---|--------------|
| 0xBB | 0xA7 | 0x00 | PFC24 | Message | MSG24 | MSG24 | MSG24 | CRC16 |

**Figure 97–20—InfoField format**

PMA_state = 00

| octet 1 | octet 2 | octet 3 | octets 4/5/6 | octet 7 | octets 8/9/10 | octets 11/12 |
|---------|---------|---------|--------------|---------|---------------|--------------|
| 0xBB | 0xA7 | 0x00 | PFC24 | Message | SeedUsrCfgCap | CRC16 |

**Figure 97–21—InfoField TRAINING format**

PMA_state = 01

| octet 1 | octet 2 | octet 3 | octets 4/5/6 | octet 7 | octets 8/9/10 | octets 11/12 |
|---------|---------|---------|--------------|---------|---------------|--------------|
| 0xBB | 0xA7 | 0x00 | PFC24 | Message | DataSwPFC24 | CRC16 |

**Figure 97–22—InfoField COUNTDOWN format**

115.  According to the text above Figs. 97-20 to 22, the 12-octet InfoField contains the other fields shown and discussed in sections 97.4.2.4.2 to 97.4.2.4.8. These include a message field (see 97.4.2.4.4). This message field includes an indicator "PMA_state<7:6>", which comprises two

EIP Europe LLP                                                                                    Page 52
Lawsuit from May 1, 2024

states "00" and "01". This indicator is used, for example, to signal the state of the transmitting transceiver to the respective link partner. In accordance with the patent in suit, for example in paragraphs [0019], [0030], the link partners are also referred to here in technical jargon as "master" and "slave".

116.    The complete formats for the message fields of the master and slave are shown in Tables 97-7 and 97-8. "Any other value shall not be transmitted and shall be ignored at the receiver". This makes it clear that the idem message field is a control field within the meaning of claim 10. We reproduce the relevant section 97.4.2.4.4 below:

### 97.4.2.4.4 Message Field

Message Field (1 octet). For the MASTER, this field is represented by Oct7{PMA_state<7:6>, loc_rcvr_status<5>, en_slave_tx<4>, reserved<3:0>}. For the SLAVE, this field is represented by Oct7{PMA_state<7:6>, loc_rcvr_status<5>, timing_lock_OK<4>, reserved<3:0>}.

The two state-indicator bits PMA_state<7:6> shall communicate the state of the transmitting transceiver to the link partner. PMA_state<7:6> = 00 indicates TRAINING, and PMA_state<7:6> = 01 indicates COUNTDOWN.

All possible Message Field settings are listed in Table 97–7 for the MASTER and Table 97–8 for the SLAVE. Any other value shall not be transmitted and shall be ignored at the receiver. The Message Field setting for the first transmitted PMA frame shall be the first row of Table 97–7 for the MASTER and the first or second row of Table 97–8 for the SLAVE. Moreover, for a given Message Field setting, the next Message Field setting shall be the same Message Field setting or the Message Field setting corresponding to a row below the current setting. When loc_rcvr_status = OK the InfoField variable is set to loc_rcvr_status<5> = 1 and set to 0 otherwise.

#### Table 97–7—InfoField message field valid MASTER settings

| PMA_state<7:6> | loc_rcvr_status | en_slave_tx | reserved | reserved | reserved | reserved |
|---|---|---|---|---|---|---|
| 00 | 0 | 0 | 0 | 0 | 0 | 0 |
| 00 | 0 | 1 | 0 | 0 | 0 | 0 |
| 00 | 1 | 1 | 0 | 0 | 0 | 0 |
| 01 | 1 | 1 | 0 | 0 | 0 | 0 |

EIP Europe LLP                                                                    Page 53
Lawsuit from May 1, 2024

| PMA_state<7:6> | loc_rcvr_status | timing_lock_OK | reserved | reserved | reserved | reserved |
|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| 00 | 0 | 0 | 0 | 0 | 0 | 0 |
| 00 | 0 | 1 | 0 | 0 | 0 | 0 |
| 00 | 1 | 1 | 0 | 0 | 0 | 0 |
| 01 | 1 | 1 | 0 | 0 | 0 | 0 |

Table 97–8—InfoField message field valid SLAVE settings

## IV.    Realization of claims 7a to 7c and 1a to 1c

117.    According to claim 7a, it is specified that "... a PMA training frame further comprises an information field, the content of which varies as the setup of the communication devices progresses." In this context, we refer to Chapter 97.4.2.4 of the standard (Appendix EIP 6), where, for example, two different formats for the information field are defined with Figures 97-21 and 97-22 shown here (color coding added).



PMA_state = 00

| octet 1 | octet 2 | octet 3 | octets 4/5/6 | octet 7 | octets 8/9/10 | octets 11/12 |
|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| 0xBB | 0xA7 | 0x00 | PFC24 | Message | SeedUsrCfgCap | CRC16 |

Figure 97–21—InfoField TRAINING format

PMA_state = 01

| octet 1 | octet 2 | octet 3 | octets 4/5/6 | octet 7 | octets 8/9/10 | octets 11/12 |
|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| 0xBB | 0xA7 | 0x00 | PFC24 | Message | DataSwPFC24 | CRC16 |

Figure 97–22—InfoField COUNTDOWN format

118.    The "TRAINING" information field contains an entry "SeedUsrCfgCap" for octets 8/9/10, whereas the "COUNTDOWN" information field contains an entry "DataSwPFC24" for octets 8/9/10. The entry "DataSwPFC24" stands for "data switch partial PHY frame count" (see

Appendix EIP 6, section 97.4.2.4.6). The entry "SeedUsrCfgCap" is not defined in more detail in Appendix EIP 6, but obviously relates to a configuration (Cfg) for seed values (Seed). This means that the contents of the "TRAINING" and "COUNTDOWN" information fields are different.

119. The "TRAINING" and "COUNTDOWN" information fields are also assigned to different PMA states. As can be seen from Figures 97-21, the "TRAINING" information field is specifically assigned to a PMA state "00" and the "COUNTDOWN" information field is assigned to a PMA state "01".

120. The two PMA states refer to different sections of the PMA training process used to set up the communication devices:

---

**97.4.2.4 PHY Control function**

PHY Control generates the control actions that are needed to bring the PHY into a mode of operation during which frames can be exchanged with the link partner. PHY Control shall comply with the state diagram description given in Figure 97–26.

During PMA training (TRAINING and COUNTDOWN states in Figure 97–26), PHY Control information is exchanged between link partners with a 12-octet InfoField, which is XORed with the first 96 bits of the 15th partial PHY frame (bits 2520 to 2615) of the PHY frame. The InfoField is also denoted IF. The link partner is not required to decode every IF transmitted but is required to decode IFs at a rate that enables the correct actions prior to the PAM2 to PAM3 transition.

The 12-octet InfoField shall include the fields in 97.4.2.4.2 through 97.4.2.4.8, also shown in the overview Figure 97–20, and the more detailed Figure 97–21 and Figure 97–22. Each InfoField shall be transmitted at least 256 times to ensure detection at link partner.

---

121. In Section 97.4.5 of the standards (Annex EIP 6), Figure 97-26 shows a state diagram according to which a "TRAINING" state is assumed to occur before a "COUNTDOWN" state. For better illustration, the state diagram according to Figure 97.4.5 is shown here (highlighted in color).

97.4.5 State diagrams



Figure 97–26—PHY Control state diagram

122.    Claim 1a has also been realized accordingly.

123.    According to <u>claim 7b</u>, it is specified that "... the PMA training frames are periodically transfer-
        red from a slave link partner to a master link partner after the slave link partner recovers a
        master clock during that training period."

124.  In clear terms, this means that the slave link partner can only send the PMA training frames to
      the master link partner if the slave link partner has previously *recovered* the master *clock*.
      Figure 97-19 of EIP 6, shown below, shows that a "recovered_clock" signal is only output to a
      "PMA TRANSMIT" block after the clock has been recovered in a "Clock Recovery" block, which
      is then responsible for transmitting the PMA training frames.

The interface between PMA and the baseband medium is the Medium Dependent Interface (MDI), which is
specified in 97.7.



NOTE—The recovered_clock arc is shown to indicate delivery of the recovered clock signal back to PMA TRANSMIT for loop timing.

**Figure 97–19—PMA reference diagram**

125.  In this context, we also refer first of all to chapters 97.1.2 and 97.1.2.2 of the standard (Appen-
      dix EIP 6). Chapter 97.1.2 (on page 60) specifies that each Ethernet PHY (circuit) can operate

EIP Europe LLP                                                                          Page 57
Lawsuit from May 1, 2024

either as a master or as a slave. The master uses a local clock to determine the timing of transmission operations. The slave recovers this clock and uses it to determine its send operations (emphasis added):

A 1000BASE-T1 PHY shall be capable of operating as MASTER or SLAVE, per runtime configuration. A MASTER PHY uses a local clock to determine the timing of transmitter operations. A SLAVE PHY recovers the clock from the received signal and uses it to determine the timing of transmitter operations. When Auto-Negotiation is used, the MASTER-SLAVE relationship between two devices sharing a link segment is established during Auto-Negotiation (see Clause 98). If Auto-Negotiation is not used, a MASTER-SLAVE relationship shall be established by management or hardware configuration of the PHYs. The MASTER and SLAVE are synchronized by a PHY Link Synchronization function in the PHY (see 97.4.2.6).

126.    Chapter 97.1.2.2 (at the bottom of page 61) also deals with the recovery of the clock generator (emphasis on this side):

**97.1.2.2 Physical Medium Attachment (PMA) sublayer**

The 1000BASE-T1 PMA transmits/receives symbol streams to/from the PCS onto the single balanced twisted-pair and provides the clock recovery, link monitor, and the 1000BASE-T1 PHY Control function. The PMA provides full duplex communications at 750 MBd.

127.    Please also refer to Fig. 97-2 on page 63 of EIP 6. In this block diagram, the clock recovery based on received PMA training frames is shown at the bottom right (highlighted in color).

EIP Europe LLP
Lawsuit from May 1, 2024

Page 58



NOTE 1—The recovered_clock arc is shown to indicate delivery of the received clock signal back the PMA TRANSMIT for loop timing.
NOTE 2—Signals and functions shown with dashed lines are optional.

**Figure 97–2—Functional block diagram**

128.   Section 97.2.2.2.3 (on page 68) emphasizes once again that clock generation occurs in master or slave configuration:

**97.2.2.2.3 Effect of receipt**

PCS and PMA Clock Recovery perform their functions in MASTER or SLAVE configuration according to the value assumed by the parameter configuration.

129. In addition, we refer again to sections 97.4 et seq. (beginning on page 111), which deal with "clock recovery" within the meaning of claim 7b (emphasis on this side):

### 97.4 Physical Medium Attachment (PMA) sublayer

#### 97.4.1 PMA functional specifications

The PMA couples messages from a PMA service interface specified in 97.2.2 to the 1000BASE-T1 baseband medium, specified in 97.5.

The interface between PMA and the baseband medium is the Medium Dependent Interface (MDI), which is specified in 97.7.



NOTE—The recovered_clock arc is shown to indicate delivery of the recovered clock signal back to PMA TRANSMIT for loop timing.

**Figure 97–19—PMA reference diagram**

130. Point 97.4.2.8 on page 123 of Appendix EIP 6 then explicitly states (again) that the clock recovery is linked to the PMA transmission function

### 97.4.2.8 Clock Recovery function

The Clock Recovery function shall provide a clock suitable for signal sampling so that the RS FER indicated in 97.4.2.3 is achieved. The received clock signal is expected to be stable and ready for use when training has been completed. The received clock signal is supplied to the PMA Transmit function by received_clock.

EIP Europe LLP
Lawsuit from May 1, 2024

Page 60

131.    Finally, we reference Section 97.1.3 of Exhibit EIP 6, which represents clock recovery during the training period and prior to sending the PMA Training Frames (emphasis on this side):

---

### 97.1.3 Signaling

1000BASE-T1 signaling is performed by the PCS generating continuous symbol sequences that the PMA transmits over the single twisted-pair copper cable. The signaling scheme achieves a number of objectives including the following:

a)    Algorithmic mapping from TXD<7:0> to PAM3 symbols in the transmit path

b)    Algorithmic mapping from PAM3 symbols to RXD<7:0> in the receive path

c)    Adding FEC coded data to transmit and validating data using FEC on receive

d)    Uncorrelated symbols in the transmitted symbol stream

e)    No correlation between symbol streams traveling both directions

f)    Ability to signal the status of the local receiver to the remote PHY to indicate that the local receiver is not operating reliably and requires retraining

g)    Optionally, ability to signal to the remote PHY that the transmitting PHY is entering the LPI mode or exiting the LPI mode and returning to normal power operation

The PHY may operate in three basic modes: the normal data mode, the training mode, or an optional LPI mode.

In the normal data mode, PCS generates symbols that represent data, control, or idles for transmission by the PMA.

In the training mode, the PCS generates only a PAM2 pattern with periodic embedded data that enables the receiver at the other end to train and synchronize timing, scrambler seeds, and capabilities. The LPI mode is enabled separately in each direction (see LPI signaling in 97.3.5). When transmitting in LPI mode, the PCS generates zero symbols and periodically send a REFRESH pattern to keep the two PHYs synchronized (see 97.3.2.2.15).

---

132.    Claim 7b is therefore realized (as is claim 1b).

        **Evidence**: Expert opinion.

133.    Claim 7c states that "... the PMA training frames are modulated using two-level pulse amplitude modulation."

134.    Pulse amplitude modulation (PAM) can be used at different levels. The number of levels is represented by a number after the abbreviation PAM, e.g. PAM2 for the sophisticated two-level pulse amplitude modulation. Here we now refer to the last paragraph of section 97.1.2.1 (on page 61) of the 802.3bp standard (Appendix EIP 6), with emphasis on this side:

In the training mode (see 97.4.2.4), the PCS transmits and receives PAM2 training sequences to synchronize to the PHY frame, learns the data mode scrambler seed, and exchanges EEE and 1000BASE-T1 OAM capabilities. The training mode uses PAM2 encoding.

135. There you can see the specification that the PMA training frames perform the training by using PAM2, i.e. two-level pulse amplitude modulation. Section 97.1.3 (on page 64) also comments on this (emphasis on this side):

## 97.1.3 Signaling

1000BASE-T1 signaling is performed by the PCS generating continuous symbol sequences that the PMA transmits over the single twisted-pair copper cable. The signaling scheme achieves a number of objectives including the following:

a)   Algorithmic mapping from TXD<7:0> to PAM3 symbols in the transmit path

b)   Algorithmic mapping from PAM3 symbols to RXD<7:0> in the receive path

c)   Adding FEC coded data to transmit and validating data using FEC on receive

d)   Uncorrelated symbols in the transmitted symbol stream

e)   No correlation between symbol streams traveling both directions

f)   Ability to signal the status of the local receiver to the remote PHY to indicate that the local receiver is not operating reliably and requires retraining

g)   Optionally, ability to signal to the remote PHY that the transmitting PHY is entering the LPI mode or exiting the LPI mode and returning to normal power operation

The PHY may operate in three basic modes: the normal data mode, the training mode, or an optional LPI mode.

In the normal data mode, PCS generates symbols that represent data, control, or idles for transmission by the PMA.

In the training mode, the PCS generates only a PAM2 pattern with periodic embedded data that enables the receiver at the other end to train and synchronize timing, scrambler seeds, and capabilities. The LPI mode is enabled separately in each direction (see LPI signaling in 97.3.5). When transmitting in LPI mode, the PCS generates zero symbols and periodically send a REFRESH pattern to keep the two PHYs synchronized (see 97.3.2.2.15).

136. The same applies to section 97.3.2.3 (emphasis added):

**97.3.2.3 PCS Receive function**

The PCS Receive function shall conform to the PCS 80B/81B receive state diagram in Figure 97–12 and the PCS Receive bit ordering in Figure 97–6 including compliance with the associated state variables as specified in 97.3.6.

The PCS Receive function accepts received symbols provided by the PMA Receive function via the parameter rx_symb. The PCS receiver uses knowledge of the PMA training alignment to correctly align the 81B-RS frames. The received 81B-RS frames are decoded with error correction; the framing is checked; and the 80B/81B blocks are converted to 10 data octets to obtain the signals RXD<7:0>, RX_DV, and RX_ER for transmission to the GMII.

During PMA training mode, PCS Receive checks the received PAM2 framing and signals the reliable acquisition of the descrambler state by setting the parameter scr_status to OK.

When the PCS Synchronization process has obtained synchronization, the PHY frame error rate (RFER) monitor process monitors the signal quality asserting hi_rfer if excessive PHY frame errors are detected (RS parity error). If 40 consecutive PHY frame errors are detected, the block_lock flag is de-asserted. When block_lock is asserted and hi_rfer is de-asserted, the PCS Receive process continuously accepts blocks. The PCS Receive process monitors these blocks and generates RXD<7:0>, RX_DV and RX_ER for transmission to the GMII.

When the receive channel is in training mode, the PCS Synchronization process continuously monitors PMA_RXSTATUS.indication(loc_rcvr_status). When loc_rcvr_status indicates OK, then the PCS Synchronization process accepts data-units via the PMA_UNITDATA.request primitive. It attains PHY frame and block synchronization based on the PMA training frames and conveys received blocks to the PCS Receive process. The PCS Synchronization process sets the block_lock flag to indicate whether the PCS has obtained synchronization. The PMA training sequence includes 1 bit pattern every 180 PAM2 symbols, which is aligned with the PCS partial PHY frame boundary, as well as an InfoField, which is inserted in the 15th PCS partial PHY frame. When the PCS Synchronization process is synchronized to the PHY frame boundary using this pattern, block_lock is asserted. One partial PHY frame codeword is defined to be 1/15 of a PHY frame. Fifteen partial PHY frames concatenated back to back form one PHY frame. The start of the first partial PHY frame coincides with the start of the PHY frame.

137.    Claim 7c (as well as claim 1c) is thus also realized.

   **Evidence**: court expert opinion.

## V.    Indirect use of claims 1, 2, 4 and 1a to 1c

138.    The defendants also indirectly infringe claims 1,2, 4 and 1a to 1c by offering and distributing in Germany so-called ▮ computers as part of the ▮ (and also ▮ with the Ethernet chips (which are connected to each other via Ethernet). The attacked ▮ computers use the chips which periodically exchange PMA training frames as explained. This is an essential element of the invention (cf. for the parallel German law BGH GRUR 2004, 758 - *Flügelradzähler*). By offering the process in Germany, the defendants intentionally determine their customers, who are not authorized to use it, to carry out the process in Germany.